1  XAVIER BECERRA, State Bar No. 118517
   Attorney General of California
2  KRISTIN M. DAILY, State Bar No. 186103
   Supervising Deputy Attorney General
3  WILLIAM H. DOWNER, State Bar No. 257644
   Deputy Attorney General
4   1300 I Street, Suite 125
    P.O. Box 944255
5   Sacramento, CA 94244-2550
    Telephone: (916) 324-2445
6   Fax: (916) 324-5567
    E-mail: William.Downer@doj.ca.gov
7  *Attorneys for Defendants Scott Lunardi, Kyle Foster,*
   *and Robert J. Jones*

8

9              IN THE UNITED STATES DISTRICT COURT

10            FOR THE EASTERN DISTRICT OF CALIFORNIA

11

12

13

14  **LARIOS, TIMOTHY,**                 | 2:15-cv-02451-MCE-CMK

15                          Plaintiff,

16       v.                               **MEMORANDUM OF POINTS AND**
                                          **AUTHORITIES IN SUPPORT OF**
17                                        **DEFENDANTS' MOTION FOR**
    **SCOTT LUNARDI, ET AL.,**            **SUMMARY JUDGMENT, OR IN THE**
                                          **ALTERNATIVE, MOTION FOR**
18                                        **SUMMARY ADJUDICATION**
                        Defendants.
19                                        Date:         December 19, 2019
                                          Time:         2:00 p.m.
20                                        Dept:         7
                                          Judge:        Hon. Morrison C. England, Jr.
21                                        Trial Date:   None Set
                                          Action Filed: 11/24/2015
22

23

24

25

26

27

28

Defs.' Memo. Points and Authorities in Supp. of Mot. for Summary Judgment, or in the Alternative, Summary
Adjudication (2:15-cv-02451-MCE-CMK)

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

FACTUAL SUMMARY ...................................................................................... 2

LEGAL STANDARD .......................................................................................... 9

ARGUMENT ....................................................................................................... 9

I.     The Court Should Grant Summary Judgment as to Larios's § 1983 Claim Because the CHP's Inspection of His Cell Phone Pursuant to a Workplace Misconduct Investigation Did Not Violate the Fourth Amendment. ...................... 9

     A.     Officer Larios Had No Reasonable Expectation of Privacy with Respect to His Text Message Communications with His Confidential Informant. ............................................................................ 11

          1.     CHP Departmental Policy Gave Larios Notice that His Communications with His Confidential Informant Were State Property Subject to Inspection upon Demand. .................... 12

          2.     The Criminal Defendant's Fair Trial Rights and the California Public Records Act Further Diminished Any Expectation of Privacy. .................................................................. 13

          3.     The CHP's Special Needs as a Law Enforcement Department and Employer Outweighed any Expectation of Privacy Larios Had in His Text Message Communications with CI Mellow. .................................................................. 15

     B.     The Inspection of Larios's Cell Phone Was Reasonable under the Circumstances. ................................................................................ 17

          1.     The Applicable Standard of Review is the Reasonableness Standard Because the CHP Inspected Officer Larios's Cell Phone During the Course of a Work-related Misconduct Investigation. ................................................................................ 17

          2.     Inspecting Officer Larios's Text Messages with CI Mellow Stored on His Cell Phone Was Justified at its Inception. .............. 20

               a.     The CHP had reasonable grounds to believe that Larios engaged in an inappropriate relationship with CI Mellow. ........................................................................ 21

               b.     The CHP had reasonable grounds to believe that Larios's cell phone contained text message evidence of Larios's relationship with CI Mellow. .......................... 23

          3.     The Inspection of Larios's Cell Phone Was Permissible in Scope. ............................................................................................ 25

II.     The Court Should Grant Summary Judgment as to Larios's Fourth Amendment Claim against Defendant Kyle Foster Because Kyle Foster Did Not Direct Larios to Produce His Personal Phone for Inspection or Inspect it. .............................................................................................................. 29

i

# TABLE OF CONTENTS
(continued)

                                                                                                        **Page**

III.   The Court Should Grant Summary Judgment as to Larios's Fourth
       Amendment Claims Because Defendants Are Entitled to Qualified
       Immunity. .......................................................................................................... 30

IV.    The Court Should Grant Summary Judgment on Larios's California Civil
       Code § 52.1 Claim Because He Did Not Suffer a Constitutional
       Deprivation. ....................................................................................................... 33

CONCLUSION ........................................................................................................... 34

ii

# TABLE OF AUTHORITIES

**Page**

CASES

*Adickes v. S. H. Kress & Co.*
398 U.S. 144 (1970)..........................................................................................................9

*Ashcroft v. Iqbal*
556 U.S. 662 (2009)...................................................................................................29, 30

*Barren v. Harrington*
152 F.3d 1193 (9th Cir. 1998)......................................................................................29

*Biehunik v. Felicetta*
441 F.2d 228 (2d Cir. 1971)........................................................................................15

*Brady v. Maryland*
373 U.S. 83 (1963)........................................................................................................14

*Celotex Corp. v. Catrett*
477 U.S. 317 (1986).......................................................................................................9

*City of Ontario, Cal. v. Quon*
560 U.S. 746 (2010)............................................................................................. *passim*

*City of San Jose v. Superior Court of Santa Clara*
2 Cal. 5th 608 (2017) ..................................................................................................15

*Comm'n on Peace Officer Standards & Training v. Superior Court*
42 Cal. 4th 278 (2007)..................................................................................................15

*Dible v. City of Chandler*
515 F.3d 918 (9th Cir. 2008)........................................................................................16

*Doe v. City & County of San Francisco*
835 F.Supp.2d 762 (N.D.Cal. 2011) ...........................................................................12

*Gabrielle A. v. County of Orange*
10 Cal. App. 5th 1268 (2017).......................................................................................34

*Garcetti v. Ceballos*
547 U.S. 410 (2006)......................................................................................................15

*Giglio v. U.S.*
405 U.S. 150 (1972)......................................................................................................14

iii

## TABLE OF AUTHORITIES
### (continued)

Page

*Green v. San Francisco*
    751 F.3d 1039 (9th Cir. 2014)...................................................................................31

*Guerra v. Sutton*
    783 F.2d 1371 (9th Cir. 1986)...................................................................................30

*Harlow v. Fitzgerald*
    457 U.S. 800 (1982)...................................................................................................30

*Hope v. Pelzer*
    536 U.S. 730 (2002)...................................................................................................31

*Int'l Fed'n of Prof'l & Technical Eng'rs*
    42 Cal. 4th 319 (2007) ..............................................................................................14

*Jones v. Community Redevelopment Agency*
    733 F.2d 646. (9th Cir. 1984).....................................................................................10

*Jones v. Williams*
    297 F.3d 930 (9th Cir. 2002).....................................................................................29

*Julian v. Mission Community Hospital*
    11 Cal.App.5th 360 (2017).........................................................................................34

*Kyllo v. United States*
    533 U.S. 27 (2001) .....................................................................................................11

*Leer v. Murphy*
    844 F.2d 628 (9th Cir. 1988)......................................................................................29

*Leventhal v. Knapek*
    266 F.3d 64 (2d Cir. 2001)..........................................................................................11

*Lybarger v. City of Los Angeles*
    40 Cal.3d at 822 (1985)..............................................................................................19

*Malley v. Briggs*
    475 U.S. 335 (1986)...................................................................................................30

*Manasco v. Bd. of Police Commissioners*
    No. 4:11-CV-00557-CDP (E.D. Mo. Apr. 1, 2011).............................................26, 32

*Nat'l Treasury Employees Union v. Von Raab*
    489 U.S. 656 (1989) ............................................................................................11, 16

iv

# TABLE OF AUTHORITIES
### (continued)

Page

*New Jersey v. T.L.O.*
   469 U.S. 325 (1985)....................................................................................................11

*O'Connor v. Ortega*
   480 U.S. 709 (1987)............................................................................................. *passim*

*Ramirez v. State Personnel Bd.*
   204 Cal. App. 3d 288 (1988)......................................................................................20

*Riley v. California*
   134 S.Ct. 2473 (2014) ..........................................................................................32, 33

*Romero v. Kitsap Cnty*
   931 F.2d 624 (9th Cir. 1991).....................................................................................31

*Saucier v. Katz*
   533 U.S. 194 (2001)...................................................................................................31

*TBG Ins. Servs. Corp. v. Superior Court*
   96 Cal. App. 4th 443 (2002)......................................................................................12

*U.S. v. Simons*
   206 F.3d 392 (4th Cir. 2000)...............................................................................12, 19

*Warren v. State Personnel Board*
   94 Cal. 3d 95 (1979) .................................................................................................19

*Wilson v. Beard*
   589 F.3d 651(2009)...................................................................................................14

v

Defs.' Memo. Points and Authorities in Supp. of Mot. for Summary Judgment, or in the Alternative, Summary
Adjudication (2:15-cv-02451-MCE-CMK)

## TABLE OF AUTHORITIES
### (continued)

**Page**

**STATUTES**

42 United States Code
    § 1983 ..................................................................................................................2, 9, 29

California Civil Code
    § 52.1 ...............................................................................................................2, 33, 34
    § 52.1(j) .......................................................................................................................33
    § 51.7 ..........................................................................................................................34

California Government Code
    § 3303(h) ....................................................................................................................19
    § 6250 et seq. ...............................................................................................13, 14, 15
    § 6252(e) .....................................................................................................................14
    § 6252(f) .....................................................................................................................14
    § 19572 .......................................................................................................................18
    § 19572(d) .............................................................................................................9, 17
    § 19990 .................................................................................................................9, 18

**CONSTITUTIONAL PROVISIONS**

United States Constitution Fourth Amendment ............................................... *passim*

**COURT RULES**

Federal Rules of Civil Procedure
    56 ...................................................................................................................................2
    56(c) ..............................................................................................................................9

**OTHER AUTHORITIES**

California Highway Patrol
    General Order 100.95 ...................................................................................... *passim*

vi

Defs.' Memo. Points and Authorities in Supp. of Mot. for Summary Judgment, or in the Alternative, Summary
Adjudication (2:15-cv-02451-MCE-CMK)

# INTRODUCTION

Plaintiff Timothy Larios (Officer Larios), an Officer in the California Highway Patrol (CHP), and agent in the Shasta Interagency Narcotics Task Force (SINTF), made a series of bad choices that compromised SINTF investigations, brought discredit upon himself and the CHP, and ultimately ended his career. Specifically, in or around 2014, Larios had an intimate, sexual relationship with a confidential informant, Tawnya Mellow, who had provided Officer Larios with material information about her boyfriend Nathan Santana's involvement in selling large quantities of marijuana. Officer Larios then compounded this lapse by falsely reporting to law enforcement dispatch that Mellow needed law enforcement assistance, disclosing confidential law enforcement records to Mellow, and disclosing sensitive, operational information regarding a joint state and federal investigation of a drug trafficking organization to in text messages to Mellow. Larios hid his relationship with his confidential informant by communicating with her via text message, using his personal cell phone instead of his SINTF-issued phone. In September 2014, the CHP Internal Affairs Section (IAS) initiated an administrative investigation into Officer Larios's conduct after discovering that Santana allegedly assaulted Mellow after discovering a greeting card that Larios had left on a vehicle outside Mellow's residence, in which he professed affection for Mellow.

During the course of its administrative investigation, IAS ordered Officer Larios to produce his personal cell phone for inspection of state work maintained on the phone pursuant to announced CHP policy. IAS's inspection of the Larios's cell phone revealed text message communications between Officer Larios and informant Mellow that not only confirmed Larios's illicit relationship with Mellow, but also that Larios committed a host of other misconduct, including (1) lying to his SINTF Commander about his relationship with Mellow; (2) making false reports of crime; (3) disclosing confidential law enforcement information to Mellow; and (4) conspiring with Mellow to cover up their relationship. As a result, Officer Larios was served with a Notice of Adverse Action (NOAA) recommending dismissal, yet he was subsequently permitted to retire.

1

1       Instead of taking responsibility for his egregious professional misconduct, Larios filed this

2    lawsuit, asserting that Defendants Scott Lunardi, Robert J. Jones, and Kyle Foster are civilly

3    liable under 42 U.S.C. § 1983 and the Bane Act, Cal. Civ. Code § 52.1.  Officer Larios alleges

4    that Defendants are liable under both of these statutes because they violated the Fourth

5    Amendment of the U.S. Constitution by searching his personal cell phone without a warrant.

6       But Officer Larios's lawsuit is without merit, and therefore subject to summary judgment

7    under Federal Rule of Civil Procedure 56 because the undisputed evidence shows that Defendants

8    were simply performing their jobs, and doing so within the confines of CHP policy and the Fourth

9    Amendment.  First, the search of Larios's cell phone did not violate the Fourth Amendment

10    because (1) Larios had no reasonable expectation of privacy in his text message communications

11    with CI Mellow; and (2) the search was conducted within the context of the workplace

12    misconduct investigation and was reasonable under the circumstances.  Second Defendant Foster

13    should be dismissed from this lawsuit because he did not participate in taking or searching Officer

14    Larios's personal cell phone.  Third, Defendants are entitled to qualified immunity from Larios's

15    Fourth Amendment § 1983 suit because (1) they did not violate the Fourth Amendment; and (2) it

16    was not clearly established that the Fourth Amendment prohibited CHP's search of Officer

17    Larios's cell phone for work related material—i.e. text messages with the confidential informant

18    he was suspected of having an inappropriate relationship with—within the context of the CHP's

19    work related misconduct investigation of Larios.  Third, Larios cannot establish a prima facie

20    Bane Act claim because Defendants did not interfere with his constitutional rights through

21    violence or threats of violence.  For all of these reasons, summary judgment, or in the alternative,

22    summary adjudication should be granted in Defendants' favor.

23       **FACTUAL SUMMARY**

24    Plaintiff Timothy Larios was a CHP officer assigned to SINTF in Redding, California.

25    (Defs.' Ex. 3, Second Amended Complaint (SAC) ¶¶9-10; Defs. Ex. 1, Deposition of Timothy

26    Larios (Larios Dep.) 82:10-86:8; 112:17-113:20.)  SINTF was a multi-agency task force that

27    enforced California's narcotics laws in Shasta County, California.  (Larios Dep. 85:10-86:8;

28    112:18-113:20; Declaration of Les James (James Decl.) ¶4.)  As part of his duties as a SINTF

2

1   agent, Officer Larios conducted undercover narcotics investigations, and developed confidential

2   informants to assist him in gathering information about narcotics operations in and around Shasta

3   County.  (Larios Dep. 119:1-6; 119:18-120:7; 255:24-256:15.)

4        In September 2013, Tawnya Mellow contacted SINTF to report that her "boyfriend,"

5   Nathan Santana, was involved in selling large quantities of marijuana.  (Larios Dep. 135:1-

6   139:20; Defs.' Ex. 19.)  Officer Larios responded to Mellow's report and she became his

7   confidential informant, eventually providing Officer Larios with information that enabled Officer

8   Larios to obtain a search warrant for Santana's residence. (Larios Dep. 135:1-140:10; 140:21-

9   143:2; Defs.' Exs.19-20.)  On or about November 12, 2013, Officer Larios participated in

10  executing a search warrant on Santana's residence, recovered approximately 158 pounds of

11  processed marijuana, and arrested Santana for possession of a controlled substance for sale and

12  conspiracy.  (Larios Dep. 139:24-140:18; 140:21-143:2; 144:7-145:16; 146:11-147:16, 148:4-15;

13  Defs.' Ex. 20.)

14       Between December 2013 and September 2014, Officer Larios engaged in an unprofessional,

15  physically intimate relationship with CI Mellow while the criminal prosecution of Santana arising

16  from his investigation was still pending in court.   (Larios Dep. 151:18-152:15; 153:4-13; 154:11-

17  157:14; SUF 14-16.)  During the course of this relationship Larios falsely reported to law

18  enforcement dispatch that Mellow needed law enforcement assistance, disclosed confidential

19  automated records to Mellow without authorization, and disclosed sensitive, operational

20  information regarding a joint state and federal investigation of a drug trafficking organization to

21  Mellow, lied to his SINTF commander about his relationship with Mellow, and conspired with

22  Mellow to cover up their affair, and in so doing, violated multiple CHP policies and professional

23  standards.  (Larios Dep. 86:22-102:23; 103:1-104:23; 105:8-23; 106:1-11; 106:20-109:18; 259:5-

24  264:22; 271:11-18, 272:22-273:25, 274:4-276:21; 277:19-278:14; Defs.' Exs. 7-15.)  Officer

25  Larios used his personal cell phone to communicate with CI Mellow even though SINTF issued

26  him a phone to perform SINTF business, including communicating with informants.  (SUF 7-8.)

27       In or around August 31, 2014, Officer Larios placed a greeting card addressed to Mellow

28  on a vehicle outside of Mellow's residence.  (Larios Dep. 264:23-267:25; 269:6-271:6; Defs.' Ex.

3

Defs.' Memo. Points and Authorities in Supp. of Mot. for Summary Judgment, or in the Alternative, Summary
Adjudication (2:15-cv-02451-MCE-CMK)

1  32.)  In the card, Officer Larios had handwritten messages expressing romantic interest in Mellow,

2  including the following phrases:  (1) "I love everything about you…;" (2) "Just love you so

3  much!!!"; (3) "Please know I want to spend forever with you as us !!!"; (4) "I want to make you

4  happier than you've ever been before, just like you were in Tahoe…"; (5) "I love you for who

5  you are Tawnya Rachelle and want nothing more than to unite as one!!"; (6) "Love Me!!"; and (7)

6  discussing "our walk across the bridge and kiss on the cheek shortly after your innocent text

7  "Marry Me' …."  (*Id.*)  According to a Shasta County Sheriff's report received by the CHP,

8  Mellow's boyfriend, Santana discovered the card and allegedly assaulted Mellow until she

9  revealed that Officer Larios had left the card.  (James Decl. ¶¶15-16; Declaration of Kyle Foster

10  (Foster Decl.) ¶8; Declaration of Scott Lunardi (Lunardi Decl.) ¶7; Defs.' Ex. 34.)

11       Soon after responding to the August 31, 2014 domestic violence incident at Mellow's

12  residence, Shasta County Sheriff's Office Captain Bertain and Deputy Nick Thompson met with

13  Officer Larios's supervisor, SINTF Commander Les James, and informed him about Larios's

14  then-alleged involvement in leaving the greeting card that had allegedly precipitated the August

15  31, 2014 domestic violence incident.  (James Decl. ¶¶15-16.)  In a meeting with Commander

16  James, Larios admitted to leaving the greeting card at CI Mellow's residence, visiting Lake Tahoe

17  with CI Mellow on a non-work trip, calling dispatch to request a welfare check at Mellow's

18  house, and riding his motorcycle back and forth in front of Mellow's residence while Sheriff's

19  deputies were responding to the welfare check he had requested. (James Decl. ¶19.)  Commander

20  James then informed CHP Redding Office Sergeant Greg Ziegler about Officer Larios's

21  involvement in the August 31, 2014 domestic violence incident at Mellow's residence and the

22  fact that Mellow appeared to have been Officer Larios's confidential informant in a SINTF

23  investigation of her boyfriend, Nathan Santana.  (James Decl. ¶¶18, 20.)  Officer Larios was

24  administratively reassigned to the CHP's Redding Area office. (Foster Decl. ¶¶5-9.)

25       On September 8, 2014, the CHP's Internal Affairs Section (IAS) opened an administrative

26  investigation into Larios's conduct in order to determine whether and to what extent Officer

27  Larios had an inappropriate relationship with his confidential informant, and whether it

28  jeopardized the safety of his informant or compromised any SINTF investigations.  (Declaration

4

Defs.' Memo. Points and Authorities in Supp. of Mot. for Summary Judgment, or in the Alternative, Summary
Adjudication (2:15-cv-02451-MCE-CMK)

1   of Helena Williams (Williams Decl.) ¶¶9-12; Declaration of Robert J. Jones (Jones Decl.) ¶3.)

2   IAS Investigations Lieutenant Helena Williams assigned IAS Investigators Scott Lunardi and Mel

3   Hutsell to conduct the Larios investigation.  (Williams Decl. ¶11.)

4         During the initial weeks of investigation of their investigation, Investigator Lunardi

5   reviewed:  (1) email correspondence between SINTF Commander James and federal agents

6   regarding Officer Larios's relationship with CI Mellow, and its effect on a joint state and federal

7   drug trafficking investigation that Officer Larios had been working on; (2) Shasta County

8   Sheriff's Office domestic violence criminal report re: Mellow; (3) Officer Larios's criminal

9   investigation report, and Statement of Probable Cause from his investigation of Nathan Santana;

10   and met with SINTF Commander James and Shasta County Deputy D.A. Laura Smith, the

11   prosecutor assigned to the criminal prosecution of Nathan Santana that arose from Larios's

12   investigation.  Through these initial reviews and interviews, Investigator Lunardi learned about

13   (1) Larios's investigation into Nathan Santana; (2) the greeting card/domestic violence incident

14   involving Larios's informant in the Santana Investigation, Tawnya Mellow; (3) and that Shasta

15   County District Attorney's Office dismissed the prosecution of Santana, in part because of the

16   allegations of misconduct that had surfaced against Officer Larios.  (SUF 44-52.)

17         Between September 23, and November 6, 2014, Investigator Lunardi interviewed multiple

18   witnesses, including CI Tawnya Mellow[1], Nathan Santana, SINTF Commander Les James,

19   SINTF Agents Tom Moon and Kip Kinneavy, and Shasta County Sheriff's Office Deputy

20   Meghan Bliss.  They also met informally with Assistant United States Attorney (AUSA) Michael

21   McCoy to discuss the impact that the allegations of misconduct against Officer Larios had on a

22   federal narcotics criminal investigation of a drug trafficking organization (DTO).  During this

23   period, Lunardi and Hutsell obtained and reviewed (1) the September 18, 2013 SINTF Daily

24   Intelligence Memorandum (DIM), documenting Mellow's initial tip to SINTF about Nathan

25   Santana's involvement in selling marijuana; (2) CHP and SINTF policies regarding use of

26   confidential informants; (3) closed incident reports and audio reports of Officer Larios's calls to

27

28

---

[1]  Mellow refused to speak with Investigator Lunardi again on October 22, 2014.

Defs.' Memo. Points and Authorities in Supp. of Mot. for Summary Judgment, or in the Alternative, Summary
Adjudication (2:15-cv-02451-MCE-CMK)

1    Shasta Area Safety Communications Agency (SHASCOM) to report incidents occurring at the CI

2    Mellow's residence; (4) the CalPhoto audit report for Officer Larios's inquiries regarding Tawnya

3    Mellow; (5) information from the DMV regarding Officer Larios's undercover driver's license

4    and identity; (6) Officer Larios's personnel file and performance appraisals; (7) transcripts from

5    the Shasta County Superior Court showing that the felony cases against Santana and Rudolph in

6    the narcotics prosecution that resulted from Officer Larios's investigation; and (8) dispatch audio

7    recordings of Larios's requests for service to CI Mellow's residence; and (9) the greeting card

8    that Officer Larios addressed to CI Mellow and left at CI Mellow's residence on August 31, 2014.

9    (SUF 54-73, 75-92, 94-96, 103.)

10           In addition, Lunardi and Hutsell obtained a cellular phone that SINTF issued to Officer

11   Larios to use when performing his duties as an agent of SINTF (SINTF phone) and reviewed the

12   text messages and other data contained on it to determine whether he used it to communicate with

13   CI Mellow.  (SUF 53, 74, 93, 98-101.)

14           Based on the administrative investigation conducted between September 10, 2014 and

15   October 30, 2014, the IAS developed a reasonable suspicion that Officer Larios had engaged in a

16   romantic and intimate relationship with his confidential informant Tawnya Mellow while the

17   prosecution of Nathan Santana, the target of Officer Larios's investigation and boyfriend of CI

18   Mellow, was being prosecuted.  (SUF 44-52, 54-73, 94-96, 103.)  Moreover, based on

19   Investigators Lunardi and Hutsell's investigation, with revealed that (1) Officer Larios likely used

20   his personal cell phone for work even though he was issued a cell phone by SINTF to conduct

21   SINTF business; and (2) Officer Larios used his personal cell phone to exchange text messages

22   with Mellow, communications with CI Mellow, the IAS developed a reasonable suspicion that

23   Larios used his personal phone to text Mellow, and that evidence of his relationship with Mellow

24   was likely located in texts stored on Officer Larios's personal cell phone.  (SUF 53, 74. 88, 93,

25   96-101, 104.)

26           Based on the information revealed in the investigation conducted, IAS received

27   authorization to direct Officer Larios to produce his phone for inspection of work product on it

28   pursuant to CHP General Order 100.95, which permitted CHP officers to use their personal cell

6

1    phones in the course of their duties, but notifies them that all work product stored on the personal

2    phone or device is the property of the state, which must be relinquished upon demand.  (Jones

3    Decl. ¶¶11-14; Williams Decl. ¶¶14-17; Defs.' Ex. 16.)  The IAS requested CHP's Computer

4    Crimes Investigative Unit's (CCIU) assistance to extract data from Officer Larios's personal cell

5    phone.  (Williams Decl. ¶18; Defs. Ex. 25.)  However, to limit the search to the parameters of the

6    CHP's administrative investigation, IAS Lieutenant Williams issued a memorandum directing

7    CCIU to only provide IAS with text messages between Officer Larios and CI Mellow, and

8    Larios's SINTF coworkers between September 1, 2013, and November 5, 2014.  (*Id.*)

9        On November 6, 2014, Larios was instructed to report to the Redding Area office to meet

10   with IAS investigators.  At the meeting, Lunardi directed Plaintiff to produce his personal cell

11   phone so it could be searched for official work product pursuant to CHP General Order 100.95.

12   (Larios Dep. 176:7-179:15.)  Investigator Lunardi gave Officer Larios a memorandum signed by

13   IAS Commander, Assistant Chief, R.J. Jones, which directed Larios to immediately provide his

14   cell phone to the CHP, and informed him that (1) the CHP would conduct a data extraction to

15   retrieve all work product; and (2) failure to adhere to the memorandum's direction "may result in

16   additional charges/disciplinary action."  (Larios Dep. 179:16-181:11.)  Officer Larios initially

17   refused to produce his cell phone, objecting that it contained personal and private information,

18   and offering instead to show Lunardi all CHP work product on his cell phone.  However, Officer

19   Larios ultimately produced his cell phone to Lunardi for inspection.  (Larios Dep. 181:12-182:23.)

20       After obtaining Officer Larios's cell phone, an Apple iPhone 4 with a significant crack on

21   its screen, at approximately 11:00 a.m., Lunardi and Domby met with CCIU Investigator Curtis

22   Duray to conduct the data extraction.  (Declaration of Curtis Duray (Duray Decl.) ¶¶7-8; Larios

23   Dep. 32:4-25; 231:11-232:2; Defs. Exs. 2, 45.)  Investigator Duray attempted to conduct a

24   forensic extraction of the data from Larios's cell phone using two different forensic extraction

25   devices but multiple attempts to conduct the extraction using these tools were unsuccessful.

26   (Duray Decl. ¶¶8-14.)  As a second resort, Investigators Duray, Lunardi, and Domby, accessed a

27   text message string between Larios's cell phone and CI Mellow's phone number and then

28   attempted to use a digital camera to photograph and video record the text messages while

7

1    manually scrolling though the message string.  (Duray Decl. ¶¶14-15, Defs.' Ex. 35.)  However,

2    due to the volume of text messages between Larios and Mellow within the string, the

3    investigators abandoned this manual method of inspection.  (*Id.*)

4          As a last resort, Investigator Duray created a backup of Larios's cellphone using Apple

5    iTunes that was loaded onto an Apple MacBook Pro in order to extract the requested data using a

6    different forensic extraction program.  (Duray Decl. ¶16; Duray Dep. 31:20-32:20.)  Once the

7    backup of Larios's cell phone was complete, Lunardi returned Larios's personal cell phone to the

8    CHP Redding Area Office at approximately 6:00 p.m.  (Duray Decl. ¶17; Lunardi Decl.) ¶77.)

9    Officer Larios retrieved his cell phone at approximately 6:50 p.m.  (Larios Dep. 219:12-16.)  On

10   November 12, 2014, Officer Duray transferred the backup of Officer Larios's phone to a different

11   MacBook Pro and employed a forensic tool to extract the text messages between Larios and CI

12   Mellow.  (Duray Decl. ¶¶18-20.)  Officer Duray then created a report containing the text

13   messages between Larios's cell phone and Mellow's cell phone, and any media exchanged within

14   these text messages and delivered the extraction report to IAS Investigator Lunardi.  (Duray Decl.

15   ¶20.)  No data was reviewed beyond the text messages exchanged between Officer Larios's phone

16   and CI Mellow's phone number.[2]  (Duray Decl. ¶¶22-23.)  Investigator Duray deleted the

17   backups made of Officer Larios's personal cell phone.  (Duray Decl. ¶¶18, 24.)

18         Based in part on Investigator Lunardi's review of the text messages extracted from Officer

19   Larios's cell phone, Lunardi determined that Larios:  (1) had an intimate, non-professional

20   relationship with CI Mellow; (2) falsely reported that Mellow was being held against her will and

21   was in physical danger to Shasta County law enforcement dispatchers between July and August

22   2014; (3) sent CI Mellow screenshots of closed incident reports made in relation to his July-

23   August 2014 calls to dispatch from a law enforcement database without authorization; (4) texted

24   Mellow operational details about ongoing undercover SINTF operations, including the joint

25   federal DTO investigation; (5) conspired with CI Mellow to cover up the facts and circumstances

26   _____

27        [2]  The extraction program extracted one text message from a phone number that was not
     specified in the Lieutenant Williams's memorandum, however, the extraction was in error and
     unintentional.  (Duray Decl. ¶23.)

28

8

1  of their relationship; and (6) lied to SINTF Commander Les James about the nature of his

2  relationship with CI Mellow when he spoke to James in September 2014.   (Lunardi Decl. ¶¶81,

3  85-92; Defs.' Ex. 44 at pp. 7-8, 12-14, 19-20, 22-23, 25-29, 31-34, 36-43.)

4  　　　As a result of this investigation, Officer Larios was served with a Notice of Adverse Action

5  charging him with violating Government Code section 19572, subsections (d) inexcusable neglect

6  of duty; (e) insubordination; (f) dishonesty; (o) willful disobedience; (p) misuse of state property;

7  (r) violations of Government Code section 19990; and (t) other failure of good behavior causing

8  discredit to the appointing authority or employment, and recommending the penalty of dismissal.

9  (Larios Dep. 63:16-65:15; 76:6-79:9; Defs.' Ex. 4.)  Larios was, however, permitted to retire and

10  receive his pension.  (Larios Dep. 65:16-68:10; 69:1-71:16; Defs.' Exs. 5-6.)

11  **LEGAL STANDARD**

12  　　　Summary judgment is appropriate when a party demonstrates that there is no genuine issue

13  as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R.

14  Civ. P. 56(c); *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970).

15  　　　Summary judgment should be entered against a party who fails to make a showing

16  sufficient to establish the existence of an element essential to that party's case and upon which

17  that party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

18  (1986).  "[A] complete failure of proof concerning an essential element of the nonmoving party's

19  case necessarily renders all other facts immaterial."  *Id.* at 322.  A defendant moving for summary

20  judgment may establish that it is entitled to judgment by negating an essential element of a

21  plaintiff's claim for relief or by establishing that "there is an absence of evidence to support the

22  non-moving party's case."  *Celotex*, 477 U.S. at 322.

23  **ARGUMENT**

24  I.   THE COURT SHOULD GRANT SUMMARY JUDGMENT AS TO LARIOS'S § 1983 CLAIM
       BECAUSE THE CHP'S INSPECTION OF HIS CELL PHONE PURSUANT TO A
25       WORKPLACE MISCONDUCT INVESTIGATION DID NOT VIOLATE THE FOURTH
       AMENDMENT.
26

27  　　　A claim under Section 1983 has two elements:  (1) the conduct complained of must be

28  under color of state law, and (2) the Plaintiff must have been subjected to a deprivation of

9

1    constitutional rights due to the conduct. *Jones v. Community Redevelopment Agency*, 733 F.2d

2    646, 649. (9th Cir. 1984).  In his SAC, Larios contends that Defendants violated the Fourth

3    Amendment of the Constitution by examining the text messages he exchanged with CI Mellow

4    and kept on his personal cell phone without a warrant.  (SAC ¶¶32-34; Larios Dep. 180:20-

5    188:11.)  Larios is wrong.  The CHP's search of Officer Larios's cell phone was legal under the

6    Fourth Amendment because (1) Larios had no reasonable expectation of privacy in the text

7    messages he exchanged with CI Mellow and kept on his personal cell phone; and (2) the search

8    conducted was reasonable under the workplace misconduct investigation exception to the Fourth

9    Amendment's presumptive warrant requirement.

10        The Fourth Amendment protects individuals, including government employees, against

11    unreasonable searches and seizures.  *City of Ontario, Cal. v. Quon* (*Quon*), 560 U.S. 746, 755-56

12    (2010).  While warrantless searches are ordinarily "per se unreasonable under the Fourth

13    Amendment," the Supreme Court has permitted warrantless searches in the context of "work-

14    related" investigations when the government is acting in its capacity as employer as opposed to

15    sovereign.  *O'Connor v. Ortega*, 480 U.S. 709, 725-26 (1987).  The plurality of the *O'Connor*

16    Court prescribed a two-step test for determining whether a government employer's warrantless

17    workplace search violates the Fourth Amendment.  Under that test, courts determine: (1) whether,

18    in light of "the operational realities of the workplace," a public employee has a reasonable

19    expectation of privacy; and (2) if there is a reasonable expectation of privacy, whether the search

20    was justifiable at its inception and permissible in scope.  *Quon*, 560 U.S. at 756-57, citing

21    *O'Connor* at 725-26.

22        Here, Larios's Fourth Amendment claim fails under both of these steps.  First, in light of

23    the operational realities of Larios's workplace, he had no reasonable expectation of privacy with

24    respect to his communications with his confidential informant that were stored on his private

25    phone.  Second, the inspection of his phone was reasonable because it was justified at its

26    inception and permissible in scope.

27

28

10

1    **A.   Officer Larios Had No Reasonable Expectation of Privacy with Respect to His Text Message Communications with His Confidential Informant.**

2

3    The search of Officer Larios's cell phone did not violate the Fourth Amendment because he

4    had no reasonable expectation of privacy in the text messages he exchanged with his confidential

5    informant and stored on his phone.  The Fourth Amendment protects individuals from

6    government intrusions solely upon items or places in which individuals have a "reasonable

7    expectation of privacy."  *Kyllo v. United States*, 533 U.S. 27, 33 (2001).  Without such, there can

8    be no Fourth Amendment violation.  *New Jersey v. T.L.O.*, 469 U.S. 325, 338 (1985).  If an

9    employee has no reasonable expectation of privacy, an employer's search does not violate the

10   Fourth amendment "regardless of the search's nature and scope."  *Leventhal v. Knapek*, 266 F.3d

11   64, 73 (2d Cir. 2001).  A government employee's expectation of privacy is limited by the

12   "operational realities of the workplace," and "whether an employee has a reasonable expectation

13   of privacy must be addressed on a case-by-case basis."  *O'Connor*, 480 U.S. at 717-18.

14   Operational realities may include:  (1) whether a workplace policy eliminates or diminishes

15   an employee's expectation of privacy with respect to office facilities or communications; (2) the

16   nature of the position occupied by the employee and surrounding work environment; (3) whether

17   a review of communications might be justified for other reasons, including performance

18   evaluations, litigation concerning the lawfulness of police actions, or compliance with state open

19   records laws; and (4) the state employer's special needs, such as swift, efficient and thorough

20   disciplinary investigations to ensure the integrity of a law enforcement agency's officer corps and

21   operations.  *Quon*, 560 U.S. at 758; *Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656,

22   666-671 (1989) ("requiring the Government to procure a warrant for every work-related intrusion

23   'would conflict with the common-sense realization that government officers could not function if

24   every employment decision became a constitutional matter.")

25   Here, the operational realities of Larios's employment as a CHP officer dissolved any

26   reasonable expectation of privacy Larios had in the text messages he exchanged with  CI Mellow:

27   (1) Larios chose to use his personal cell phone to communicate with CI Mellow despite CHP

28   rules informing him that such data was state property that must be relinquished on demand; (2)

11

1  Larios's role as a public employee and law enforcement agent made it likely that his

2  communications would be subject to disclosure and review; and (3) the CHP's special need to

3  maintain the integrity of its police force and operations, and the safety of its personnel via swift

4  and thorough misconduct investigations justified accessing Officer Larios's text messages with

5  his confidential informant even though they were stored on his personal cell phone.

**1.  CHP Departmental Policy Gave Larios Notice that His
Communications with His Confidential Informant Were State
Property Subject to Inspection upon Demand.**

8      An employee's expectation of privacy may be diminished through "legitimate regulation."

9  *O'Connor*, 480 U.S. at 717.  For instance, government employees have no reasonable expectation

10  of privacy in the files they download from the Internet at work where the employer's Internet

11  policy states that it will "audit, inspect, and/or monitor" employees' use of the Internet.  *U.S. v.*

12  *Simons*, 206 F.3d 392, 398-99 (4th Cir. 2000); *see also, e.g., Doe v. City & County of San*

13  *Francisco* 835 F.Supp.2d 762, 769 (N.D.Cal. 2011) (employee's reasonable expectation of

14  privacy in the content of his or her email will vary depending on the circumstances, including the

15  employer's announced policies regarding computer and email use); *and TBG Ins. Servs. Corp. v.*

16  *Superior Court,* 96 Cal. App. 4th 443, 452 (2002) (employer's computer use policy reserving the

17  right to monitor emails on a work-provided computer, and the employee's written

18  acknowledgment defeated any reasonable expectation of privacy).

19      Here, in General Order 100.95, the CHP had a written policy that put Larios on notice that

20  his text message communications with his confidential informant were state work subject to

21  relinquishment on demand.  (SUF 1, 4-6.)  Specifically, G.O. 100.95, which was entitled "On-

22  Duty Use of Cellular Telephones and Personal Electronic/Entertainment Devices" permitted

23  officers to use personal cell phones, but informed them that "work stored on any type of

24  electronic device is the property of the state and must be relinquished on demand."  (SUF 4.)

25  Larios was aware of this policy and acknowledged so in writing.  (SUF 5.)  Still, Larios elected to

26  use his personal phone to communicate with his confidential informant even though he was

27  provided a SINTF-issued phone specifically for work use.  (SUF 7-8.)  Even Larios conceded that

28  he was required to produce all of his texts with CI Mellow under G.O. 100.95.  (SUF 6.)

12

1    Officer Larios's text messages with CI Mellow constituted state work subject to disclosure

2    under G.O. 100.95 because communicating with confidential informants was part of his duties as

3    a SINTF agent.  (SUF 2-3.)  Moreover, Officer Larios's texts with CI Mellow were properly

4    classified as "work" because they arose from, and were part and parcel of a law enforcement

5    activity:  (1) Larios's relationship with CI Mellow arose solely from Mellow's role as a

6    confidential informant; (SUF 9) and (2) Officer Larios's and CI Mellow's communications were

7    material evidence to a criminal narcotics investigation into and prosecution of Nathan Santana

8    because they enabled Officer Larios to obtain a warrant authorizing the search of Santana's

9    residence, and ultimately resulted in the arrest and prosecution of Santana.  (SUF 10-11, 13, 24.)

10    Further, even if some of the texts between Mellow and Larios were not directly related to

11    the Santana investigation, their communications were inherently work-related because their

12    relationship arose from a law enforcement undertaking, and therefore were relevant to the

13    prosecution of Nathan Santana and the integrity of the CHP's personnel and operations.  For

14    example, Larios's communications with CI Mellow were material to:  (1) preparing him for trial;

15    (2) defending Larios's Statement of Probable Cause for obtaining a warrant; and (3) refreshing a

16    witness's recollection during hearing or trial.  Such information is inherently state property

17    because it was part and parcel of a law enforcement activity, and inherently reflected the integrity

18    of the Officer in charge of the investigation and the integrity of the investigation and the CHP.

19    (SUF 20-22.)  Finally, Larios's text messages with CI Mellow were evidence of the nature of the

20    relationship between an investigating agent and witness, which the CHP had an interest in

21    monitoring to ensure that the relationship did not become inappropriate in a manner that could

22    jeopardize the safety of the informant or compromise the integrity of an investigation.  (SUF 18,

23    20-22.)  In these circumstances, Larios had no reasonable expectation of privacy in the text

24    messages that he exchanged with Mellow.

25         **2.    The Criminal Defendant's Fair Trial Rights and the California
              Public Records Act Further Diminished Any Expectation of Privacy.**
26

27    Officer Larios also had no reasonable expectation of privacy in the text messages he

28    exchanged with CI Mellow because they were made in the course and scope of his duty as a CHP

13

1    officer, and were therefore inherently subject to review and oversight by his employer and various

2    public entities. *Quon*, 560 U.S. at 758. Like the officer in *Quon*, "[a]s a law enforcement officer,

3    [Larios] would or should have known that his actions were likely to come under legal scrutiny,

4    and that this might entail an analysis of his [work-related] communications." *Id.* at 762.

5         For instance, the nature of Larios's relationship with CI Mellow, and by extension, their

6    communications, would likely have been subject to discovery under *Brady v. Maryland*, 373 U.S.

7    83 (1963) (requiring the prosecution to disclose exculpatory evidence to a criminal defendant).

8    Here, CI Mellow supplied material evidence to Larios that led to a search warrant, arrest, and

9    prosecution of Nathan Santana on various narcotics charges. (SUF 10-11, 13, 24.) Thus,

10   evidence of Larios's intimate relationship with Mellow was likely discoverable under *Brady*

11   because Larios's intimate relationship with Mellow could have been used to show bias or

12   impeach Officer Larios's credibility, ethics, or judgment, in a suppression hearing or trial,

13   especially given that the target of Larios's investigation was Mellow's boyfriend Nathan Santana.

14   (SUF 20-22.). *See, e.g., Giglio v. U.S.*, 405 U.S. 150 (1972) (exculpatory evidence includes

15   evidence that can be used to impeach the credibility of a prosecution's witness); *and see Wilson v.*

16   *Beard*, 589 F.3d 651, 666-67 (2009) (prosecution's suppression of information regarding officer's

17   history of providing interest-free loans to informant witness was a material *Brady* violation).

18        Larios's communications with his confidential informant may also have been accessible to

19   the public under the California Public Records Act (CPRA), Cal. Gov't Code. § 6250 et seq.

20   Government employees in California are well aware that every government record is potentially

21   discoverable at the mere request of a member of the public, and their reasonable expectation of

22   privacy in such public records is accordingly reduced. The CPRA broadly defines a public record

23   as any "writing containing information relating to the conduct of the public's business prepared,

24   owned, used or retained by any state or local agency regardless of physical form or

25   characteristics." Cal Gov't Code § 6252(e). Such records "must be disclosed unless one of the

26   statutory exceptions applies." *Int'l Fed'n of Prof'l & Technical Eng'rs*, 42 Cal. 4th 319, 329

27   (2007). While the CPRA does provide numerous exemptions to the definition of "public record,"

28   including the "statements" and "names and addresses" of confidential informants (Cal. Gov't

14

1   Code § 6252(f)), those exemptions are "narrowly construed" and may not completely eliminate

2   public access to Larios's communications with Mellow that were not related to the underlying

3   criminal matter because they show that Larios abused public resources making unauthorized

4   disclosures of confidential law enforcement information and operations; and wasting public

5   resources by requesting law enforcement assistance at Mellow's residence based on false

6   pretenses. (SUF 14-16.)  This information could be disclosed without harming the confidentiality

7   of the informant by redacting any identifying information or sensitive law enforcement

8   information that she delivered in the course of the underlying criminal investigation.

9          Moreover, public employees cannot evade disclosure of communications regarding public

10   business under the CPRA by using their private email or communication devices to transmit or

11   store the communications.  *See City of San Jose v. Superior Court of Santa Clara*, 2 Cal.5th 608,

12   616 (2017) (employees' communications about official agency business may be subject to CPRA

13   regardless of whether public or private email account used in their preparation or transmission).

14   Thus, Larios's decision to use his cell phone to communicate with CI Mellow does not shield

15   their communications from public oversight under the CPRA.

### 3.   The CHP's Special Needs as a Law Enforcement Department and Employer Outweighed any Expectation of Privacy Larios Had in His Text Message Communications with CI Mellow.

18          Finally, the CHP's unique position as a law enforcement agency and employer, it had a

19   special need to swiftly and thoroughly administer its work-related misconduct investigations and

20   disciplinary process to ensure the safety of the public, the integrity of department, its operations,

21   and employees, and to detect and preserve evidence relevant to the investigation.  (SUF 18-19.)

22   "Public employees … often occupy trusted positions in society."  *Garcetti v. Ceballos,* 547 U.S.

23   410, 419 (2006).  In the law enforcement context, "[a] trustworthy police force is a precondition

24   of minimal social stability …."  *Biehunik v. Felicetta*, 441 F.2d 228, 230 (2d Cir. 1971).  Because

25   the police "carry upon their shoulders the cloak of authority to enforce the laws of the state,",

26   abuses within a police department have great potential for social harm. *Comm'n on Peace Officer*

27   *Standards & Training v. Superior Court*, 42 Cal.4th 278, 297-98 (2007).  Thus, the Government,

28   particularly a law enforcement agency like the CHP, has a compelling and special need to ensure

15

1    that its investigators and officers "have unimpeachable integrity and judgment." *Von Raab*, 489

2    U.S.at 670; *and see Dible v. City of Chandler,* 515 F.3d 918, 928 (9th Cir. 2008) (the public

3    legitimately holds police officers to more rigorous standards of conduct than ordinary citizens).

4         Under the circumstances, the CHP's need to determine whether Officer Larios's conduct

5    jeopardized the safety of his informant, compromised SINTF investigations, and brought discredit

6    upon the CHP, eviscerated any reasonable expectation of privacy Larios may have had in his text

7    messages with CI Mellow.  Specifically, once the CHP learned that Officer Larios left a

8    romantically worded greeting card at CI Mellow's residence, resulting in a domestic violence

9    incident between the CI Mellow and the target of Officer Larios's investigation, it had a

10   compelling need to swiftly determine whether, and to what extent (1) Officer Larios engaged in

11   an inappropriate relationship with a confidential informant; (2) Officer Larios's conduct

12   jeopardized the integrity of any investigation or prosecution; and (4) endangered the safety of CI

13   Mellow by potentially exposing her as an informant against her boyfriend.  (SUF 18.)

14        Moreover, the CHP needed to execute its investigation swiftly and efficiently to mitigate

15   any damage such misconduct may have caused and because of the one-year statute of limitations

16   applicable to investigating and disciplining peace officers in California.  (SUF 17.)  In addition,

17   as the investigation progressed, the CHP's special need to learn the full extent of Officer

18   misconduct became even more acute when investigators learned that (1) the Shasta County D.A.

19   dismissed its prosecution of Santana in part because of the misconduct allegations against Officer

20   Larios; and (2) the allegations of misconduct against Officer Larios resulted in a wiretap warrant

21   application being withdrawn in a joint state and federal investigation of a drug trafficking

22   organization.  (SUF 19.)

23        As a law enforcement agency, the CHP had a special need to swiftly detect and root out

24   misconduct within its own ranks that jeopardized the safety and integrity of its operations, and

25   brought discredit to the CHP.  Here, the allegations of misconduct against Officer Larios invoked

26   these special needs and subordinated any expectation of privacy Officer Larios had in keeping his

27   illicit relationship with a confidential informant hidden from view on his personal cell phone.   In

28   light of these special needs, and the operational realities of Officer Larios's employment with the

16

CHP, he had no reasonable expectation of privacy in the text messages he exchanged with CI Mellow and stored on his cell phone. For this reason alone, the CHP's examination of his texts with CI Mellow did not violate the Fourth Amendment.

**B.  The Inspection of Larios's Cell Phone Was Reasonable under the Circumstances.**

The CHP's search of Officer Larios's cell phone also did not violate the Fourth Amendment because it was reasonable under all of the circumstances.

**1.  The Applicable Standard of Review is the Reasonableness Standard Because the CHP Inspected Officer Larios's Cell Phone During the Course of a Work-related Misconduct Investigation.**

The Fourth Amendment only prohibits *unreasonable* searches and seizures. And while warrantless searches are ordinarily regarded as presumptively unreasonable under the Fourth Amendment, *Quon*, 560 U.S. at 760-61, one exception to the warrant requirement applies in the context of a government employer's search of employee property arising in workplace misconduct investigation:

> [P]ublic employer intrusions on the constitutionally protected privacy interests of government employees for … investigations of work-related misconduct should be judged by the standard of reasonableness under all the circumstances. Under this reasonableness standard both the inception and the scope of the intrusion must be reasonable.

*O'Connor*, 480 U.S. at 725. A government employer's warrantless search is reasonable in the context of a work-related misconduct investigation if the: (1) search is justified at its inception; and (2) is permissible in scope—i.e., the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the circumstances giving rise to the search. *Quon*, 560 U.S. at 761.

Here, the CHP inspected Larios's cell phone within the context of an administrative, workplace misconduct investigation that was initiated to determine whether and to what extent Larios engaged in an illicit relationship with a confidential informant he used to obtain a search warrant in a narcotics investigation of the informant's boyfriend. (SUF 25-30.) As a result of this investigation, Officer Larios was served with a Notice of Adverse Action charging him with violating Government Code section 19572, subsections (d) inexcusable neglect of duty; (e)

17

1   insubordination; (f) dishonesty; (o) willful disobedience; (p) misuse of state property; (r)

2   violations of Government Code section 19990; and (t) other failure of good behavior causing

3   discredit to the appointing authority or employment, and recommending the penalty of dismissal

4   from employment with the CHP. (SUF 26.) Accordingly, the *Ortega/Quon* reasonableness test

5   applies to determine whether the search was permissible under the Fourth Amendment.

6       Officer Larios alleges that a warrant was necessary because he was being criminally

7   investigated. (SAC ¶¶8, 12, 14, 19, 21.) In support of this argument, Larios alleges that IAS

8   Investigators confronted him about the fact that his work-related misconduct violated California

9   criminal statutes during his administrative interrogation and was informed of his *Miranda* rights

10   in a separate interrogation that took place before his administrative interrogation. (SAC ¶¶24-25;

11   Larios Dep. 239:5-241:14; 245:24-246:18; 251-1-253:3.) Both of these arguments fail for a

12   number of reasons.

13       First, contrary to Larios's argument, the investigation preceding the CHP's inspection of

14   Larios's cell phone was an administrative, work-related misconduct investigation that resulted in

15   disciplinary action, not criminal charges or sanctions. (SUF 25-30). The objective was to

16   determine whether and to what extent Officer Larios had an inappropriate relationship with his

17   confidential informant, whether it violated CHP policy and subjected him to disciplinary action

18   under Government Code § 19572, and whether it compromised any investigation he participated

19   in. (SUF 25, 27.) Larios was never detained, arrested, indicted, charged, or otherwise criminally

20   prosecuted for his conduct. (SUF 28-30.)

21       Second, Larios's allegation that the he was informed of his *Miranda* rights similarly fails to

22   prove that he was criminally investigated. Here, Larios was advised of his *Miranda* rights in a

23   nominally criminal interrogation that was conducted by IAS investigators who did not participate

24   in the work misconduct investigation. (SUF 31-38, 40.) The proceeding lasted only one minute,

25   and during that time, Larios was informed of his *Miranda* rights, permitted to invoke his Fifth

26   Amendment right to not answer any questions, and the proceeding ended without further

27   questions. (SUF 31, 33-35.) None of the Defendants were present at the *Miranda* advisement.

28   (SUF 32.) In fact, Larios was advised of his *Miranda* rights solely because the CHP was required

18

1    by law to do so because the November 2014 search of Larios's text messages with CI Mellow

2    revealed that he engaged in conduct that possibly violated multiple penal code statutes.  (SUF 36.)

3    Thus, the CHP was required to advise Officer Larios of his *Miranda* rights under the Peace

4    Officer Bill of Rights.  *See* Cal Gov't Code § 3303(h) (requiring agencies to immediately inform

5    a peace officer of his constitutional rights before or during an interrogation if it is determined that

6    the officer may be charged with a criminal offense).

7         By comparison, in Larios's administrative interrogation, which was administered by

8    Lunardi and Hutsell after the criminal interrogation concluded, Larios was explicitly informed

9    that none of his statements could be used in any criminal proceeding against him.  (SUF 39-42.)

10   *See Lybarger v. City of Los Angeles*, 40 Cal.3d at 822, 826 (1985) (purpose of the admonitions

11   was to ensure "any statements [the employee] chose to make under the compulsion or threat of

12   such discipline could not be used against [the employee] in any subsequent criminal

13   proceeding").

14        Larios's contention that Investigator Lunardi's reference to penal code violations during his

15   administrative interrogation proves he was being criminally investigated likewise fails.  First, the

16   fact that an employee's misconduct simultaneously violates both workplace rules and criminal

17   provisions does not convert an employer's work-related misconduct investigation into a criminal

18   inquiry, or render a search performed during the course of that investigation illegal or suspect.

19   *United States v. Simons*, 206 F.3d 392, 400 (4th Cir. 2000) (employer does not lose its special

20   need for the efficient and proper operation of the workplace merely because the evidence

21   obtained was evidence of a crime, particularly when the conduct investigated violates both

22   workplace policies and criminal statutes).  Indeed, Larios conceded in his deposition that some of

23   the conduct he was accused of was violated both CHP rules and criminal statutes.  (Larios Dep.

24   252:16-253:13.)

25        Second, the fact that Larios's workplace misconduct potentially violated criminal statutes

26   was highly relevant for the purposes of weighing the seriousness of the misconduct and assessing

27   a proper penalty within the context of California's state employee disciplinary framework.  *See,*

28   *e.g., Warren v. State Personnel Board*, 94 Cal.3d 95, 106 (1979) (officer's off-duty drug use

19

1   relevant to determining whether penalty of dismissal was appropriate); *Ramirez v. State*

2   *Personnel Bd.*, 204 Cal. App. 3d 288, 292-93 (1988) (peace officer's arrest for off-duty public

3   masturbation had a sufficient nexus to his employment as a peace officer because he broke the

4   law he was sworn to uphold).  Here, Investigator Lunardi did not question Larios about his

5   possible violation of California Penal Code provisions to build a criminal case against Officer

6   Larios.  Rather, he addressed these possible violations to (1) emphasize the seriousness and

7   severity of Officer Larios's alleged misconduct; and (2) to secure admissions by Officer Larios

8   that he knowingly violated criminal law in order to show that his conduct with Mellow, even if

9   conducted while off-duty had a sufficient nexus to his employment as a peace officer and justified

10  any disciplinary penalty imposed on Officer Larios by the CHP.  (SUF 43.)

11      The CHP searched Larios's cell phone during the course of a work-related misconduct

12  investigation of Larios.  Accordingly, the CHP's inspection of Larios's phone needed only to be

13  reasonable under the circumstances.

14          **2.    Inspecting Officer Larios's Text Messages with CI Mellow Stored on
                     His Cell Phone Was Justified at its Inception.**
15

16      "Ordinarily, a search of an employee's office by a supervisor will be 'justified at its

17  inception' when there are reasonable grounds for suspecting that the search will turn up evidence

18  that the employee is guilty of work-related misconduct…."  *O'Connor*, 480 U.S. at 726.

19      Here, the CHP's inspection of Officer Larios's cell phone for text messages between Larios

20  and CI Mellow was justified at its inception because the investigation preceding the search

21  uncovered reasonable grounds to suspect that:  (1) Larios had an intimate relationship with CI

22  Mellow in violation of CHP policy and professional standards; and (2) Larios's cell phone

23  contained the text messages between Larios and Mellow, and the extent to which his misconduct

24  in furtherance of that relationship jeopardized the safety of his CI, compromised the integrity of

25  SINTF investigations, and brought discredit upon the CHP.

26  ///

27  ///

28
                                            20

### a. The CHP had reasonable grounds to believe that Larios engaged in an inappropriate relationship with CI Mellow.

During the course of the IAS's investigation of Larios's relationship with CI Mellow, the IA investigators assigned to this case gathered evidence, which established a reasonable suspicion that Officer Larios had a romantic, and physically intimate relationship with CI Mellow before November 6, 2014. (SUF 102.)  Defendants' administrative investigation of Officer Larios commenced on or about September 8, 2014. (SUF 44.)

First, the witness statements from SINTF Commander Les James, CI Mellow, and Nathan Santana, and documents, including Commander James's email correspondence, the August 31, 2014 Shasta County Sheriff's Office investigation report, and the greeting card that Nathan Santana produced during his witness interview, indicated to Investigator Lunardi that on or about August 31, 2014, Officer Larios placed a greeting card addressed to CI Mellow on the windshield of a car parked at Mellow's residence.  In the greeting card, Officer Larios handwrote multiple messages expressing romantic interest in Mellow, including:  (1) "I love everything about you…;" (2) "Just love you so much!!!;" (3) "Please know I want to spend forever with you as us !!!;" (4) "I want to make you happier than you've ever been before, just like you were in Tahoe…"; (5) "I love you for who you are Tawnya Rachelle and want nothing more than to unite as one!!;" (6) "Love Me!!;" and (7) discussing "our walk across the bridge and kiss on the cheek shortly after your innocent text "Marry Me' …;"  and described having a first date with Mellow on December 6, 2013, having kissed, exchanged a text proposing marriage, and taking a trip to Lake Tahoe together. (SUF 45-48; 57-72, 76, 80-85.)  These facts alone supported a reasonable suspicion that Officer Larios had an intimate, physical relationship with Mellow between December 2013 and August 2014.

Second, the witness statements of Santana, Mellow and Commander James, and documents, including Commander James's email correspondence, the SINTF Investigative Report and Statement of Probable Cause from the Santana investigation, and the September 18, 2013 SINTF Daily Intelligence Memorandum (DIM), indicated to Investigator Lunardi that Tawnya Mellow served as Officer Larios's confidential informant in an investigation into Nathan Santana, that CI

21

1  Mellow provided Officer Larios with information that enabled Officer Larios a search warrant to

2  search Santana's residence, recover approximately 158 pounds of marijuana and ultimately arrest

3  Santana for possession of marijuana for sale and conspiracy.  (SUF 45-46, 48-52, 54-55. 57, 60,

4  63. 71, 73. 78. 82, 85. 88-91.)  In addition, Shasta County Deputy D.A. Laura Smith informed

5  Investigator Lunardi that the criminal prosecution of Nathan Santana, which arose from Larios's

6  SINTF investigation of Santana, was still pending until September 17, 2014, when the Shasta

7  County District Attorney's office stipulated to dismiss the case in part because of the allegations

8  that Officer Larios had a personal relationship with his confidential informant.  (SUF 50.)

9      Third, the witness statements of Santana and Mellow indicated that Officer Larios had

10  expressed romantic interest in Mellow between December 2013 and August 2014.  (SUF 59, 61,

11  64.)  In fact, the witness statements of Santana and Commander James together, indicated to

12  Investigator Lunardi that Officer Larios attempted to disrupt Santana and Mellow's relationship

13  by continuously riding his motorcycle outside of her residence and honking his horn repeatedly

14  on occasions when Santana was present at Mellow's residence, thus possibly indicating to IAS

15  investigator Lunardi that Officer Larios was jealous of Santana.[3]  (SUF 48, 65-66, 72, 81, 83-84,

16  103.)

17      Fourth, the witness statements of Mellow and Commander James further bolstered the

18  suspicion that Officer Larios had a romantic and possibly physically intimate relationship with

19  Tawnya Mellow while the criminal case she assisted with was still pending in court.  Specifically,

20  their statements indicated to Investigator Lunardi that Officer Larios and Mellow took an

21  overnight trip to South Lake Tahoe together in spring or summer of 2014 (while the case against

---

23      [3] Specifically, (1) Santana told IAS Investigators that on multiple occasions while visiting
Mellow, a black Harley Davidson whose rider wore a skullcap helmet and a facemask drove by
24  Mellow's residence multiple times honking its horn (SUF 65); (2) Commander James stated that
that Officer Larios admitted driving by Mellow's residence on his motorcycle after he had
25  requested that local law enforcement perform a welfare check at Mellow' residence, and that he
had observed Officer Larios riding a black Harley Davidson motorcycle with a skullcap helmet;
26  (SUF 83-84); and (3) Commander James told Investigator Lunardi that Sheriff's Deputy Nick
Thompson stated that he observed a black Harley Davidson driving back and forth at Mellow's
27  residence while responding to the domestic violence call at Mellow's residence in August 2014.
(SUF 81.)

28

1   Santana was still pending), and shared the same hotel room and bed during that trip.  (SUF 12, 13,

2   24, 46, 48, 61, 70, 80, 82.)

3          Fifth, Commander James's email correspondence, witness statement, and Investigator

4   Lunardi's review of Officer Larios's searches made on the PUBSAFE AS400 database and the

5   DMV's CalPhoto database indicated that Officer Larios falsely told Commander James that he

6   had been friends with Mellow years before she served as his confidential informant, yet did not

7   realize who she was until December 2013, following Santana's arrest because Mellow had used

8   the name "Rachelle" when initially reporting Nathan Santana to SINTF because Officer Larios's

9   PUBSAFE AS400 and CalPhoto searches showed that he between September 20, 2013 and

10  November 11, 2013, he had accessed information that not only revealed Tawnya Mellow's full

11  name, including the name "Rachelle," but also provided information about her physical

12  appearance and her portrait photo more than one month before Santana was arrested.  (SUF 78,

13  92, 94.)

14         Based on his review of CHP and SINTF policy, Investigator Lunardi was informed that

15  CHP Officers and SINTF Agents were prohibited from having an intimate or non-professional

16  relationship with a confidential informant.  (SUF 54-56, 75, 79.)  Accordingly, based on

17  Investigator Lunardi's investigation, the CHP's IAS developed a reasonable suspicion based on

18  articulable fact that that Larios had engaged in an intimate relationship with a confidential

19  informant in violation of CHP and SINTF policy.  (SUF 103, 107.)

20                    **b.    The CHP had reasonable grounds to believe that Larios's cell
                            phone contained text message evidence of Larios's relationship
21                          with CI Mellow.**

22         During the course of their administrative investigation, Investigator Lunardi also learned

23  the following information indicating that Officer Larios used his personal cell phone to conduct

24  work and exchange text messages with CI Mellow, and therefore, Larios's cell phone likely

25  contained text messages between Larios and CI Mellow showing the nature of their relationship.

26         First, the witness statements of CI Mellow, Nathan Santana, and Commander Les James,

27  IAS investigators determined that Officer Larios communicated with CI Mellow via text message.

28  (SUF 60-61, 64, 85.)  Specifically, CI Mellow told Investigator Lunardi that she and Officer

23

1   Larios exchanged text messages regarding the Santana investigation and continued exchanging

2   text messages after Santana was arrested.  (SUF 60-61.)  And according to Commander James,

3   Larios admitted to him that he texted CI Mellow.  (SUF 85.)  In addition, Commander James told

4   Investigator Lunardi that SINTF issued Officer Larios a cell phone for the express purpose of

5   conducting SINTF business such as communicating with confidential informants.  (SUF 7, 88.)

6   Yet when Investigator Lunardi reviewed Officer Larios's SINTF phone and the data extracted

7   from Officer Larios's SINTF phone, he observed no text messages between CI Mellow's phone

8   number and Larios's SINTF phone, and only one outgoing phone call lasting approximately 31

9   seconds for the time period between January 21, 2013, and September 26, 2014. (SUF 53. 74, 94,

10   98-99, 104.)  These facts combined indicated to Investigator Lunardi that Officer Larios likely

11   used his personal cell phone to communicate with CI Mellow.

12        Second, while reviewing the data extracted from Officer Larios's SINTF phone, Lunardi

13   observed (1) more than 100 text messages were exchanged between Officer Larios's SINTF

14   phone and Officer Larios's personal cell phone number; and (2) these messages relayed license

15   plate numbers, names, and addresses.  These observations indicated to Investigator Lunardi that

16   Officer Larios was using his personal cell phone to conduct and store SINTF work and to transmit

17   it to his SINTF phone.  (SUF 53, 74, 93, 100-101, 104.)

18        Third, the greeting card that Santana produced during his interview with IAS Investigators

19   and Officer Larios's admission to Commander James that he placed a greeting card on a vehicle

20   outside of CI Mellow's residence on August 31, 2014, indicated to Investigator Lunardi that CI

21   Mellow sent Officer Larios a text that stated "Marry Me," yet no such corresponding text was

22   discovered on Officer Larios's SINTF phone.  (SUF 53, 68-70, 74, 82, 93, 98-99, 104.)

23        Fourth, the Statement of Probable Cause from SINTF's investigative file from the Nathan

24   Santana investigation, indicated that Officer Larios attested that confirmed Nathan Santana's

25   identity and residence address by showing CI Mellow a mug shot of Nathan Santana and a

26   Google earth image of Santana's residence.  (SUF 49, 51, 57, 103.)  Yet the witness statements of

27   Commander James, Mellow, and SINTF Agents Tom Moon and Kip Kinneavy, indicated that

28   Officer Larios and Mellow never met in person before Santana's November 12, 2013 arrest, and

24

1   therefore, Officer Larios likely texted CI Mellow Santana's mugshot and the Google earth image

2   of Santana's residence in order to have submitted a truthful affidavit of probable cause.  (SUF 60,

3   79, 93, 95-96, 104.)

4          Together, this information indicated to Investigator Lunardi that Officer Larios used his

5   personal cell phone to exchange text messages with CI Mellow.  Accordingly, the CHP, and

6   Defendants, had reasonable grounds to suspect that evidence of Larios's intimate relationship

7   with CI Mellow was contained on Larios's personal cell phone.  (SUF 104.)  Based on this

8   investigation, the CHP authorized Internal Affairs to direct Officer Larios to produce his phone so

9   it could be searched for work product pursuant to G.O. 100.95.  (SUF 105-106.)

10             **3.    The Inspection of Larios's Cell Phone Was Permissible in Scope.**

11         For an employer search of employee property to be reasonable under the Fourth

12   Amendment, the search must be "permissible in scope."  *O'Connor*, 480 U.S. at 726.  A search is

13   "permissible in scope" when "the measures adopted are reasonably related to the objectives of the

14   search and not excessively intrusive in light of … the nature of the [misconduct].  *Id.*; *accord*

15   *Quon*, 560 U.S. at 761.

16         For instance, in *Quon*, the Court found that a police chief's review of text messages on a

17   government pager issued to Officer Quon, which revealed that Quon was committing work-

18   related misconduct by sending explicit messages during work hours, was reasonable.  Applying

19   the *O'Connor* reasonableness standard, the court found that the search was justified because the

20   department needed to determine whether its pager plan met the department's needs.  *Quon*, 560

21   U.S. at 750-53.  The Court further found that the search was permissible in scope because:  (1)

22   reviewing the transcripts was an "efficient and expedient way to determine whether Quon's [text]

23   overages were the result of work-related messaging or personal use;" (2) while it would have

24   been reasonable for the department to review texts in all months in which Quon exceeded his text

25   allowance, its decision to limit its review was appropriately hewed to its limited objective for

26   performing the review; and (3) the department redacted messages sent while Quon was off duty.

27   *Id.* at 761-62.

28

1        Also, in *Manasco v. Bd. of Police Commissioners*, No. 4:11-CV-00557-CDP, at *4-7 (E.D.

2    Mo. Apr. 1, 2011), a district court found that the St. Louis Metropolitan Police Department's

3    (SLPD) order that officers produce detailed text message records from their personal phones,

4    including images sent and received within a two-week period, did not violate the Fourth

5    Amendment. The SLPD sought the text messages from several officers after discovering that

6    officers had shared an image of a man who police shot to death after he murdered a federal

7    marshal, and that the image was shared outside of the police department. *Id.* at *1-2. The district

8    court applied the *Quon/Ortega* reasonableness standard after assuming the officers had an

9    expectation of privacy in their cell phone records, and found that the SLPD's demand to inspect

10    the officers' private cell phone records was a justified intrusion given their need to determine the

11    extent to which officers had shared the crime scene image. *Id.* at *4-7. Further, the Court found

12    that the SLPD's demand for records was "not excessive in scope" because the inspection of the

13    records within the timeframe in which the dissemination took place—here, March 8-18, 2011—

14    was reasonably related to the investigatory objective of identifying those officers who used

15    private cell phones to transmit crime scene photos to the public in violation of SLPD policy. *Id.*

16    at *7.[4]

17        As in *Quon* and *Manasco*, the CHP's inspection of Officer Larios's personal cell phone was

18    permissible in scope because it was reasonably related to the CHP's objective for performing the

19    review. Here, the objective for performing the review of Officer Larios's cell phone was to

20    determine whether (1) Larios had an inappropriate relationship with CI Mellow; (2) whether

21    Larios's actions in furtherance of this relationship jeopardized CI Mellow's safety or

22    compromised CHP or SINTF investigations; and (3) whether Larios's conduct brought discredit

23    to the CHP. (SUF 25, 27.)

24        In addition, the inspection prescribed and conducted was reasonably related to the objective

25    of the review and was not excessively intrusive. To prevent IAS investigators from viewing data

26    that was unrelated to the administrative investigation's objective of determining whether Larios

27

28

---

[4] A true and correct copy of this unpublished decision is attached as Defs.' Ex. 47 and referenced in Defendants' Request for Judicial Notice (RJN). L.R. 5-133(i)(3).

26

1    had an intimate relationship with a confidential informant, CHP IAS Lieutenant Helena Williams

2    instructed the CHP's CCIU to provide IAS Investigators with "only call logs and text messages

3    (MMS and SMS), sent and received," (1) between Larios's phone and the phones of CI Mellow,

4    SINTF Commander Les James, SINTF Agent Larios, SINTF Agent Kinneavy, and SINTF Agent

5    Tom Moon; and (2) spanning from September 1, 2013 (the month that Mellow initially contacted

6    SINTF with information about Santana's marijuana distribution operation) to November 5, 2014

7    (the day before the CHP directed Larios to produce his phone). (SUF 107.) And with the

8    exception of one unintentional error,[5] the CCIU provided IAS Investigators only text messages,

9    and any media attached to the messages, and call log data between Officer Larios's cell phone

10   and CI Mellow's phone, consistent with Lieutenant Williams's memorandum. (SUF 107, 123-

11   125.)

12       By contrast, Larios has no evidence showing that Defendants intentionally inspected or

13   molested any other data on his cell phone beyond the scope defined in Lt. Williams's

14   memorandum. (SUF 126). Therefore, the search of Officer Larios's text messages with CI

15   Mellow that were stored on his personal cell phone was reasonably related to the investigatory

16   objectives of the CHP's underlying work-related misconduct investigation of Larios.

17       Larios may argue that the CHP did not use the least intrusive methods practicable when it

18   inspected his cell phone because Officer Larios offered to locate and self-produce the "work

19   product" located on his phone. (Larios Dep. 181:18-22.) But Defendants were not obligated to

20   use the least intrusive means practicable to perform a reasonable search. *Quon*, 560 U.S. at 763.

21   To the contrary, the Supreme Court has "repeatedly refused to declare that only the 'least

22   intrusive' search practicable can be reasonable under the Fourth Amendment." *Id.* quoting

23   *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 663 (1995). In addition, it was impractical

24   under the circumstances for Defendants to give Larios—the target of a misconduct investigation

25   for having an illicit relationship with a confidential informant —the discretion and control to

26   _____

27   [5] The extraction program extracted one text message from a phone number that was not
     specified in the Lieutenant Williams's memorandum, however, the extraction was in error and
     unintentional. (Duray Decl. ¶23.)

28

1  determine what constituted work product and how to produce it under the circumstances. Larios

2  had already made his judgment suspect by knowingly endangering CI Mellow by leaving the

3  greeting card at her residence, and intending that her boyfriend and target of his investigation was

4  present. (SUF 46, 82.)  Moreover, based on Investigator Lunardi's investigation up to November

5  6, 2014, he believed that Officer Larios lied to Commander James about having known Mellow

6  before she assisted him in the Santana investigation, and attempted to interfere in the

7  investigation given CAHP Cantrall's presence at CI Mellow's first interview and CI Mellow's

8  refusal to speak to Investigator Lunardi in a follow-up interview.  (SUF19, 58.)  Thus,

9  Investigator Lunardi had no reason to trust that Larios would voluntarily produce his text

10  messages with CI Mellow.

11       Larios may also argue that the search conducted exceeded the investigatory needs of the

12  CHP because Investigator Duray (1) backed up (copied) Larios's entire cell phone before later

13  extracting the narrower range of text messages prescribed by IAS for review (i.e. text messages

14  between Larios and Mellow); and (2) placed two calls from Larios's phone while it was in CHP

15  custody on November 6, 2014.  Both of these arguments lack merit.

16       First, the facts show that Investigator Duray only created a copy of Larios's cell phone for

17  extraction at a later date because (1) he was unable to extract the data from Officer Larios's cell

18  phone with the forensic extraction tools he had with him; and (2) the text messages between

19  Larios and Mellow were so voluminous that Investigator Lunardi, Domby, and Duray were

20  unable to manually inspect and record them within the same day.  (SUF 114-117, 119, 123.)

21  Once Investigator Duray had access to additional forensic tools, he was able to extract the text

22  messages requested by IAS and produce them for inspection.  (SUF 123-125.)  Conversely,

23  Larios has no evidence that either Defendants, the CHP or anyone else associated with the

24  administrative investigation, intentionally accessed data beyond the texts between Larios and

25  Mellow that were sought by IAS.  (SUF 123-126.)

26       Second, the calls placed from Larios's phone were not intrusive.  While manually

27  reviewing the texts between Larios and Mellow, Duray accidentally pushed the call button on

28  Larios's phone, which resulted in two inadvertent calls attempts to Mellow's phone number, each

28

1   of which lasted 1 seconds and 2 second; and there was no intent to call CI Mellow.  (SUF 118.)[6]

2   Accordingly, there was no unreasonable intrusion upon Larios's expectation of privacy under the

3   circumstances.

4        The inspection of Officer Larios's cell phone for text messages between him and his

5   confidential informant during the course of an administrative workplace misconduct investigation

6   examining whether Larios had an illicit relationship with a confidential informant, was justified at

7   its inception, and permissible in scope.  For these reasons, any intrusion upon Larios's

8   expectation of privacy was reasonable and did not violate the Fourth Amendment.

9   **II.   THE COURT SHOULD GRANT SUMMARY JUDGMENT AS TO LARIOS'S FOURTH
        AMENDMENT CLAIM AGAINST DEFENDANT KYLE FOSTER BECAUSE KYLE FOSTER
10       DID NOT DIRECT LARIOS TO PRODUCE HIS PERSONAL PHONE FOR INSPECTION OR
        INSPECT IT.**

11

12       Liability under Section 1983 arises only upon a showing of a defendant's "personal"

13   participation or involvement in the plaintiff's alleged constitutional deprivation.  *Jones v.*

14   *Williams*, 297 F.3d 930, 934 (9th Cir. 2002); *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir.

15   1998).  "[E]ach Government official . . . is only liable for his or her own misconduct."  *Ashcroft v.*

16   *Iqbal*, 556 U.S. 662, 677 (2009).  A person subjects another to the deprivation of a constitutional

17   right, within the meaning of Section 1983, "if he does an affirmative act, participates in another's

18   affirmative acts, or omits to perform an act which he is legally required to do that causes the

19   deprivation of which [the plaintiff complains]."  *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir.

20   1988) (quotation omitted).  The inquiry into causation for the Section 1983 claim "must be

21   individualized and focus on the duties and responsibilities of each individual defendant whose

22   acts or omissions are alleged to have caused a constitutional deprivation."  *Id.*

23       Here, Defendant Kyle Foster cannot be liable under § 1983 because he did not participate in

24   the conduct that Office Larios contends violated his Fourth Amendment rights.  Officer Larios

25   has no evidence that Defendant Foster participated in the administrative investigation that led to

26   the search of his cell phone.  (SUF 131.)  Rather, Foster was merely the liaison between the

27   ───────────
     [6]  Officer Larios's own picture of his phone showed that the call attempts lasted 0 seconds
28   and 1 second, respectively.  Larios Dep. 189:21-192:8, Defs.' Ex. 2.

29

1   Redding Area office and the IAS investigators who conducted the investigation.  (SUF 127.)

2   Defendant Foster also did not participate in directing Officer Larios to produce his personal cell

3   phone for inspection.  (SUF 128-129.)  And while Defendant Foster did contact Officer Larios to

4   direct Larios to report to the Redding Office to meet with IAS investigators on November 6,

5   2014, knowing that IAS investigators were going to ask Larios to produce his phone so they could

6   retrieve work product, Defendant Foster did not know that the IAS Investigators were planning to

7   order Officer Larios to produce his personal phone.  (*Id.*)  Finally, Defendant Foster did not

8   participate in extracting any data from Officer Larios's personal cell phone, nor did he review any

9   data extracted from Officer Larios's personal cell phone.  (SUF 130-131.)  Indeed, Larios testified

10  that his sole basis for suing Kyle Foster is because Foster told him to report to the Redding Area

11  office, but told him that he did not need to contact his union representative.  (Larios Dep. 171:13-

12  172:23.)  That quibble does not establish that Defendant Foster participated in the Fourth

13  Amendment deprivation that Larios alleges.  For these reasons, the Court should grant summary

14  judgment as to Kyle Foster.

15  **III.  THE COURT SHOULD GRANT SUMMARY JUDGMENT AS TO LARIOS'S FOURTH
        AMENDMENT CLAIMS BECAUSE DEFENDANTS ARE ENTITLED TO QUALIFIED
16      IMMUNITY.**

17          Qualified immunity shields state officials "from liability for civil damages insofar as their

18  conduct does not violate clearly established statutory or constitutional rights of which a

19  reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

20  Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the

21  law."  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  An official is entitled to qualified immunity if

22  acting under an objectively reasonable, even if mistaken, belief that his conduct is lawful.  *Guerra*

23  *v. Sutton*, 783 F.2d 1371, 1374 (9th Cir. 1986).  Qualified immunity is "both a defense to liability

24  and a limited 'entitlement not to stand trial or face the other burdens of litigation,'"  *Iqbal*, 556

25  U.S. at 672.

26          When analyzing whether an official has qualified immunity, a court must determine

27  whether:  (1) "a constitutional right would have been violated on the facts alleged," and (2) the

28  law forming the basis of the violation was clearly established in light of the context of the case at

30

1   the time of the alleged violation. *Saucier v. Katz*, 533 U.S. 194, 200 (2001), *overruled on other*

2   *grounds by Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

3        Regardless of whether a constitutional violation occurred, a defendant should prevail if the

4   right asserted by the plaintiff was not "clearly established" or the defendant could have

5   reasonably believed that his particular conduct was lawful. *Romero v. Kitsap Cnty*, 931 F.2d 624,

6   627 (9th Cir. 1991). The determination of whether a right is clearly established must be made at a

7   case-specific level—"not as a broad general proposition," *Saucier*, 533 U.S. at 201—and requires

8   two separate inquiries, whether: (1) the law governing the conduct at issue was clearly

9   established; and (2) "the facts as alleged could support a reasonable belief that the conduct in

10  question conformed to the established law." *Green v. San Francisco*, 751 F.3d 1039, 1051-52

11  (9th Cir. 2014). The "salient question" is whether the law at the time gave "fair warning" that a

12  defendant's conduct was unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 740 (2002).

13       Here, all Defendants in this case are entitled to qualified immunity because, as discussed in

14  detail above, the CHP's inspection of Officer Larios's text messages with CI Mellow that he sent

15  from and stored on his personal phone did not infringe upon Larios's Fourth Amendment rights.

16  *See* argument above, Section I.A and I.B. Rather, consistent with *O'Connor* and *Quon*, the

17  CHP's search of Officer Larios's text messages exchanged with CI Mellow from his personal

18  phone was justified at its inception in light of Officer Lunardi's administrative investigation, and

19  reasonably related to the scope of the misconduct inquiry. (*See* argument above, Section I.B.)

20  Moreover, Larios had no reasonable expectation of privacy under the Fourth Amendment with

21  respect to his text communications with CI Mellow. (*See* argument above, Section I.A.) For

22  these reasons alone, Defendants' conduct should be deemed legal and they should be granted

23  qualified immunity.

24       In addition, there is no legal authority that clearly established that the search performed in

25  this case violated the Fourth Amendment. To the contrary, both *Quon* and *Ortega* authorized

26  government employer's warrantless intrusions upon areas in which employees ordinarily have an

27  expectation of privacy within the context of a work-related misconduct investigation, so long as

28  the search is justified at its inception and reasonable in scope. *See Quon*, 560 U.S. at 756-57.

31

1   Conversely, there was no case law at the time Officer Larios's personal phone was searched that

2   expressly prohibited a law enforcement agency from reviewing its officer's text messages with a

3   confidential informant that were sent from and stored on the officer's personal cell phone, when

4   the officer was suspected of having an inappropriate relationship with his confidential informant,

5   and suspected of using his personal cell phone to communicate with that informant, when he was

6   provided with a work phone to conduct such communications.

7          Indeed, in at least one jurisdiction, a court affirmatively determined that a police

8   department had the right to access private information from its officers' personal devices, which

9   were used for work, to investigate work misconduct, as long as the search was tailored to obtain

10  evidence of the work misconduct investigated. *See Manasco v. Bd. of Police Comm'rs*, No. 4:11-

11  CV-00557-CDP, at *4-7 (E.D. Mo. Apr. 1, 2011).  Moreover, Defendants reasonably relied on

12  CHP's policy on On-Duty Cell Phone Use for authority to inspect Larios's text messages with

13  Mellow that were kept on his personal cell phone.  G.O. 100.95 explicitly informed CHP Officers

14  that all state work stored on personal devices was subject to inspection upon demand.  (SUF 4-5.)

15  And as discussed above, all of Larios's communications with Mellow, even those that were

16  personal, were inherently state work because they (1) arose from a relationship that was rooted in

17  Larios's duties as a CHP Officer and SINTF Agent, (2) were material to an ongoing criminal

18  prosecution; and (3) the integrity of the CHP.  (SUF 4-13, 105-106, 109-110.)  Under all of these

19  circumstances, Defendants reasonably believed that inspecting the text messages exchanged

20  between Larios and Mellow that were stored on Larios's phone was lawful because:  (1) they had

21  reasonable grounds to believe that Larios used the phone to conduct work-related misconduct, i.e.

22  facilitate an illicit, intimate relationship with CI Mellow; and (2) the measures adopted to inspect

23  Larios's phone, which took pains to limit the data examined to only those messages exchanged

24  between Larios and Mellow within a fixed time period, were reasonably related to the objectives

25  of the search and not excessively intrusive in light of the circumstances giving rise to the search.

26         Larios may argue that qualified immunity is unwarranted because Defendants inspected his

27  phone after the Supreme Court found that police generally may not, without a warrant, search

28  digital information on a cell phone seized from an individual who has been arrested in *Riley v.*

32

1  *California*, 134 S.Ct. 2473, 2482-2495 (2014).  But this argument is frivolous.  *Riley* is

2  inapplicable to this case because it stands for the simple prospect that police cannot search the

3  data contained on a criminal suspect's cell phone without a warrant under the "search incident to

4  arrest" exception to the warrant requirement.  Here, by contrast, here (1) the search of Officer

5  Larios's phone was conducted pursuant to an administrative workplace misconduct investigation,

6  not a search incident to a criminal arrest.  (SUF 25-27.)  There was no arrest, criminal charges or

7  criminal investigation, nor was any criminal investigation authorized.  (SUF 25-27, 30; 133.)

8  Moreover, Larios had no reasonable expectation of privacy in the digital content that the IAS

9  examination targeted in his phone: text communications between him and his confidential

10  informant.  *See* Section I.A. above.

11       There was no objective measure that would have informed the Defendants that reviewing

12  the text messages between Officer Larios and his confidential informant violated Larios's Fourth

13  Amendment rights, given that the review was conducted pursuant to a work-related misconduct

14  investigation, in which Officer Larios was suspected of having an inappropriate relationship with

15  his confidential informant, and evidence of their relationship would be located in text messages

16  sent from and stored on his personal phone since Officer Larios used his phone to communicate

17  with her even though he was given a work phone to carry out such communications.  For this

18  reason too, Defendants should be granted qualified immunity even in the event that the Court

19  believes that the conduct technically deviated from Fourth Amendment requirements.

20  **IV.   THE COURT SHOULD GRANT SUMMARY JUDGMENT ON LARIOS'S CALIFORNIA**

21  **CIVIL CODE § 52.1 CLAIM BECAUSE HE DID NOT SUFFER A CONSTITUTIONAL**
   **DEPRIVATION.**

22       Larios alleges that the search of his personal phone violated California's Bane Act, Cal. Civ.

23  Code § 52.1.  The Bane Act authorizes civil actions against persons who interfere, by threat,

24  intimidation, or coercion, with the enjoyment of individual rights secured by the Constitution.

25  But speech alone is not sufficient to constitute a violation unless it involves a credible threat of

26  violence. Cal. Civ. Code § 52.1(j).  "[T]o state a cause of action under the Bane Act there must

27  first be violence or intimidation by threat of violence.  Second, the violence or threatened

28  violence must be due to plaintiff's membership in one of the specified classifications set forth in

33

1   Civil Code section 51.7 or a group similarly protected by constitution or statute from hate

2   crimes." *Gabrielle A. v. County of Orange*, 10 Cal.App.5th 1268, 1290 (2017); *accord Julian v.*

3   *Mission Community Hospital*, 11 Cal.App.5th 360, 395 (2017) (plaintiff must show defendant

4   interfered with or attempted to interfere with the plaintiff's legal right by threatening or

5   committing violent acts).

6        Larios's Bane Act cause of action fails for two reasons.  First, he has no evidence showing

7   that Defendants either committed or threatened violence against him to interfere with his Fourth

8   Amendment rights.  (SUF 134-137.)  Second, as discussed above, the search of Larios's cell

9   phone did not violate the Fourth Amendment as it was reasonable under all the circumstances.

10  For either of these reasons, Larios cannot prove the essential elements of his Bane Act claim, and

11  summary adjudication is appropriate.

12                                  **CONCLUSION**

13       For the foregoing reasons, the Court should grant summary judgment and dismiss this

14  lawsuit with prejudice.

15  Dated:  October 7, 2019                     Respectfully Submitted,

16                                              XAVIER BECERRA
                                                Attorney General of California
17                                              KRISTIN M. DAILY
                                                Supervising Deputy Attorney General
18

19                                              /s/ WILLIAM H. DOWNER

20

21                                              WILLIAM H. DOWNER
                                                Deputy Attorney General
22                                              *Attorneys for Defendants*

SA2015303210
23  14151317

24

25

26

27

28

                                  34