XAVIER BECERRA, State Bar No. 118517
Attorney General of California
KRISTIN M. DAILY, State Bar No. 186103
Supervising Deputy Attorney General
WILLIAM H. DOWNER, State Bar No. 257644
Deputy Attorney General
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 210-6120
  Fax: (916) 324-5567
  E-mail: William.Downer@doj.ca.gov
*Attorneys for Defendants Scott Lunardi, Kyle Foster,
Robert J. Jones*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TIMOTHY LARIOS, | 2:15-cv-02451-MCE-CMK |
| Plaintiff, | **DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE MOTION FOR SUMMARY ADJUDICATION** |
| v. | |
| SCOTT LUNARDI, ET AL., | |
| Defendants. | Date: December 19, 2019<br>Time: 2:00 p.m.<br>Courtroom: 7<br>Judge: Hon. Morrison C. England, Jr.<br>Trial Date: None Set<br>Action Filed: November 24, 2015 |

Defendants Scott Lunardi, Robert J. Jones, and Kyle Foster hereby submit the following

statement of undisputed facts in support of their motion for summary judgment or, in the

alternative, partial summary judgment.

///

///

///

1

**ISSUE 1 – Defendants are entitled to summary adjudication on Plaintiff's first cause of action under 42 U.S.C. § 1983 Violation of Fourth Amendment of the United States Constitution Because Officer Larios Had No Expectation of Privacy In the Text Messages Between Him and Confidential Informant Tawnya Mellow that He Stored on His Personal Cell Phone.**

| MOVING PARTIES' UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE: | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE: |
|---|---|
| 1.    Plaintiff Timothy Larios (Officer Larios) was at all times relevant to this lawsuit employed as an officer by the California Highway Patrol (CHP).  Defs.' Ex. 1, Deposition of Timothy Larios (Larios Dep.) 82:10-85:18. | 1. |
| 2.    Between July 2012 and approximately September 4, 2014, Officer Larios was assigned as an agent to the Shasta Interagency Narcotics Task Force (SINTF).  Larios Dep. 86:2-3; 112:18-20; 113:21-22; Declaration of Kyle Foster (Foster Decl.) ¶9; Defs.' Ex. 39. | 2. |
| 3.    Officer Larios's job duties as a SINTF agent included developing and communicating with confidential informants who provided him with information material to narcotics investigations.  Larios Dep. 119:7-17, 121:10-19; 259:18-261:1. | 3. |
| 4.    While Officer Larios was employed with the CHP, the CHP had a policy under CHP General Order 100.95, entitled "On Duty Use of Cellular Telephone and Personal Electronic/Entertainment Devices" which stated that "all state work produced on personal electronic devices shall be transferred to an electronic data storage device… and shall not be stored on personal electronic devices.  After the state work is transferred to an electronic data storage device, the material shall be deleted from the personal electronic device.  Work stored on any type of electronic device is the property of the state and must be relinquished on | 4. |

2

| MOVING PARTIES' UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE: | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE: |
|---|---|
| demand." Larios Dep. 82:10-85:18; 109:20-111:20; Ex. 16. | |
| 5. Officer Larios received and reviewed CHP General Order 100.95 while he was a SINTF agent and acknowledged doing so in writing. Larios Dep. 112:1-16; Ex. 17. | 5. |
| 6. Officer Larios testified that he was required to produce all of his texts between him and his confidential informant, Tawnya Mellow, under General Order 100.95. Larios Dep. 187:20-24. | 6. |
| 7. SINTF issued Officer Larios a smart phone style cellular phone (SINTF phone) to use for SINTF business, including communicating with informants. Larios Dep. 131:13-132:21; Defs.' Ex. 18; Declaration of Les James (James Decl.) ¶14. | 7. |
| 8. Officer Larios used his personal cell phone to communicate with confidential informant Tawnya Mellow. Larios Dep. 149:17-150:4; 151:10-13; 153:4-13. | 8. |
| 9. Officer Larios first became aware of Tawnya Mellow through his work as a SINTF Agent through a Daily Intelligence Memorandum (DIM) dated September 18, 2013 in which Mellow reported that Nate Santana was involved in large scale marijuana sales. Larios Dep. 129:12-130:5; 135:1-139:20; Defs.' Ex. 19. | 9. |
| 10. While acting as Officer Larios's informant, Tawnya Mellow provided Officer Larios with information that was material to his investigation of Nathan Santana because it corroborated enough information to obtain a search warrant that allowed Officer Larios to | 10. |

3

| MOVING PARTIES' UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE: | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE: |
|---|---|
| search Santana's residence.<br><br>Larios Dep. 138:17-24; 139:4-140:10; 140:21-143:2; Defs.' Ex. 20. | |
| 11.   The execution of the search warrant on Santana's residence resulted in the recovery of approximately 158 pounds of processed marijuana, the arrest of Santana, and felony criminal charges against Santana for possession of a controlled substance for sale and conspiracy.<br><br>Larios Dep. 139:24-140:18; 140:21-143:2; 144:7-145:16; 146:11-147:16; 148:4-15; Defs.' Exs. 20-21. | 11. |
| 12.   The Shasta County District Attorney's Office stipulated to dismiss the felony case against Nathan Santana in *The People of the State of California v. Robin Carl Rudolph and Nathan John Santana*, Case Number 13F7922, on or about September 17, 2014, in the Shasta County Superior Court.<br><br>Defendants' Request for Judicial Notice, Defs.' Ex. 43. | 12. |
| 13.   During his administrative investigation of Officer Larios, Internal Affairs Investigator Scott Lunardi spoke with the Shasta County Deputy District Attorney Laura Smith who was assigned to the Nathan Santana prosecution that arose from Officer Larios's investigation of Nathan Santana.  Deputy D.A. Laura Smith informed Lunardi that she had been made aware of the allegations that Officer Larios had a personal relationship with his confidential informant involved in the Santana investigation and that the D.A.'s decision to dismiss the prosecution against Santana was made in part because of the allegation that Officer Larios had an inappropriate relationship with his confidential informant who provided him information in the criminal investigation that resulted in the prosecution of Nathan Santana | 13. |

4

| MOVING PARTIES' UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE: | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE: |
|---|---|
| in case number 13F7922.<br><br>Declaration of Scott Lunardi (Lunardi Decl. ¶¶12, 58; Defs.' Ex. 43.) | |
| 14.   On three occasions, Officer Larios contacted Shasta Communications (SHASCOM), a dispatch center for different agencies including the Sheriff's Office and the Anderson police, identified himself as a CHP Officer and SINTF agent, and made untruthful statements that CI Mellow was being assaulted by her ex-boyfriend.<br><br>Larios Dep. 97:16-98:22; 105:8-19; | 14. |
| 15.   Officer Larios disclosed confidential information about his participation in a joint state and federal drug trafficking organization (DTO) to CI Mellow, including operational details regarding installing trackers on vehicles and about a trip he took to Chicago in connection with the joint state-federal investigation.<br><br>Larios Dep. 89:16-90:2; 259:5-264:22. | 15. |
| 16.   Officer Larios sent CI Tawnya Mellow information from the SHASCOM closed incident system without authorization, in violation of CHP policy.<br><br>Larios Dep. 99:1-102:23; 103:1-104:23; 105:20-23; Defs.' Exs. 10-12. | 16. |
| 17.   The CHP needed to complete its investigation swiftly because under the Peace Officer Bill of Rights, the CHP was required to complete its investigation of Officer Larios and served him with any notice of disciplinary action against Officer Larios within one year of discovering the allegations of misconduct.<br><br>Declaration of Helena Williams (Williams Decl.) ¶13; Declaration of Robert J. Jones (Jones Decl.) ¶10. | 17. |
| 18.   The CHP needed to swiftly and thoroughly conduct its administrative investigation of Officer Larios in order to | 18. |

| MOVING PARTIES' UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE: | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE: |
|---|---|
| determine whether Officer Larios engaged in an inappropriate relationship with confidential informant Tawnya Mellow, and whether, and the extent to which, Officer Larios's actions in furtherance with his relationship with informant Mellow jeopardized Mellow's safety, compromised CHP or SINTF law enforcement activities, and brought discredit to the CHP and its investigations.<br><br>Williams Decl. ¶¶9, 11-13; Jones Decl. ¶¶4-10. | |
| 19.   Internal Affairs Section (IAS) Investigator Lunardi suspected that Officer Larios would attempt to destroy any text message communications with CI Mellow stored on his personal cell phone because (1) California Association of Highway Patrolmen district representative Mike Cantrall appeared with CI Mellow during Investigator Lunardi's witness interview with her, indicating to Lunardi that Officer Larios had asked Cantrall to attend to obtain information about the administrative investigation; (2) CI Mellow refused to speak to Investigator Lunardi on October 22, 2014 when he attempted to schedule a follow up interview; and (3) in his interview with Officer Larios's SINTF supervisor, Commander Les James, Lunardi learned that Officer Larios told Commander James that he had known Mellow before she became his confidential informant but he failed to recognize her because she used the name Rachelle when providing information about Santana, yet Lunardi's examination of Officer Larios's searches in CalPhoto and the PUBSAFE AS400 database revealed that Officer Larios had access to Mellow's full name and appearance, thus indicating that Officer Larios had attempted to cover up his relationship with Tawnya Mellow.<br><br>Lunardi Decl. ¶71. | 19. |
| 20.   During the time Officer Larios was assigned to SINTF both CHP and SINTF had | 20. |

6

| MOVING PARTIES' UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE: | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE: |
|---|---|
| rules against engaging in romantic relationships with informants.<br><br>Larios Dep. 127:23-128:15; Jones Decl. ¶6; James Decl. ¶¶8, 10, 11; Defs.' Exs. 33, 40. | |
| 21.   The rationale for SINTF's policy prohibiting unprofessional relationships between an agent and an informant is because such relationships (1) adversely affect an agent's impartiality or judgment; (2) could jeopardize the safety of the informant, the agent and allied agency personnel; and (3) could compromise the integrity of an investigation and bring discredit to SINTF.<br><br>James Decl. ¶12; Larios Dep. 128:22-129:11. | 21. |
| 22.   The rationale for CHP's policy prohibiting unprofessional relationships between an officer and an informant was to formalize the professional and personal barriers between informants and officers who are engaged in a law enforcement operation in order to protect the safety and credibility of the informant and the officer and ensure the integrity of law enforcement personnel and operations.<br><br>Jones Decl. ¶6. | 22. |
| 23.   On October 21, 2014, Investigators Lunardi and Hutsell met with Assistant United States Attorney Michael McCoy at his office in Sacramento.  AUSA McCoy told Lunardi and Hutsell that between May and September of 2014, Officer Larios participated in a joint federal state investigation of a drug trafficking organization.  AUSA McCoy stated that Officer Larios's role in the investigation included making undercover drug buys, conducting recorded conversations and communicating by text messages with targets of the investigation.  AUSA McCoy stated that Officer Larios's removal from SINTF as a result of the CHP's internal investigation negatively impacted the joint state and federal DTO investigation because they would have | 23. |

| MOVING PARTIES' UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE: | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE: |
|---|---|
| to identify another undercover agent to keep the investigation going. AUSA McCoy further stated that he was processing a Federal T-III Wire Application for the DTO investigation when he was notified of the alleged misconduct involving Officer Larios, and that although the alleged misconduct was not related to the federal investigation, the Wire Application was cancelled instead of disclosing the allegations of misconduct pending against Officer Larios in the supporting affidavit.  Lunardi Decl. ¶55. | |
| 24.   On October 28, 2014, Investigator Lunardi received transcripts from a court hearing that occurred on September 17, 2014, in the Shasta County Superior Court, in *The People of the State of California v. Robin Carl Rudolph and Nathan John Santana*, Case Number 13F7922. The transcript corroborated Shasta County Deputy D.A. Laura Smith's statement to Lunardi that on or about September 17, 2014, the Shasta County D.A.'s Office dismissed the felony case against Nathan Santana and Robin Rudolph that was brought after Officer Larios executed a search warrant on Santana's residence.  Lunardi Decl. ¶58, Defs.' Ex. 43. | 24. |

**ISSUE 2 - Defendants are entitled to summary adjudication on Plaintiff's first cause of action under 42 U.S.C. § 1983 Violation of Fourth Amendment of the United States Constitution Because the Inspection of Officer Larios's Personal Cell phone Was Reasonable under the Circumstances.**

**SUBISSUE A: Officer Larios's Cell Phone Was Inspected in the Course of a Workplace Misconduct Investigation.**

| MOVING PARTIES UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE: | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE: |
|---|---|
| See also SUFs 1-24, which are incorporated herein. | |

8

| MOVING PARTIES UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE: | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE: |
|---|---|
| 25.   Officer Larios was the subject of an administrative investigation conducted by the CHP's Internal Affairs Section (IAS) to determine whether Officer Larios fostered an inappropriate relationship with his Confidential Informant Tawnya Mellow in violation of CHP policies and expectations, and Government Code section 19572, and whether, and to what extent, Officer Larios's actions compromised or jeopardized the integrity of his investigations, SINTF operations, or the safety of CI Mellow or allied law enforcement personnel.<br><br>Williams Decl. ¶¶9-12; Jones Decl. ¶3; Lunardi Decl. ¶¶4-5. | 25. |
| 26.   As a result of the administrative investigation into Officer Larios's relationship with his confidential informant, Officer Larios was served with a Notice of Adverse Action charging him with violating Government Code section 19572, subsections (d) inexcusable neglect of duty; (e) insubordination; (f) dishonesty; (o) willful disobedience; (p) misuse of state property; (r) violations of Government Code section 19990; and (t) other failure of good behavior causing discredit to the appointing authority or employment, and recommending the penalty of dismissal.<br><br>Larios Dep. 63:16-65:15; 76:6-79:9; Jones Decl. ¶19; Defs.' Ex. 4. | 26. |
| 27.   The objective of the CHP Internal Affairs Section's administrative investigation of Officer Larios was to confirm or disprove whether Officer Larios had an inappropriate, non-professional relationship with a confidential informant in violation of CHP policy and professional standards, and if Officer Larios did have an inappropriate relationship with a confidential informant, the extent to which such conduct may have compromised or jeopardized Officer Larios's investigations, SINTF investigations, Tawnya | 27. |

9

| MOVING PARTIES UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE: | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE: |
|---|---|
| Mellow's safety, the safety of allied agency personnel working within SINTF or with SINTF, and the integrity of the CHP.<br><br>Lunardi Decl. ¶4-5; Williams Decl. ¶¶9-12; Jones Decl. ¶3. | |
| 28.   Defendants and the CHP did not criminally investigate Officer Larios.<br><br>Williams Decl. ¶¶19-22.; Lunardi Decl. ¶5, 82-84; Jones Decl. ¶¶17-18. | 28. |
| 29.   Officer Larios has no personal knowledge whether the CHP was criminally investigating him prior to November 6, 2014.<br><br>Larios Dep. 167:18-168:7. | 29. |
| 30.   Officer Larios was never detained, arrested, indicted, charged with any crimes, or prosecuted in connection with the CHP's administrative investigation of his relationship with CI Tawnya Mellow.<br><br>Larios Dep. 211:4-23; 212:19-213:9; 214:14-215:3; 239:25-240:3; Defs.' Ex. 22. | 30. |
| 31.   On or about February 3, 2015, Officer Larios was advised of his *Miranda* rights.<br><br>Larios Dep. 234:19-238:1. | 31. |
| 32.   None of the Defendants in this action attended the February 3, 2015 proceeding in which Officer Larios was advised of his *Miranda* rights.<br><br>Larios Dep. 236:2-17. | 32. |
| 33.   The February 3, 2015 criminal interrogation of Officer Larios lasted one minute.<br><br>Larios Dep. 238:12-18. | 33. |
| 34.   During the February 3, 2015 criminal interrogation, Officer Larios invoked his Fifth Amendment right to remain silent.<br><br>Larios Dep. 238:5-11. | 34. |
| 35.   After Larios invoked his right to remain | 35. |

10

| MOVING PARTIES UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE: | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE: |
|---|---|
| silent, the February 3, 2015 criminal interrogation ended. Larios Dep. 238:5-11. | |
| 36.   IAS criminally interrogated Officer Larios solely to advise Larios of his Miranda rights in order to comply with the California Peace Officer Bill of Rights, Government Code Section 3303(h) because Investigator Lunardi's review of Officer Larios's text messages with Tawnya Mellow revealed that Officer Larios may have violated California Penal Code sections 502, 11142, and 13303. Jones Decl. ¶18; Williams Decl. ¶22; Lunardi Decl. ¶81. | 36. |
| 37.   After the February 3, 2015 criminal interrogation ended, Officer Larios had no further contacts with the interrogators Sergeants Scrivner or Morrison. Larios Dep. 238:19-239:4. | 37. |
| 38.   The CHP investigators who administered Larios's criminal interrogation did not participate in the IAS's administrative investigation into Officer Larios nor did they participate in Officer Larios's administrative interrogation. Larios Dep. 238:19-239:4; Larios Dep. 239:19-21; Williams Decl. ¶22; Jones Decl. ¶18. | 38. |
| 39.   After the criminal interrogation ended, Officer Larios participated in an administrative interrogation with Investigators Scott Lunardi and Mel Hutsell. Larios Dep.  239:5-21; 240:15-17; 243:2-244:8, Defs.' Ex. 29. | 39. |
| 40.   Officer Larios's administrative interrogation was not attended by Sergeants Scrivner or Morrison. Larios Dep. 239:19-21. | 40. |
| 41.   Officer Larios received and signed an | 41. |

| MOVING PARTIES UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE: | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE: |
|---|---|
| Administrative Interrogation Record dated February 3, 2015.  The Administrative Interrogation Record that Officer Larios received and signed contained the following language: "You are being questioned as part of an official internal investigation.  You are hereby directed to answer all questions honestly and completely.  Your refusal to answer or any type of evasion, deception, dishonesty or lack of cooperation on your part could constitute insubordination and/or inexcusable neglect of duty, and result in disciplinary action up to and including dismissal." "Neither your statement, nor any information or evidence which is gained by reason of such statement can be used against you in any criminal proceedings.  No promise or reward will be made as an inducement for the answer to any question." Larios Dep. 243:2-246:6; Defs.' Ex. 29. | |
| 42.   At the beginning of the administrative interrogation of Officer Larios, Investigator Lunardi read Officer Larios an admonition called a Lybarger admonition, in which Larios was instructed that he was being directed to answer all questions honestly and completely, that any evasion, deception, dishonesty or lack of cooperation could result in disciplinary action up to and including dismissal, and that neither his statement, nor any information or evidence which was gained by reason of such statement could be used against him in any criminal proceedings. Larios Dep. 247:11-248:18; Lunardi Decl. ¶82; Defs.' Ex. 30, p. 3:25-4:13, 262:6-11. | 42. |
| 43.   Lunardi did not question Officer Larios about whether Officer Larios's conduct violated California Penal Code provisions in order to build a criminal case against Officer Larios.  Rather, he addressed these possible violations to emphasize the seriousness and | 43. |

12

| MOVING PARTIES UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE: | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE: |
|---|---|
| severity of the misconduct that Officer Larios was suspected of being involved in, and to secure admissions by Officer Larios that he knowingly violated criminal law in order to provide factual support to show that Officer Larios's conduct with informant Mellow, even if conducted while off-duty had a sufficient nexus to his employment as a peace officer and justified any disciplinary penalty imposed on Officer Larios by the CHP. Lunardi Decl. ¶83; Defs. Ex 46.. | |

**SUBISSUE B: The Inspection of Officer Larios's Cell Phone Was Justified at its Inception and Permissible in Scope.**

| MOVING PARTIES UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE: | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE: |
|---|---|
| 44.   The CHP Internal Affairs Section (IAS) commenced its administrative investigation of Officer Larios on or about September 8, 2014. IAS Investigators Scott Lunardi and Mel Hutsell were assigned to conduct the administrative investigation into Officer Larios. Williams Decl. ¶¶9-19; Lunardi Decl. ¶¶4-5. | 44. |
| 45.   On September 10, 2014, Investigator Lunardi reviewed emails dated September 2 and 3, 2014, between SINTF Commander Les James and DEA Special Agent Christopher DeFreece, and Assistant U.S. Attorney Michael McCoy with the subject line T-III Williams Decl. ¶11; Lunardi Decl. ¶6; James Decl. ¶21; Foster Decl. ¶7; Defs.' Ex.35. | 45. |
| 46.   In these emails, SINTF Commander Les James informed Agent DeFreece that on or about August 31, 2014, a Shasta County Sheriff's Deputy responded to a domestic violence report.  According to James's summary: "The female victim reported being battered by a suspect after the suspect found a "Hallmark" | 46. |

13

| MOVING PARTIES UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE: | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE: |
|---|---|
| type card on his windshield.  The card was apparently from an unknown male, who referenced a trip the victim and the author had taken to Lake Tahoe.  On or about 9/1/2014, the deputy spoke to the suspect via telephone.  The suspect said the victim told him the card was from Tim Larios.  The suspect was previously arrested by Agent Larios after a search warrant was served at his residence and about 158 pounds of processed marijuana was seized.  The criminal case is still moving through the court process.  However, attempts were made to identify the CI who'd provided the probable cause for the issuance of the search warrant which were unsuccessful.  The suspect told the deputy that he intended to inform his attorney of the alleged relationship between the victim and Agent Larios as proof of wrong doing on Agent Larios's part."  "In speaking to Agent Larios, he admits to knowing the victim/CI before working the case involving the suspect.  However; they'd never dated and were merely acquaintances, who hadn't been in recent contact with each other for a period of a year +/- .  Although Agent Larios spoke to the CI via telephone to obtain the information for the search warrant, she didn't provide the name Agent Larios knew her by and he didn't recognize her voice as one he was immediately familiar with.  The service of the search warrant and the arrest of the suspect preceded Agent Larios and the CI communicating with each other again on a personal basis."  "In about December 2013, Agent Larios and the CI ran into each other and began continuing their friendship.  At some point they realized that the CI had provided Agent Larios with the information that resulted in the issuance of the search warrant for the suspect's residence for marijuana."  "The CI told Larios that her relationship with the suspect involved physical violence, threats | |

14

| MOVING PARTIES UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE: | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE: |
|---|---|
| of violence, and she was in sustained fear for her physical safety.  At some point, Agent Larios thought he might deter the suspect from coming around the CI if he placed the card where the suspect could find it.  Agent Larios thought that if the suspect believed the CI was in a serious relationship, the suspect would leave the CI alone."<br><br>"Agent Larios said that the contents of the card weren't true.  However; he admitted to going to Lake Tahoe with the CI as was stated in the card.  Agent Larios insisted that his relationship with the CI was one of friendship and not intimacy."<br><br>Lunardi Decl. ¶6; James Decl. ¶21; Defs.' Ex. 35. | |
| 47.   On September 18, 2014, Investigator Lunardi received and reviewed a copy of the Shasta County Sheriff's Office criminal report of domestic violence occurring on August 31, 2014, Case Number 14-32588 from CHP Lieutenant Foster.<br><br>Lunardi Decl. ¶7; Foster Decl. ¶8; James Decl. ¶¶15-16; Defs.' Ex. 34. | 47. |
| 48.   According to the August 31 2014, Shasta County Sheriff's Report, Sherriff's deputies responded to a call at the victim's residence in which the victim claimed that she was physically assaulted by her boyfriend.  The victim, who Investigator Lunardi later identified as Tawnya Mellow, identified her "on again/off again" boyfriend as Nate Santana.  According to Mellow, Santana spent the night on August 30, 2014.  In the afternoon of the following day, Santana found a Hallmark greeting card on the windshield of the victim's vehicle.  Mellow described the greeting card as having certain text underlined, including the phrase "I love you."  The greeting card mentioned a past trip to Lake Tahoe.  Mellow stated that Santana returned to the residence after finding the | 48. |

15

Defendants' Statement of Undisputed Material Facts in Support of Defendants' Motion for Summary Judgment, or, in the Alternative, Motion for Summary Adjudication  (2:15-cv-02451-MCE-CMK)

| MOVING PARTIES UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE: | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE: |
|---|---|
| greeting card. After closing the windows, Santana demanded Mellow tell him who left the greeting card, in the process striking the victim on her right cheek. Santana told Mellow that the blow was for the kiss on the cheek referenced by the ex-boyfriend in the greeting card. Santana threatened to kill Mellow if she did not tell her who left the card. Mellow told Santana who the card was from. After Mellow identified the person who authored the card, Santana said "Oh my God, it all makes sense now." After Mellow told Santana who sent the card, he began to leave the residence. Mellow grabbed the greeting card from Santana and she and Santana struggled over possession of the card until Santana regained possession of the card and left the residence. In the investigative report, Sheriff's Deputy Nick Thompson stated that in a telephone interview with Santana on September 1, 2014, Santana told Deputy Thompson that he dated Mellow for seven years. Santana confirmed that on August, 31, 2014, as he was leaving Mellow's residence, he found a greeting card on the windshield of his vehicle. After he confronted Mellow about the card, Mellow told him that the card was from Tim Larios. Santana told Deputy Thompson that Tim Larios was the agent in charge of a criminal investigation in which he was facing charges for possession of marijuana.<br><br>Lunardi Decl. ¶7; Foster Decl. ¶8; James Decl. ¶¶15-16; Defs.' Ex. 34. | |
| 49.   On September 22, 2014, Lunardi and Hutsell met with SINTF Commander Sergeant Les James at the SINTF office in Redding. James provided Investigator Lunardi with the SINTF Investigation Report and Statement of Probable Cause that Officer Larios had prepared in the Santana investigation, SINTF Case Number SH2013-00074.<br><br>Lunardi Decl. ¶¶ 10-11; James Decl. ¶23; | 49. |

16

| MOVING PARTIES UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE: | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE: |
|---|---|
| Defs.' Exs. 20-21. | |
| 50.   On September 22, 2014, Lunardi and Hutsell met with Shasta County Deputy District Attorney (DA) Laura Smith.  Deputy DA Smith stated that she was assigned to the prosecution of Nathan Santana and Robin Rudolph that arose from SINTF Case Number SH2013-00074.  Smith related that she was aware of the allegations that Officer Larios had a personal relationship with the confidential informant involved in the Santana investigation and that the DA's decision to dismiss the prosecutions against Santana and Rudolph on September 17, 2014 was made in part because of the allegations that Officer Larios had an inappropriate relationship with his confidential informant that had provided him information in the criminal investigation that resulted in the prosecution of Nathan Santana in Shasta County Superior Court case 13F7922.<br><br>Lunardi Decl. ¶12. | 50. |
| 51.   On September 22, 2014, Lunardi reviewed the criminal investigation report of the investigation into Nathan Santana (SINTF Case Number SH2013-00074) and Statement of Probable Cause that Officer Larios prepared in support of the search warrant application.  The statement of probable cause stated in part:<br><br>"On September 20, 2013, I was contacted by a Citizen Informant, hereinafter referred to as CI.  The CO informed me that he/she was aware that Nathan John Santana was purchasing and selling marijuana.  The CI related that he/she has known for Santana for more than one year and known Santana to be selling marijuana in this fashion for more than two years.<br><br>"On September 30, 2013, I spoke with the CI and the CI related that he/she has seen Santana in possession of bulk marijuana.  The CI was | 51. |

| MOVING PARTIES UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE: | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE: |
|---|---|
| shown a Shasta County Jail mugshot and positively identified the photograph as the person he/she knows as Nathan John Santana. The CI was shown a Google Earth photograph of [REDACTED] and the CI positively identified that photograph as the residence that Nathan John Santana lives in. | |
| "Between September 20, 2013 and November 11, 2013, I have conversed with the CI several times. The CI informed me that Santana is currently in possession of processed marijuana that he is trying to sell. | |
| Lunardi Decl. ¶11; James Decl. ¶23; Defs.' Ex. 20; Larios Dep. 140:25-143:2. | |
| 52.   By reviewing the criminal investigation report from SINTF Case Number SH2013-00074 Lunardi learned that on November 12, 2013, SINTF, along with other allied law enforcement agencies served a Shasta County Search Warrant SW2013-284 at Nathan Santana's residence on 22085 Hermosa Dr. Anderson, CA 96007.  During the service of the search warrant agents located approximately 158 pounds of processed marijuana.  According to the report, during the service of the search warrant, Santana was arrested at the scene and transported to the Shasta County Jail and booked.  According to the report, it was recommended that Nathan Santana and Robin Carl Rudolph be prosecuted for possession of marijuana for sale in violation of California Health and Safety Code section 11359 and Conspiracy in violation of California Penal Code section 182.<br><br>Lunardi Decl. ¶10; James Decl. ¶23; Defs.' Ex. 21. | 52. |
| 53.   On or about September 23, 2014, Investigator Lunardi obtained SINTF property assigned to Officer Larios from Lieutenant Kyle Foster, including: (1) a laptop, (2) SINTF cellphone, and a (3) flash drive.  The | 53. |

18

| MOVING PARTIES UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE: | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE: |
|---|---|
| SINTF cell phone (Officer Larios's SINTF phone) that Investigator Lunardi received from Lieutenant Foster was a Casio G'z One Commando C771.<br><br>Lunardi Decl. ¶13; Foster Decl. ¶13; Defs.' Ex. 18; Larios Dep. 132:8-133:3. | |
| 54.   On September 23, 2014, SINTF Commander, Sergeant James provided Lunardi with SINTF policy regarding Confidential Informant management.<br><br>Lunardi Decl. ¶14; James Decl. ¶24; Defs.' Ex. 33. | 54. |
| 55.   Under section 10.1 of SINTF's Informant Management Policy, "[a]n informant is a person, not a member of a law enforcement, who provides law enforcement information or assistance concerning suspected criminal activity."<br><br>Lunardi Decl. ¶14; James Decl. ¶9; Defs.' Ex. 33. | 55. |
| 56.   Under section 10.6 of SINTF's Informant Management Policy, "[r]elationships between Shasta Interagency Narcotics Task Force Agents and informants shall be completely ethical and professional in nature.  Fraternization with an informant in any way other than in an official capacity is strictly prohibited.  When contacting informants, SINTF Agents shall have another agent or law enforcement officer present.  Only during actual undercover situations may a SINTF Agent be alone with an informant.  Exceptions require the prior approval of the SINTF Commander."<br><br>Lunardi Decl. ¶14; James Decl. ¶10; Defs.' Ex. 33 | 56. |
| 57.   On September 23, 2014, at approximately 2:00 p.m., Lunardi and Hutsell conducted an interview of CI Tawnya Mellow, at the Anderson River Park in | 57. |

19

| MOVING PARTIES UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE: | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE: |
|---|---|
| Anderson California. Lunardi Decl. ¶15. | |
| 58.   At the time of Lunardi and Hutsell's interview with Mellow, California Association of Highway Patrolmen, district representative Mike Cantrall arrived with CI Mellow and requested to be present during the interview. Lunardi advised representative Cantrall that he would not interview CI Mellow with Cantrall present.  Cantrall left prior to the interview with Mellow commencing. Lunardi Decl. ¶15. | 58. |
| 59.   During her September 23, 2014 interview, Mellow stated that Officer Tim Larios left a greeting card at her residence on a vehicle parked at her residence August 31, 2014.  Mellow stated she knew Officer Larios had left the card for her on August 31, 2014 because she had seen Officer Larios's handwriting before when he had her a greeting card on another occasion.  Mellow stated that the greeting card left outside her residence on August 31, 2014, had the same handwriting as the card that Officer Larios had given her on another occasion.  Mellow claimed that Officer Larios embellished what he had written in the card in order to drive her ex-boyfriend Santana away from her.  Mellow claimed that after discovering the greeting card, Santana choked her while asking who left the card and threatened to kill her if she did not tell him who left it. Lunardi Decl. ¶15. | 59. |
| 60.   Mellow stated that she first met Officer Larios around 2005-2006 at the Win River Casino but lost touch.  Mellow stated that she called SINTF in September or October 2013 to provide information about Santana regarding Nathan Santana's involvement in selling large amounts of marijuana.  Mellow stated that she provided information about Santana to Officer Larios, and that the | 60. |

20

| MOVING PARTIES UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE: | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE: |
|---|---|
| information she provided about Santana led to a search warrant. Mellow stated that she contacted Officer Larios between 10-15 times in a month and a half to provide information about Santana, and said that a lot of her communications with Officer Larios were done via texting. Regarding the search warrant, Mellow said she texted Officer Larios the address of Santana's residence, but denied receiving any photographs from Officer Larios. Mellow also denied meeting Officer Larios in to provide him information. Mellow stated that she also described Santana's appearance to Officer Larios, described his vehicle, and provided his license plate number, and where he worked.<br><br>Lunardi Decl. ¶15. | |
| 61.   Mellow stated that she ran into Officer Larios at a Safeway gas station in December 2013 and they exchanged phone numbers, and shortly after they realized that Mellow had provided information about Santana to Officer Larios (on December 7 or 8, 2013.)  Mellow stated that after their meeting at the gas station, they continued to talk and text and went on two or three drives together.  Mellow stated that she took a trip to Lake Tahoe with Officer Larios in April or May of 2014. During the trip to Lake Tahoe, Officer Larios and Mellow stayed in the same room together at Harvey's Casino in South Lake Tahoe, and shared the a bed.  Mellow denied that she had any physical contact with Officer Larios, and stated that their relationship was not intimate. Mellow stated that her relationship with Officer Larios ended after their Lake Tahoe trip.  She stated that Officer Larios expressed feelings toward her, but she was not attracted to him in a romantic way.<br><br>Lunardi Decl. ¶15. | 61. |
| 62.   On September 23, 2014 at approximately 5:00 p.m., Lunardi and Hutsell interviewed Nathan Santana at the Civic Auditorium in | 62. |

21

| MOVING PARTIES UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE: | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE: |
|---|---|
| Redding.<br><br>Lunardi Decl. ¶16. | |
| 63.   During the interview, Santana told Lunardi and Hutsell that he was arrested for marijuana possession on November 12, 2013 after a search warrant.  Santana stated that he and Mellow had been together for approximately seven years.<br><br>Lunardi Decl. ¶16. | 63. |
| 64.   Santana stated that within a month of his arrest, Mellow told him that Officer Larios had approached her at the Three Shastas Bar in Redding and started talking to her.  Mellow told Santana that she and Officer Larios had been exchanging texts for a month and that Officer Larios wanted to take their relationship further, but that she had told Officer Larios that she was still in love with Santana.<br><br>Lunardi Decl. ¶16. | 64. |
| 65.   Santana stated that in March or April of 2013, at approximately 2:15, a.m., he and Mellow were having sex at her residence when someone repeatedly drove by and was honking the car horn.  Santana looked outside and saw a white car, possibly a Camry, take off down the street.  Santana said that he knew that Officer Larios had a white car.  Santana stated that approximately 15-20 minutes later, a person on a black, Harley Davidson motorcycle drove by the house honking the horn, and continued doing so until 6 a.m.  Santana stated that the same motorcycle would pass by the residence for the next six months, with the horn honking every time Santana was at Mellow's residence.<br><br>Lunardi Decl. ¶16. | 65. |
| 66.   Santana stated that in August 2014, at approximately 10 a.m., he was at Mellow's residence when a Sheriff's Deputy arrived and wanted to speak to her.  Santana heard the | 66. |

| MOVING PARTIES UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE: | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE: |
|---|---|
| Deputy ask Mellow whether she knew Nathan Santana and inquire whether Mellow was ok. While the Sheriff's Deputy was at the residence, the black Harley Davidson motorcycle passed by the residence approximately four times.  Santana heard the Deputy ask Mellow if she knew who the person on the motorcycle was and Mellow responded that she did not know who it was. Santana stated that he did not observe Mellow calling the Sheriff's office to request service that day. Lunardi Decl. ¶17. | |
| 67.   With respect to the domestic violence incident that occurred on August 31, 2014, Santana stated that he had arrived at Mellow's residence on the evening of August 30, 2014, and spent the night and had sex during the morning of August 31, 2014.  Later that day, Santana walked to his car that was parked in front of Mellow's residence and discovered a greeting card in an envelope under the left side windshield wiper of his car. Lunardi Decl. ¶17. | 67. |
| 68.   During the September 23, 2014 interview, Santana produced the greeting card and envelope that he found on his car on August 31, 2014, to Lunardi.  Lunardi took photographs of the greeting card and envelope and returned them to Santana. Lunardi Decl. ¶18; Defs.' Ex. 32. | 68. |
| 69.   The envelope produced by Santana on September 23, 2014, was addressed to "Tawnya Rachelle." Lunardi Decl. ¶18; Defs.' Ex. 32. | 69. |
| 70.    The greeting card produced by Santana at his interview had the following writing in it (hand writing denoted by italics): "Since I met you *(December 6, 2013)* all I can think about is making you happy.  I want to | 70. |

23

| MOVING PARTIES UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE: | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE: |
|---|---|
| see your smile and hear your laughter.  I want to kiss away old hurts and hold you *SO TIGHT* until you know without a doubt that this is for real . . . *AND YOU KNOW IT IS!!*"<br><br>"*Aug. 31, 2014, DEAREST TAWNYA, SINCE OUR FIRST DATE (12/6/13), I HAVE NOT BEEN THE SAME... AND OUR WALK ACROSS THE BRIDGE AND KISS ON THE CHEEK SHORTLY AFTER YOUR INNOCENT TEXT "MARRY ME" HAS ME WANTING TO ASK YOU THE SAME THING. YOU MEAN THE WORLD TO ME AND THOUGH WE DO NOT SPEND ENOUGH TIME TOGETHER THE TIMES ARE SPECIAL TO ME.  I LOVE EVERYTHING ABOUT YOU, YOUR GIRLS, PARENTS, GMA, YOUR LAUGH, SMILE, VOICE, AND JUST LOVE YOU SO VERY MUCH!!!! PLEASE KNOW I WANT TO SPEND FOREVER WITH YOU AS US!!!*"<br><br>I want to memorize the sound of your voice and the dreams of your heart.  More than anything else, I want to make you happier than you've ever been before, *JUST LIKE YOU WERE IN TAHOE* and give you all the things that you truly deserve.  *WHICH IS THE WORLD!!!  I LOVE YOU FOR WHO YOU ARE TAWNYA RACHELLE AND WANT NOTHING MORE THAN TO UNITE AS ONE!! LOVE ME!!*"<br><br>Lunardi Decl. ¶18; Defs.' Ex. 32. | |
| 71.   Santana stated that after he discovered the card, he returned to Mellow's house and confronted Mellow about it.  Santana denied physically assaulting Mellow.  Santana claimed that he asked Mellow who wrote the card and when Mellow would not tell him. Santana stated that after he threatened to break up with Mellow, she told him that Officer Larios had left the greeting card.  Santana stated that he immediately recognized Officer Larios's name from his pending marijuana criminal charges.  During the interview, | 71. |

| MOVING PARTIES UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE: | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE: |
|---|---|
| Santana produced a copy of the search warrant related to his marijuana cases, which was written and signed by Officer Larios, the main investigator of the case.  Santana then compared the writing in the affidavit to the writing in the greeting card and stated that he believed the writing looked similar.  Santana then told Mellow that he could not believe she was having sex with Officer Larios, the main investigator in his case. | |
| Lunardi Decl. ¶19. | |
| 72.   Santana stated that he asked Mellow about the motorcycle rider that had been driving past her residence and Mellow told him that the rider was Officer Larios.  Santana stated that Mellow denied having gone to Lake Tahoe with Officer Larios and denied having sex with him.  She stated that Officer Larios was weird, often followed her, and had left flowers on her car when she was at the gym.  Mellow told Santana that she did not want anything to do with Officer Larios and denied having had a relationship with him.  Santana stated that he told Mellow that the greeting card left by Officer Larios was going to get him out of his case.  Santana claimed that Mellow attempted to take the greeting card from him and a struggle over the card ensued.  Santana kept the card and threatened to leave Mellow and Mellow threatened to call the police.  Santana told Mellow that he was going to see his attorney and then left Mellow's residence with the greeting card. | 72. |
| Lunardi Decl. ¶19. | |
| 73.   On September 25, 2014, SINTF Commander James provided Lunardi with a SINTF Daily Intelligence Memorandum (DIM) Number 13-22, dated September 18, 2013.  Based on the DIM and explanation of the DIM from Commander James, Lunardi learned that on or about September 18, 2013, Tawnya Mellow called SINTF and reported that she had information regarding large scale | 73. |

| MOVING PARTIES UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE: | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE: |
|---|---|
| marijuana sales by Nate Santana at his residence.<br><br>Lunardi Decl. ¶20; Defs.' Ex. 19. | |
| 74.   On or about September 25, 2014, Investigator Lunardi delivered Officer Larios's SINTF phone that he received from Lieutenant Kyle Foster to CHP's Computer Crimes Investigation Unit (CCIU) Investigator Peter Phurchpean on or about September 25 or 26, 2014, to extract all data from Officer Larios's SINTF phone.  Before handing Officer Larios's SINTF phone over to Investigator Phurchpean, Investigator Lunardi performed a cursory review of the text messages stored on Officer Larios's SINTF phone by opening the text message application and reviewing its contents.  In his preliminary review of the text message application on Officer Larios's SINTF-assigned cell phone, Investigator Lunardi did not see any text messages sent to or received from Tawnya Mellow's phone number, (530) 945-4986.<br><br>Lunardi Decl. ¶21. | 74. |
| 75.   On September 30, 2014, Investigator Lunardi reviewed departmental policy contained in HPM 81.1, Vehicle Theft Control, Chapter 7, Informant Management and Confidential Funds entitled "Relationship of Officers with Informants."  This policy states in pertinent part:<br><br>"Relationships between officers and informants shall be completely ethical and professional in nature.  Officers shall not fraternize with an informant in any way other than in an official capacity.  When contacting informants, officers shall have another officer or member of an allied agency present."<br><br>Lunardi Decl. ¶22; Jones Decl. ¶6; Defs. Ex. 40; Larios Dep. 76:9-16; 127:23-128:15; 152:16-153:3. | 75. |
| 76.   On October 1, 2014, Investigators | 76. |

26

| MOVING PARTIES UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE: | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE: |
|---|---|
| Lunardi and Hutsell interviewed SINTF Commander Les James at the SINTF office in Redding.  Lunardi Decl. ¶23. | |
| 77.   During the interview Commander James stated that: SINTF is was multi-agency narcotics task force and that Commander James was the Commander of SINTF.  Officer Larios was assigned to SINTF as an agent and Commander James was his immediate supervisor in SINTF. Officer Larios was removed from SINTF and reassigned to the CHP because of allegations of misconduct.  Lunardi Decl. ¶23; James Decl. ¶26. | 77. |
| 78.   Commander James explained the process for SINTF Agents establishing the reliability of confidential informants.  He explained that citizen informants, i.e., informants who provide information without expectation of remuneration or other inducement apart from confidentiality, are deemed reliable but the information they provide must be verified.  By contrast a criminal informant, is a person who provides information in exchange for payment or a reduction in charges in their own criminal case.  To establish the reliability of a citizen informant, SINTF agents need to identify the informant to the extent necessary to contact them in the future.  SINTF agents ordinarily verified the identity of an informant by searching the California Law Enforcement Telecommunication System (CLETS) database or the PUBSAFE AS400 system, which is a Shasta County-wide database for law enforcement.  Commander James stated that agents are expected to be able to identify citizen informants if requested by the court.  Lunardi Decl. ¶23; James Decl. ¶26. | 78. |
| 79.   Commander James confirmed that SINTF adopted a written policy governing confidential informant management and explained that under SINTF's informant | 79. |

| MOVING PARTIES UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE: | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE: |
|---|---|
| policy, agents are prohibited from meeting an informant in person without another agent present. According to Commander James, the SINTF informant policy also prohibited agents from having a relationship with an informant that is not professional in nature. Commander James informed me that the reason for prohibiting SINTF agents from having personal relationships with informants is that such a relationship could affect the impartiality of the agent toward the informant. Commander James indicated that he interpreted this SINTF policy to prohibit romantic or intimate relationships between an Agent and informant, particularly if the related criminal matter was ongoing and not adjudicated. Lunardi Decl. ¶24; James Decl. ¶26. | |
| 80.   Commander James stated that he became aware of the possibility that Officer Larios had a non-professional relationship with one of his citizen informants when he received a call from Captain Anthony Bertain of Shasta County Sheriff's Office on September 2nd or 3rd, 2014. Commander James stated that he met with Captain Bertain and Deputy Nick Thompson on the same day he received Captain Bertain's call. During the meeting, Deputy Thompson told Commander James that he responded to a domestic violence call on August 31, 2014, at Tawnya Mellow's residence. The victim was Tawnya Mellow and the suspect was her boyfriend Nathan Santana. Commander James stated that according to Deputy Thompson, the domestic violence incident occurred after Santana found a greeting card that was allegedly left by Officer Larios, and which described a romantic relationship between Officer Larios and Mellow, including a trip Larios took with Mellow to Tahoe. Lunardi Decl. ¶25; James Decl. ¶26. | 80. |
| 81.   According to Commander James, Deputy | 81. |

28

| MOVING PARTIES UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE: | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE: |
|---|---|
| Thompson also stated that while he was responding to the August 31, 2014 domestic violence call, a person on a black Harley Davidson motorcycle with a face mask rode by the residence multiple times.  Deputy Thompson stated that he suspected that the rider of the motorcycle may have been Officer Larios.  Deputy Thompson stated that while he was responding to a welfare check at Mellow's residence a few weeks before August 31, 2014.  Deputy Thompson stated that Officer Larios had requested the welfare check.  During the welfare check, Nathan Santana told Deputy Thompson that he had observed a black Harley Davidson motorcycle traveling in front of Mellow's residence while honking the horn.<br><br>Lunardi Decl. ¶25; James Decl. ¶26. | |
| 82.   Commander James stated that he also met with CHP Sergeant Greg Ziegler to brief him about the Officer Larios's alleged involvement in the August 31, 2014 domestic violence incident at Mellow's residence after his meeting with Captain Bertain and Deputy Nick Thompson.  Commander James stated that after his meeting with CHP Sergeant Ziegler, he met with Officer Larios at the SINTF officer to discuss his involvement in the August 31, 2014 domestic violence incident at Mellow's residence.  Commander James stated that during their discussion, Officer Larios admitted that he left a Hallmark-type greeting card with the intent that Santana would find it.  Officer Larios stated that he knew that the relationship between Santana and Mellow had a history of violence.  According to Commander James, Officer Larios stated that he thought that once Santana read the card that he would believe that Mellow was in a relationship with someone else and leave her alone. Officer Larios claimed that the contents of the card, which expressed romantic love toward | 82. |

29

| MOVING PARTIES UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE: | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE: |
|---|---|
| Mellow, was not true, and that it was a ruse. Officer Larios admitted that he went to Lake Tahoe with Mellow and that she was the confidential informant for the case involving Nathan Santana. But Officer Larios denied that he had had an intimate relationship with Mellow.<br><br>Lunardi Decl. ¶¶26-27; James Decl. ¶26. | |
| 83.   According to Commander James, Officer Larios also admitted that he was the rider on the black motorcycle described by Deputy Thompson.  Officer Larios further admitted that he had requested the welfare check on Mellow.  According to Commander James, Officer Larios explained that he requested the welfare check on Mellow because he had received a call from Mellow's daughter regarding an altercation between Santana and Mellow, and that he requested a welfare check to make sure that Santana had not followed Mellow home after their altercation.<br><br>Lunardi Decl. ¶27; James Decl. ¶26. | 83. |
| 84.   Commander James stated that he had observed Officer Larios with a black Harley Davidson motorcycle and wearing a face mask and a skull cap style helmet.<br><br>Lunardi Decl. ¶28; James Decl. ¶26. | 84. |
| 85.   According to Commander James, Officer Larios claimed that he had known Mellow for a year or more before she became his confidential informant.  Officer Larios also admitted that he and Mellow texted each other but claimed that the texts were not intimate. Officer Larios claimed that when he first contacted Mellow that he did not recognize her voice or the name that she provided. Officer Larios claimed that sometime after Santana's arrest, in December 2013 or January 2014, Mellow and Officer Larios saw each other in public and rekindled their past friendship.  Officer Larios stated that he realized that Mellow was his confidential | 85. |

| MOVING PARTIES UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE: | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE: |
|---|---|
| informant on the Santana case shortly after they resumed their friendship. Lunardi Decl. ¶29; James Decl. ¶26. | |
| 86.   Commander James stated that after of the misconduct allegations against Officer Larios arising from the August 31, 2013 domestic violence incident came to light, the prosecution of Nathan Santana was dismissed by the Shasta County District Attorney's Office. Lunardi Decl. ¶30; James Decl. ¶26. | 86. |
| 87.   Commander James also stated that Officer Larios was the main investigator in a joint state and federal investigation, and that Officer Larios had been involved in making undercover drug buys.  As part of the investigation, the Assistant United States Attorney (AUSA) had prepared a request for a federal wiretap warrant.  But once the allegations against Officer Larios was removal from SINTF and the suspicions that Officer Larios had an inappropriate relationship with a confidential informant surfaced, the AUSA advised Commander James that he planned to insert a footnote describing the allegations against Officer Larios into the affidavit supporting the federal wiretap application. Commander James told me that because he was not comfortable in agreeing to the AUSA's plan to add a footnote describing the allegations against Officer Larios in the affidavit, they stopped the application. Commander James further stated that the Shasta County District Attorney's Office declined to sign a search warrant made in connection with this investigation because of the allegations pending against Officer Larios. Lunardi Decl. ¶30; James Decl. ¶26. | 87. |
| 88.   Commander James stated that Officer Larios should have used his assigned SINTF cell phone to communicate with Tawnya Mellow and that SINTF did not provide other | 88. |

31

| MOVING PARTIES UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE: | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE: |
|---|---|
| phones to its agents for conducting business with confidential informants.<br><br>Lunardi Decl. ¶31; James Decl. ¶26. | |
| 89.   During the October 1, 2014 interview of SINTF Commander James he described his knowledge of Tawnya Mellow's confidential informant status.  Specifically, Commander James stated that:  (1) Mellow initially provided info to SINTF as a tip; (2) Mellow's tip was documented on a form called a daily intelligence memorandum (DIM), which are ordinarily randomly assigned to Agents— SINTF Agents do not have any control over who is assigned to follow up on a particular DIM assignments to follow up on a DIM; (3) it is standard protocol for SINTF Agents to identify themselves to the citizen informant when responding to a tip; (4) Officer Larios briefed him about using Mellow as a confidential informant after making contact with her; (5) Larios told him that Mellow was a victim of domestic violence and that her desire to leave her boyfriend had motivated her to provide report Santana's criminal activities to SINTF; (6) Officer Larios told Commander James that he verified the domestic violence history between the informant and Santana on the AS 400 system to establish her reliability as an informant; (7) Commander James authorized Officer Larios to use Mellow as a confidential informant; (8) at the time Commander James authorized Officer Larios to use Mellow as a confidential informant, he was not told that her name was Tawnya Mellow.<br><br>Lunardi Decl. ¶33. | 89. |
| 90.   Commander James stated that Officer Larios told him that he (Larios) did not realize that he was already friends with Mellow before making her a confidential informant in the Santana investigation because the DIM only supplied Mellow's name as "Rachelle," not Tawnya, the name by which Officer | 90. |

| MOVING PARTIES UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE: | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE: |
|---|---|
| Larios knew Mellow.<br><br>Lunardi Decl. ¶34. | |
| 91.   Commander James that Officer Larios's claim—that he did not recognize Mellow until after Santana's arrest—did not make sense to him because: (1) Officer Larios relied on information provided by Mellow as a confidential informant to obtain a warrant to search Nathan Santana's residence; (2) Officer Larios would have had to identify Mellow beyond her first name and telephone number in order to rely on Mellow as a source in support of an application for a search warrant, and Larios would not have been able to do that based on his claim that he only knew the informant as "Rachelle," not Tawnya; (3) Officer Larios would have had to have fully verified Mellow's identity because a judge could have required him to disclose the identity of his informant, and Larios would not have been able to verify Mellow's identity based on Officer Larios's claim that he only knew the informant as "Rachelle," not Tawnya; and (4) contrary to Officer Larios's claim that he did not know who Mellow was, Officer Larios told Commander James that he verified Mellow's information and history with Santana in the AS 400 system, which he could not have done without knowing or discovering her last name.<br><br>Lunardi Decl. ¶35. | 91. |
| 92.   During the October 1, 2014 interview with SINTF Commander James demonstrated how to use the Shasta County law enforcement database PUBSAFE AS 400. During the demonstration, Commander James demonstrated searches for incidents involving Tawnya Rachelle Mellow, searches performed via variations on Mellow's name and her known cell phone number.  Each of the searches resulted in a list of multiple incidents corresponding with the name Tawnya Mellow. During this demonstration, Investigator | 92. |

33

| MOVING PARTIES UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE: | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE: |
|---|---|
| Lunardi learned that all inquiries into the PUBSAFE AS400 database are logged and maintained on the database and the inquiries can be audited by entering the user's name. <br><br> Commander James's demonstration of the PUBSAFE AS400 system showed that between September 30, 2013, and October 16, 2013, Officer Larios made fifteen separate inquiries from the PUBSAFE AS400 database regarding Tawnya Mellow, using Mellow's name and aliases, including Tawnya, Scheidecker, Tawnya Rachelle Mellow, and Mellow's driver's license number, which, to Investigator Lunardi, appeared to contradict Officer Larios's statement to Commander James that he did not recognize Mellow until after Santana was arrested because Mellow had used the name "Rachelle." <br><br> Lunardi Decl. ¶36-37; James Decl. ¶ 26 | |
| 93.   Commander James denied ever meeting Tawnya Mellow in person. <br><br> Lunardi Decl. ¶39. | 93. |
| 94.   On October 3, 2014, Officer Phurchpean of CCIU completed the data extraction of Officer Larios's SINTF phone. Officer Phurchpean delivered the data extracted from Officer Larios's SINTF phone to Investigator Lunardi in an HTML, searchable report on a compact disc to Investigator Lunardi. <br><br> Lunardi Decl. ¶42; Phurchpean Decl. ¶¶10-19; Defs.' Ex. 38. | 94. |
| 95.   On October 7, 2014, Investigator Lunardi met with CHP Officer Whitney Geraurd, of the CHP Field Support Section. Officer Geraurd served as the CHP Statewide CalPhoto Coordinator. Officer Geraurd provided Investigator Lunardi with a CalPhoto audit report showing all of Officer Larios's CalPhoto inquiries regarding Tawnya Mellow made from September 20, through November 11, 2013. | 95. |

| MOVING PARTIES UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE: | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE: |
| --- | --- |
| The CalPhoto audit report indicated to Investigator Lunardi that Officer Larios pulled CalPhoto reports on Tawnya Mellow on three separate occasions—twice on September 30, 2013, and once on October 9, 2013—all of which occurred before Nathan Santana's November 12, 2013 arrest.  Because Officer Larios's CalPhoto inquiries regarding Mellow would have revealed Tawnya Mellow's full name, physical identifying information, including her driver's license portrait, and height, weight, and other physically identifying features to Officer Larios at the time they were accessed, Lunardi suspected that Officer Larios's statement to SINTF Commander James—that he had been friends with Mellow before she became an informant yet did not realize who Mellow was until after Santana's arrest in November 2013—appeared to be false.  Lunardi Decl. ¶¶43-44; Defs. Ex. 41. | |
| 96.   On October 8, 2014, Investigator Lunardi and Hutsell interviewed SINTF Agent Tom Moon.  Moon denied having met Tawnya Mellow or knowing who she was.  Moon confirmed that SINTF had a policy that required SINTF agents to bring another SINTF agent along when meeting a confidential informant in person.  Moon could not recall ever meeting Mellow.   Moon stated that he had seen Officer Larios text photographs to confidential informants to identify suspects in the past.  After Lunardi showed Moon a picture of Mellow, Moon denied knowing Mellow or ever having met her.  Lunardi Decl. ¶46. | 96. |
| 97.   On October 8, 2014, Investigator Lunardi and Hutsell interviewed SINTF Agent Kip Kinneavy.  Kinneavy denied knowing Tawnya Mellow and denied recognizing her when Lunardi showed him a picture of Mellow.  Agent Kinneavy confirmed that | 97. |

| MOVING PARTIES UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE: | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE: |
|---|---|
| SINTF had a policy that required SINTF agents to bring another SINTF agent along when meeting a confidential informant in person, and stated that he had accompanied Officer Larios during such meetings before. Kinneavy confirmed that he had observed Officer Larios confirming the identities of suspects with confidential informants by either meeting with them in person or texting them a photo to verify. Lunardi Decl. ¶45. | |
| 98.   Between October 3-15, 2014, Lunardi and Hutsell reviewed and analyzed the data extraction of Officer Larios's SINTF phone via the HTML report provided to Lunardi by Officer Phurchpean.  The report revealed that Officer Larios's SINTF phone showed activity from January 21, 2013, to September 26, 2014.  During that time period, there were 500 phone calls and 8,681 text messages in total. Lunardi Decl. ¶¶48-49; Phurchpean Decl. ¶¶10-19; Defs.' Ex. 42, pp. 1-5. | 98. |
| 99.   During his examination of the data extracted from Officer Larios's SINTF phone, Investigator Lunardi observed that of the 500 phone calls and 8,681 text messages extracted from Officer Larios's SINTF phone, there was only one phone call lasting approximately 31 seconds and zero text messages with Tawnya Mellow's phone number. Lunardi Decl. ¶¶49-51; Defs.' Ex. 42, p. 6. | 99. |
| 100. During his examination of the data extracted from Officer Larios's SINTF phone, Investigator Lunardi observed that there were three phone calls and 110 text messages between Officer Larios's SINTF phone and Officer Larios's personal cell phone. Lunardi Decl. ¶52; Defs. Ex. 42, p. 7. | 100. |
| 101. During his examination of the data extracted from Officer Larios's SINTF phone, Investigator Lunardi observed that the texts | 101. |

36

| MOVING PARTIES UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE: | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE: |
|---|---|
| exchanged between Officer Larios's SINTF phone and Officer Larios's personal cell phone contained what appeared to be addresses, phone numbers, names and license plate numbers.  Based on Investigator Lunardi's review of these texts, he deduced that Officer Larios was conducting work using his personal cell phone.<br><br>Lunardi Decl. ¶53. | |
| 102. On October 22, 2014, Investigator Lunardi contacted CI Mellow via telephone to arrange a follow-up interview.  Mellow stated that she was uncomfortable speaking with Investigator Lunardi and hung up.<br><br>Lunardi Decl. ¶57. | 102. |
| 103. Based on the investigation conducted between September 10, 2014 and October 30, 2014, Investigator Lunardi developed a suspicion that Officer Larios fostered an inappropriate, personal relationship with his confidential informant Tawnya Mellow in violation of CHP and SINTF policy and professional standards.<br><br>First, the witness statements from SINTF Commander Les James, CI Mellow, and Nathan Santana, and documents, including Commander James's email correspondence, the August 31, 2014 Shasta County Sheriff's Office investigation report, and the greeting card that Nathan Santana produced during his witness interview, indicated to Investigator Lunardi that on or about August 31, 2014, Officer Larios placed a greeting card addressed to CI Mellow on the windshield of a car parked at Mellow's residence.  In the greeting card, Officer Larios handwrote multiple messages expressing romantic interest in Mellow, including: (1) "I love everything about you…;" (2) "Just love you so much!!!;" (3) "Please know I want to spend forever with you as us !!!;" (4) "I want to make you happier than you've ever been | 103. |

| MOVING PARTIES UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE: | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE: |
|---|---|
| before, just like you were in Tahoe…"; (5) "I love you for who you are Tawnya Rachelle and want nothing more than to unite as one!!;" (6) "Love Me!!;" and (7) discussing "our walk across the bridge and kiss on the cheek shortly after your innocent text "Marry Me' …;"  and described having a first date with Mellow on December 6, 2013, having kissed, exchanged a text proposing marriage, and taking a trip to Lake Tahoe together.<br><br>Second, the witness statements of Santana, Mellow and Commander James, and documents, including Commander James's email correspondence, the SINTF Investigative Report and Statement of Probable Cause from the Santana investigation, and the September 18, 2013 SINTF Daily Intelligence Memorandum (DIM), indicated to Investigator Lunardi that Tawnya Mellow served as Officer Larios's confidential informant in an investigation into Nathan Santana, that CI Mellow provided Officer Larios with information that enabled Officer Larios a search warrant to search Santana's residence, recover approximately 158 pounds of marijuana and ultimately arrest Santana for possession of marijuana for sale and conspiracy.<br><br>Third, the witness statements of Santana and Mellow indicated that Officer Larios had expressed romantic interest in Mellow between December 2013 and August 2014. (SUF 59, 61, 64.)  In fact, the witness statements of Santana and Commander James together, indicated to Investigator Lunardi that Officer Larios attempted to disrupt Santana and Mellow's relationship by continuously riding his motorcycle outside of her residence and honking his horn repeatedly on occasions when Santana was present at Mellow's residence, thus possibly indicating to IAS investigator Lunardi that Officer Larios was jealous of Santana. | |

| MOVING PARTIES UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE: | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE: |
|---|---|
| Fourth, the witness statements of Mellow and Commander James further bolstered Investigator Lunardi's suspicion that Officer Larios had a romantic and possibly physically intimate relationship with Tawnya Mellow while the criminal case she assisted with was still pending in court.  Specifically, their statements indicated to Investigator Lunardi that Officer Larios and Mellow took an overnight trip to South Lake Tahoe together in spring or summer of 2014, and shared the same hotel room and bed during that trip. | |
| Fifth, Commander James's email correspondence, witness statement, and Investigator Lunardi's review of Officer Larios's searches made on the PUBSAFE AS400 database and the DMV's CalPhoto database indicated that Officer Larios falsely told Commander James that he had been friends with Mellow years before she served as his confidential informant, yet did not realize who she was until December 2013, following Santana's arrest because Mellow had used the name "Rachelle" when initially reporting Nathan Santana to SINTF because Officer Larios's PUBSAFE AS400 and CalPhoto searches showed that he between September 20, 2013 and November 11, 2013, he had accessed information that not only revealed Tawnya Mellow's full name, including the name "Rachelle," but also provided information about her physical appearance and her portrait photo more than one month before Santana was arrested. | |
| Lunardi Decl. ¶¶9, 14, 22, 24, 59-64, Defs.' Exs. 19-21, 23, 32-35, 40, 43. | |
| 104.  Based on the investigation conducted between September 10, 2014 and October 30, 2014, Investigator Lunardi further suspected that Officer Larios communicated with confidential informant Tawnya Mellow via text message, and that he likely used his personal cell phone to on only to conduct | 104. |

| MOVING PARTIES UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE: | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE: |
|---|---|
| work but to exchange text messages with Mellow, and therefore, likely contained evidence of the nature of Officer Larios's and Tawnya Mellow's relationship. | |

First, the witness statements of CI Mellow, Nathan Santana, and Commander Les James, IAS investigators determined that Officer Larios communicated with informants via text message, Officer Larios and CI Mellow exchanged text messages regarding the Santana investigation and continued exchanging text messages after Santana was arrested, and that SINTF issued Officer Larios a cell phone for the express purpose of conducting SINTF business such as communicating with confidential informants. But, Investigator Lunardi's did not observe any text messages between CI Mellow's phone number and Larios's SINTF phone and only one outgoing phone call lasting approximately 31 seconds for the time period between January 21, 2013, to September 26, 2014 during his review of Officer Lunardi's SINTF phone, and the data extracted from Officer Larios's SINTF phone.

Second, the data extracted from Officer Larios's SINTF phone, which Investigator Lunardi observed (1) displayed that more than 100 text messages were exchanged between Officer Larios's SINTF phone and Officer Larios's personal cell phone number; and (2) consisted of messages relaying license plate numbers, names, and addresses, indicated to IAS Investigator Lunardi that Officer Larios was using his personal cell phone to conduct and store SINTF work and to transmit it to his SINTF phone.

Third, the greeting card that Santana produced during his interview with Investigator Lunardi and Officer Larios's admission to Commander James that he placed it on a car outside CI Mellow's residence on August 31, 2014, indicated to Investigator Lunardi that CI

| MOVING PARTIES UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE: | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE: |
|---|---|
| Mellow sent Officer Larios a text that stated "Marry Me," yet no such corresponding text was discovered on Officer Larios's SINTF phone. | |
| Fourth, the Statement of Probable Cause from SINTF's investigative file from the Nathan Santana investigation, indicated that Officer Larios attested that he conversed with Tawnya Mellow and confirmed Nathan Santana's identity and residence address by showing CI Mellow a mug shot of Nathan Santana and a Google earth image of Santana's residence. Yet the witness statements of Commander James, Mellow, and SINTF Agents Tom Moon and Kip Kinneavy to Investigator Lunardi that Officer Larios and Mellow never met in person before Santana's November 12, 2013 arrest, and therefore, Officer Larios likely texted CI Mellow Santana's mugshot and the Google earth image of Santana's residence in order to have submitted a truthful affidavit of probable cause. | |
| Lunardi Decl. ¶¶65-69; Defs.' Exs. 20, 32-33, 42. | |
| 105. Based on the Investigator Lunardi's administrative investigation of Officer Larios, IAS sought and received authorization from the CHP to direct Officer Larios to produce his personal phone for CHP to conduct a search for work product under CHP General Order 100.95. | 105. |
| Williams Decl. ¶¶14-17; Jones Decl. ¶¶11-14. | |
| 106. Based on the information revealed in the investigation conducted, Lunardi received approval from Lt. Williams to conduct a limited search of Officer Larios's cell phone for departmental work product and requested assistance from CCIU to perform the data extraction of Officer Larios's cell phone. | 106. |
| Williams Decl. ¶¶14-17; Lunardi Decl. ¶72; | |

41

| MOVING PARTIES UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE: | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE: |
|---|---|
| Jones Decl. ¶¶12-14. | |
| 107. In order to limit the search to the parameters of the CHP's administrative investigation, Lt. Williams issued a memorandum to CCIU, directing them to only provide IAS with call logs and text messages between Officer Larios's personal cell phone and CI Mellow's phone, Officer Larios's SINTF phone, SINTF Agent Moon's SINTF phone, SINTF Agent Kinneavy's SINTF phone, and SINTF Commander Les James's phone between September 1, 2013, and November 5, 2014.<br><br>Williams Decl. ¶18; Lunardi Decl. ¶73; Duray Decl. ¶¶5-6; Defs.' Ex. 25. | 107. |
| 108. Officer Larios has no personal knowledge about how Defendant Scott Lunardi and Mel Hutsell conducted the investigation of Officer Larios between August 31, 2014 and November 6, 2014.<br><br>Larios Dep. 169:1-22 | 108. |
| 109. On November 6, 2014, Lunardi directed Officer Larios to produce his personal cell phone so it could be searched for official work product pursuant to CHP General Order 100.95.<br><br>Larios Dep. 179:16-181:11 | 109. |
| 110. Lunardi served Officer Larios with a memorandum signed by CHP Assistant Chief, and IAS Commander R.J. Jones, which directed Officer Larios to provide his cell phone to the CHP, and informed him that (1) the CHP would conduct a data extraction to retrieve all work product; and (2) failure to adhere to the memorandum's direction "may result in additional charges/disciplinary action."<br><br>Larios Dep. 179:16-180:1; 180:2-181:11; Jones Decl. ¶15; Defs.' Ex. 22. | 110. |
| 111. Officer Larios initially refused to | 111. |

| MOVING PARTIES UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE: | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE: |
|---|---|
| produce his cell phone because it contained personal and private information, offering instead to show Lunardi all CHP work product on his cell phone.<br><br>Larios Dep. 181:12-182:9; 182:10-23. | |
| 112. During the November 6, 2014 meeting Officer Larios told Investigator Lunardi that he had work product on his cell phone.<br><br>Larios Dep. 203:2-4; Lunardi Decl. ¶70. | 112. |
| 113. Investigator Lunardi rejected Officer Larios's offer to show him work product and Officer Larios produced his cell phone to Lunardi.<br><br>Larios Dep. 181:12-182:23 | 113. |
| 114. After obtaining Officer Larios's cell phone, an Apple iPhone 4 with a cracked screen, at approximately 11:00 a.m., Investigators Lunardi and Domby met CHP CCIU Investigator Curtis Duray at a Redding area hotel to conduct the data extraction from Officer Larios's cell phone.<br><br>Lunardi Decl. ¶75; Duray Decl. ¶¶7-8; Larios Dep. 215:19-217:24; 219:6-23; 231:24-232:2. | 114. |
| 115. Investigator Duray spent multiple hours attempting to conduct a forensic extraction of the data from Officer Larios's personal cell phone using two different forensic extraction devices but was unable to conduct the extraction using the forensic extraction tools he brought.<br><br>Duray Decl. ¶¶9-13. | 115. |
| 116. After Investigator Duray's efforts to perform the extraction with the forensic extraction tools he brought failed, Investigator Duray and Lunardi manually accessed a text message string between Officer Larios's cell phone and CI Mellow and then attempted to use a digital camera to photograph and video record the text messages exchanged in this | 116. |

| MOVING PARTIES UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE: | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE: |
|---|---|
| string while manually scrolling through it. Duray Decl. ¶14; Lunardi Decl. ¶76; Defs.' Ex. 45. | |
| 117. Investigators Lunardi and Duray determined that, in light of the significant volume of text messages between Officer Larios's personal cell phone and Tawnya Mellow's number, it would take multiple additional hours to complete the manual search and documentation of these messages, the manual search could not be completed within the same day and decided to discontinue the manual search. Duray Decl. ¶14; Lunardi Decl. ¶77. | 117. |
| 118. While handling Officer Larios's phone on November 6, 2014, which he had placed in Airplane mode, Investigator Duray inadvertently pushed the call out button on Officer Larios's cell phone twice, resulting in two calls being attempted by the phone to the number (530) 945-4986; the first inadvertent call attempt was made on November 6, 2014, at approximately 1403 for the duration of two seconds and the second call occurred on November 6, 2014, at 1653 for one second. It was unclear whether either of these call attempts successfully connected with the phone number that was being dialed. Investigator Duray immediately terminated each inadvertent call attempt immediately after realizing he had inadvertently initiated the call button. Duray Decl. ¶21. | 118. |
| 119. As a last resort, Investigator Duray created a backup of Larios's phone using a CHP Apple MacBook Pro in order to make a second extraction attempt using a different forensic device. Duray Decl. ¶16-17; Deposition of Curtis Duray 31:2-32:20. | 119. |
| 120. Officer Larios was not present during | 120. |

44

| MOVING PARTIES UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE: | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE: |
|---|---|
| Lunardi and Duray's attempt to perform the data extraction of his cell phone on November 6, 2014, and therefore did not personally observe these events.<br><br>Larios Dep. 221:5-24 | |
| 121. Once the backup of Officer Larios's cell phone was complete, Lunardi returned Larios's cell phone to the CHP Redding Area Office at approximately 6:00 p.m.<br><br>Lunardi Decl. ¶77; Duray Decl. ¶17. | 121. |
| 122. Officer Larios retrieved his cell phone at approximately 6:50 p.m.<br><br>Larios Dep. 219:6-23; Defs.' Ex. 24. | 122. |
| 123. On November 12, 2014, Officer Duray employed a forensic tool to extract the text messages between Larios and CI Mellow from the backup he made of Officer Larios's cell phone.<br><br>Duray Decl. ¶¶18-20. | 123. |
| 124. CCIU Investigator Duray then created a report containing the text messages between Officer Larios's cell phone and Mellow's cell phone, and any media exchanged within these text messages and delivered the report to Lunardi.<br><br>Duray Decl. ¶¶18-20; Lunardi Decl. ¶79. | 124. |
| 125. Investigator Duray's extraction of data from Officer Larios's cell phone unintentionally yielded one text from a phone number that was not included in Lieutenant Williams's memorandum.<br><br>Duray Decl. ¶23. | 125. |
| 126. Officer Larios has no evidence showing that Defendants accessed any information on his phone, including bank account information, private pictures, or private messages, beyond the text messages, and media exchanged via text message, between Officer Larios and CI Mellow. | 126. |

45

| MOVING PARTIES UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE: | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE: |
|---|---|
| Larios Dep. 188:12-192:23. | |

**ISSUE 3 – Defendant Kyle Foster is Entitled to Summary Adjudication of Plaintiff's first cause of action under 42 U.S.C. § 1983 Violation of Fourth Amendment of the United States Constitution Because He Did not Direct Officer Larios to Produce His Cell Phone for Inspection or Participate in Inspecting It.**

| MOVING PARTIES UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE: | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE: |
|---|---|
| See SUFs 1-126, which are incorporated herein. | |
| 127. Kyle Foster was assigned to facilitate the IAS administrative investigation into Officer Larios. Foster Decl. ¶10. | 127. |
| 128. At or near November 6, 2014, Kyle Foster's supervisor, CHP Captain Todd Garr, instructed Foster to contact Officer Larios and instruct him to report to the Redding Area office for a meeting with Investigator Lunardi and CHP officer Kevin Domby.  Foster was informed that at the meeting Investigator Lunardi would request Officer Larios to produce his personal cell phone for to extract CHP work product from it, but Captain Garr instructed Foster not to disclose to Officer Larios the reason for the meeting. Foster Decl. ¶¶14-15. | 128. |
| 129. When Kyle Foster contacted Officer Larios on November 6, 2014, he had no knowledge regarding how the CHP IAS planned to obtain Officer Larios's personal cell phone beyond asking him to produce it. Foster Decl. ¶16-17. | 129. |
| 130. Kyle Foster did not participate in extracting or reviewing any data from Officer Larios's personal cell phone. Foster Decl. ¶18. | 130. |
| 131. Officer Larios has no personal | 131. |

46

| MOVING PARTIES UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE: | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE: |
|---|---|
| knowledge regarding Kyle Foster's role in the IAS administrative investigation into his alleged misconduct with CI Mellow. Larios Dep. 170:3-22; 171:13-172:23. | |
| 132. Officer Larios has no evidence that Kyle Foster participated in the examination of his cell phone. Larios Dep. 192:21-23; 221:16-18. | 132. |

**ISSUE 4 - Defendants Are Entitled to Summary Adjudication of Plaintiff's first cause of action under 42 U.S.C. § 1983 Violation of Fourth Amendment of the United States Constitution under the Grounds of Qualified Immunity Because the Inspection of Larios's Cell Phone Did Not Violate a Clearly Established Constitutional Right.**

| MOVING PARTIES UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE: | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE: |
|---|---|
| See SUFs 1-132, which are incorporated herein. | |
| 133. The IAS did not criminally investigate Officer Larios, nor was any criminal investigation of Larios authorized by the CHP. Jones Decl. ¶¶17-18; Williams Decl. ¶19-22 | 133. |

**ISSUE 5- Defendants Are Entitled to Summary Adjudication of Plaintiff's second Cause of Action under the California Bane Act (Cal. Civ. Code § 52.1 Because Defendants Did not Threaten Officer Larios with Violence and Larios Did Not Suffer a Constitutional Deprivation.**

| MOVING PARTIES UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE: | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE: |
|---|---|
| See also SUFs 1-133, which are incorporated herein. | |
| 134. During the November 6, 2014 meeting no one threatened to arrest Officer Larios or charge him with a crime if he did not turn over his phone for inspection. Larios Dep. 212:19-213:9; Ex. 22 | 134. |
| 135. During the November 6, 2014 meeting, not one threatened Officer Larios with | 135. |

47

| MOVING PARTIES UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE: | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE: |
|---|---|
| physical harm or violence if he refused to turn over his phone for inspection. Larios Dep. 213:10-17. | |
| 136. Officer Larios was not subjected to physical violence during the November 6, 2014 meeting. Larios Dep. 213:18-20 | 136. |
| 137. None of the named Defendants in this action have ever threatened Officer Larios with physical violence. Larios Dep. 213:21-214:13 | 137. |

Dated:  October 7, 2019

Respectfully submitted,

XAVIER BECERRA
Attorney General of California
KRISTIN M. DAILY
Supervising Deputy Attorney General


/s/ WILLIAM H. DOWNER


WILLIAM H. DOWNER
Deputy Attorney General
*Attorneys for Defendants*

SA2015303210
14130938

48