XAVIER BECERRA, State Bar No. 118517
Attorney General of California
KRISTIN M. DAILY, State Bar No. 186103
Supervising Deputy Attorney General
WILLIAM H. DOWNER, State Bar No. 257644
Deputy Attorney General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone: (916) 324-2445
 Fax: (916) 324-5567
 E-mail: William.Downer@doj.ca.gov
*Attorneys for Defendants Scott Lunardi, Kyle Foster, and Robert Jones*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **TIMOTHY LARIOS,**<br><br>Plaintiff,<br><br>v.<br><br>**SCOTT LUNARDI, ET AL.,**<br><br>Defendants. | 2:15-cv-02451-MCE-CMK<br><br>**DECLARATION OF SCOTT LUNARDI IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY ADJUDICATION** |

I, Scott Lunardi, declare as follows:

1.    All of the facts set forth below are of my personal knowledge and, if called upon to testify, I could and would competently testify to the following.

2.    I am a Lieutenant employed by the California Highway Patrol (CHP) and am currently assigned to the South Sacramento area office. I have been employed with the CHP since 1995. I have held the rank of Lieutenant since March 2017. Prior to being promoted to Lieutenant, I served as a Sergeant from January 2008 to February 2017.

3.    I was assigned to the Internal Affairs Section (IAS) as an analyst from 2011-2013 and as an investigator from 2013 to 2017. I have received specialized training in Domestic Violence Internal Investigations; Peace Officer Procedural Bill of Rights (POBR); Public Service and

1

1  Trust; State Personnel Board (SBP) Personnel Actions; SPB Precedential Decisions; SPB

2  Hearings. Interviews and Interrogations – Behavior Analysis Training Institute (BATI); Search

3  Warrants "A to Z"; FBI Interview, Interrogation, and Statement Analysis.

4      4.    On or about September 8, 2014, I was assigned as the primary investigator in the

5  administrative investigation of CHP Officer and Shasta Interagency Narcotics Task Force

6  (SINTF) agent Timothy Larios (Officer Larios). IAS Investigator Mel Hutsell was also assigned

7  to this administrative investigation.

8      5.    After being assigned to this investigation, Investigator Hutsell and I met with our

9  supervisor CHP IAS Lieutenant Helena Williams. Lieutenant Williams informed us that Officer

10  Larios was suspected of having an inappropriate relationship with his confidential informant,

11  Tawnya Mellow, that Officer Larios had left a greeting card at Mellow's residence that resulted in

12  a domestic violence incident between Mellow and her boyfriend Nathan Santana; and that

13  Mellow had served as Officer Larios's informant in an investigation into her boyfriend and

14  alleged assailant Nathan Santana. During this briefing, we determined that the objective of our

15  administrative investigation was to confirm or disprove whether Officer Larios had an

16  inappropriate, non-professional relationship with a confidential informant in violation of CHP

17  policy and professional standards, and if Officer Larios did have an inappropriate relationship

18  with a confidential informant, the extent to which such conduct may have compromised or

19  jeopardized Officer Larios's investigations, SINTF investigations, confidential informant Tawnya

20  Mellow's safety, the safety of allied agency personnel working within SINTF or with SINTF, and

21  the integrity of the CHP. We were not instructed to conduct a criminal investigation of Officer

22  Larios's conduct, nor did we suspect that Officer Larios had committed a crime.

23      6.    On September 10, 2014, I received and reviewed emails—between SINTF

24  Commander, Sergeant Les James and DEA Special Agent Christopher DeFreece—from

25  Lieutenant Williams. In these emails, SINTF Commander Les James summarizes the allegations

26  against Officer Larios:

27       The female victim reported being battered by a suspect after the suspect found a
         "Hallmark" type card on his windshield. The card was apparently from an unknown
28       male, who referenced a trip the victim and the author had taken to Lake Tahoe. On or

2

about 9/1/2014, the deputy spoke to the suspect via telephone. The suspect said the victim told him the card was from Tim Larios. The suspect was previously arrested by Agent Larios after a search warrant was served at his residence and about 158 pounds of processed marijuana was seized. The criminal case is still moving through the court process. However, attempts were made to identify the CI who'd provided the probable cause for the issuance of the search warrant which were unsuccessful. The suspect told the deputy that he intended to inform his attorney of the alleged relationship between the victim and Agent Larios as proof of wrong doing on Agent Larios's part.

James also details his discussion with Larios about his involvement with the victim CI:

In speaking to Agent Larios, he admits to knowing the victim/CI before working the case involving the suspect. However, they'd never dated and were merely acquaintances, who hadn't been in recent contact with each other for a period of a year +/-. Although Agent Larios spoke to the CI via telephone to obtain the information for the search warrant, she didn't provide the name Agent Larios knew her by and he didn't recognize her voice as one he was immediately familiar with. The service of the search warrant and the arrest of the suspect preceded Agent Larios and the CI communicating with each other again on a personal basis.

In about December 2013, Agent Larios and the CI ran into each other and began continuing their friendship. At some point they realized that the CI had provided Agent Larios with the information that resulted in the issuance of the search warrant for the suspect's residence for marijuana.

The CI told Larios that her relationship with the suspect involved physical violence, threats of violence, and she was in sustained fear for her physical safety. At some point, Agent Larios thought he might deter the suspect from coming around the CI if he placed the card where the suspect could find it. Agent Larios thought that if the suspect believed the CI was in a serious relationship, the suspect would leave the CI alone.

Agent Larios said that the contents of the cared weren't true. However, he admitted to going to Lake Tahoe with the CI as was stated in the card. Agent Larios insisted that his relationship with the CI was one of friendship and not intimacy.

Based on my discussions with Lieutenant Williams I understood that the victim/CI referred to in this email was Officer Larios's confidential informant, Tawnya Mellow, and that the suspect referred to in this email was Mellow's boyfriend, Nathan Santana. A true and correct copy of the email correspondence that I received from Lieutenant Williams and reviewed is attached to this declaration as Exhibit 35.

7.    On September 18, 2014, I received a copy of the Shasta County Sheriff's Office criminal report of domestic violence incident occurring on August 31, 2014 from Lieutenant Kyle Foster and reviewed it. According to the Investigation Summary portion of the report, Shasta County Sheriff Deputies Nick Thompson and Meghan Bliss responded to a call from 21730 Lonetree Road, Cottonwood, California. During their interview of the victim, who I learned from

3

1   my supervisor Helena Williams, and later confirmed in my interview with Tawnya Mellow, was

2   Tawnya Mellow, Mellow claimed that she was physically assaulted by her on again/off again

3   boyfriend Nathan Santana. According to Mellow, Santana spent the night at her residence on

4   August 30, 2014. In the afternoon of the following day, Santana found a Hallmark greeting card

5   on the windshield of the victim's vehicle. Mellow described the greeting card as having certain

6   text underlined, including the phrase "I love you." The greeting card mentioned a past trip to

7   Lake Tahoe. Mellow stated that Santana returned to the residence after finding the greeting card.

8   After closing the windows, Santana demanded Mellow tell him who left the greeting card, in the

9   process striking the victim on her right cheek. Santana told Mellow that the blow was for the kiss

10  on the cheek referenced by the ex-boyfriend in the greeting card. After Santana threatened to kill

11  Mellow if she did not tell him who left the card, Mellow told Santana who the card was from.

12  (According to the report, the Sheriff's deputy did not ask Mellow who left the card). After

13  Mellow identified the person who authored the card, Santana said "Oh my God, it all makes sense

14  now." After Mellow told Santana who sent the card, he began to leave the residence. Mellow

15  grabbed the greeting card from Santana and fled to the kitchen. Santana and the victim struggled

16  over possession of the card until Santana regained possession of the card and left the residence.

17  In the investigative report, Thompson stated that he made telephone contact with Santana on

18  September 1, 2014. Santana declined to meet in person until he had spoken with his attorney but

19  agreed to speak over the phone. Santana told Thompson that he dated the victim for seven years.

20  Santana confirmed that on August 31, 2014, as he was leaving Mellow's residence, he found a

21  greeting card on the windshield of his vehicle. After he confronted Mellow about the card,

22  Mellow told him that the card was from Tim Larios. Santana told Deputy Thompson that Tim

23  Larios was the agent in charge of a criminal investigation in which he was facing charges for

24  possession of marijuana. A true and correct copy of the Shasta County Sheriff's Office

25  investigation report that I reviewed as part of the administrative investigation into Officer Larios,

26  and summarized in this paragraph, is attached to this declaration as Defendants' Exhibit 34.

27      8.    During my investigation of Officer Larios, I obtained Officer Larios's personal cell

28  phone number, (530) 227-6063, from the CHP Redding Area office.

4

1    9.    On September 18, 2014, I reviewed CHP departmental policy contained in CHP

2  Highway Patrol Manual (HPM) 81.5, regarding Informant Procedures, entitled "Departmental

3  Policies." This policy was current CHP policy between the operative dates of the administrative

4  investigation into Larios, September 1, 2013 through November 6, 2014, and beyond. This policy

5  states in pertinent part:

6      It is the policy of the CHP that all members of the Department perform their duties in
       a fair and equitable manner, and in compliance with all applicable state and federal
7      laws. In performing their enforcement activities while assigned to a DTF, all
       uniformed members shall ensure their actions strictly adhere to all departmental
8      policies including those outlined in Chapter 1, Drug Programs Administration,
       paragraph 2., of this manual. Additionally, when interpreting search and seizure or
9      consent protocols, all definitions and procedural requirements outlined in General
       Order (GO) 100.91, Search and Seizure Policy, will be controlling.
10

11  A true and correct copy of CHP Highway Patrol Manual 81.5 that I reviewed during the CHP's

12  administrative investigation of Officer Larios is attached to this declaration as Defendants'

13  Exhibit 23.

14    10.    On September 22, 2014, Investigator Hutsell and I met with SINTF Commander,

15  Sergeant Les James of the Redding Police Department. Commander James provided me with a

16  SINTF Investigation Report and Statement of Probable Cause corresponding with SINTF's 2013

17  investigation of Nathan Santana (SINTF Case Number SH2013-00074). Based on my review of

18  the SINTF Investigation Report, which appeared to be authored and signed by Officer Larios,

19  Larios served a search warrant on Nathan Santana's residence at 22085 Hermosa Drive,

20  Anderson, California on November 12, 2013, and in the course of the search discovered and

21  seized approximately 158 pounds of processed marijuana on the premises, confiscated a cellular

22  telephone belonging to Santana, and arrested Santana under suspicion of possessing marijuana for

23  sale in violation of California Health and Safety Code section 11359 and Conspiracy in violation

24  of California Penal Code section 182. A true and correct copy of the SINTF Investigation Report

25  for SINTF Case Number SH2013-00074 is attached to this declaration as Defendants' Exhibit 21.

26    11.    On or about September 22, 2014, I reviewed the Statement of Probable Cause from

27  SINTF Case Number SH2013-00074 that Commander James provided to me. The statement of

28  probable cause stated in part:

5

1

2

3

On September 20, 2013, I was contacted by a Citizen Informant, hereinafter referred to as CI. The CI informed me that he/she was aware that Nathan John Santana was purchasing and selling marijuana. The CI related that he/she has known for Santana for more than one year and known Santana to be selling marijuana in this fashion for more than two years.

4

5

6

7

On September 30, 2013, I spoke with the CI and the CI related that he/she has seen Santana in possession of bulk marijuana. The CI was shown a Shasta County Jail mugshot and positively identified the photograph as the person he/she knows as Nathan John Santana. The CI was shown a Google Earth photograph of [REDACTED] and the CI positively identified that photograph as the residence that Nathan John Santana lives in.

8

9

Between September 20, 2013 and November 11, 2013, I have conversed with the CI several times. The CI informed me that Santana is currently in possession of processed marijuana that he is trying to sell.

10

11

A true and correct copy of the Statement of Probable Cause is attached to this declaration as Defendants' Exhibit 20.

12

13

14

15

16

17

18

19

20

12.    On September 22, 2014, I met with Shasta County Deputy District Attorney (DA) Laura Smith. Deputy DA Smith stated that she was assigned to the prosecution of Nathan Santana and Robin Rudolph that arose from SINTF Case Number SH2013-00074. Smith related that she was aware of the allegations that Officer Larios had a personal relationship with the confidential informant involved in the Santana investigation and that the DA's decision to dismiss the prosecutions against Santana and Rudolph on September 17, 2014 was made in part because of the allegations that Officer Larios had an inappropriate relationship with his confidential informant that had provided him information in the criminal investigation that resulted in the prosecution of Nathan Santana in Shasta County Superior Court case 13F7922.

21

22

23

24

25

26

27

13.    On or about September 23, 2014, I obtained SINTF property assigned to Officer Larios from Lieutenant Kyle Foster, including: (1) a laptop, (2) SINTF cellphone, and a (3) flash drive. I also received Officer Larios's personnel folder. The SINTF cell phone (Officer Larios's SINTF phone) that I received from Lieutenant Foster was a Casio G'z One Commando C771. True and correct copies of photographs that accurately depict the appearance of Officer Larios's SINTF phone I received from Lieutenant Foster are attached to this declaration as Defendants' Exhibit 18.

28

6

1        14.    On September 23, 2014, SINTF Commander James provided me with SINTF policy

2    regarding Confidential Informant Management. I reviewed these policies on the day I received

3    them.    Under section 10.1 of the SINTF Confidential Informant Management policy, "[a]n

4    informant is a person, not a member of a law enforcement, who provides law enforcement

5    information or assistance concerning suspected criminal activity." Under section 10.6 of the

6    SINTF policy on informants, "[r]elationships between Shasta Interagency Narcotics Task Force

7    Agents and informants shall be completely ethical and professional in nature. Fraternization with

8    an informant in any way other than in an official capacity is strictly prohibited. When contacting

9    informants, SINTF Agents shall have another agent or law enforcement officer present. Only

10   during actual undercover situations may a SINTF Agent be alone with an informant. Exceptions

11   require the prior approval of the SINTF Commander." A true and correct copy of the SINTF

12   Confidential Informant Management policies that I received from SINTF Commander James and

13   reviewed are attached to this declaration as Exhibit 33.

14        15.    On September 23, 2014, Investigator Hutsell and I interviewed Tawnya Mellow at the

15   Anderson River Park in Anderson, California. The interview of Mellow was digitally recorded. I

16   verified Mellow's identity by viewing her California Driver's License. California Association of

17   Highway Patrolmen (CAHP), district representative Mike Cantrall arrived with Mellow and

18   requested to be present during the interview. I advised Cantrall that I would not interview

19   Mellow with Cantrall present. Cantrall stated that he wanted Mellow to be interviewed because

20   she had information relevant to the investigation and then left prior to the interview. Mellow

21   stated that she first met Officer Larios around 2005-2006 at the Win River Casino but lost touch.

22   Mellow stated that she called SINTF in October 2013 to provide information about Santana

23   regarding Nathan Santana's involvement in selling large amounts of marijuana. Mellow stated

24   that she provided information about Santana to Officer Larios, and that the information she

25   provided about Santana led to a search warrant. Mellow stated that she contacted Officer Larios

26   between 10-15 times in a month and a half to provide information about Santana, and said that a

27   lot of her communications with Officer Larios was done via text message (texting). Regarding

28   the search warrant, Mellow said she texted Officer Larios the address of Santana's residence, but

7

Declaration of Scott Lunardi in Support of Defendants' Motion for Summary Judgment or in the Alternative Motion
for Summary Adjudication  (2:15-cv-02451-MCE-CMK)

1   denied receiving any photographs from Officer Larios. Mellow also denied meeting Officer

2   Larios in to provide him information. Mellow stated that she also described Santana's appearance

3   to Officer Larios, described his vehicle, and provided his license plate number, where he worked,

4   and the names of other people. Mellow stated that she ran into Officer Larios at a Safeway gas

5   station in December 2013 and they exchanged phone numbers, and shortly after they realized that

6   Mellow had provided information about Santana to Officer Larios (on December 7 or 8, 2013.)

7   Mellow stated that after their meeting at the gas station, they continued to talk and text and went

8   on two or three drives together to talk, and went to Lake Tahoe in April or May of 2014. During

9   the trip to Lake Tahoe, Officer Larios and Mellow stayed at Harvey's Casino in South Lake

10  Tahoe, and shared the same room and bed. Mellow denied any physical contact between her and

11  Officer Larios, and stated that their relationship was not intimate. Mellow stated that her

12  relationship with Officer Larios ended after their Lake Tahoe trip. She stated that Officer Larios

13  expressed feelings toward her, but she was not attracted to him in a romantic way.

14       16.   On September 23, 2014, at approximately 5:00 p.m., Investigator Hutsell and I

15  interviewed Nathan "Nate" Santana at the Civic Auditorium parking lot in Redding. I verified

16  Santana's identity by viewing his California Driver's License. Santana's interview was digitally

17  recorded. During the interview, Santana stated that he was arrested for marijuana possession on

18  November 12, 2013, after a search warrant was served on his residence that same day. Santana

19  stated that Officer Larios was present during the service of the search warrant, confiscated his cell

20  phone, and told Santana to provide the passcode to access his phone. Santana provided his

21  phone's passcode. Santana stated that his phone contained naked pictures of his girlfriend

22  Tawnya Mellow. Santana stated that he and Mellow had been together for approximately seven

23  years. Santana stated that within a month of his arrest, Mellow told him that Officer Larios had

24  approached her at the Three Shastas Bar in Redding and started talking to her. According to

25  Santana, Mellow told him that she and Officer Larios had been exchanging texts for a month and

26  that Officer Larios wanted to take their relationship further, but that she had told Officer Larios

27  that she was still in love with Santana. Santana stated that in March or April of 2013, at

28  approximately 2:15, a.m., he and Mellow were having sex at her residence when someone

8

1  repeatedly drove by and was honking the car horn. Santana looked outside and saw a white car,

2  possibly a Camry, take off down the street. Santana said that he knew that Officer Larios had a

3  white car. According to Santana, approximately 15-20 minutes after he observed the white car

4  pass by, a person on a black, Harley Davidson motorcycle drove by the house honking the horn,

5  and continued doing so until 6 a.m. Santana stated that the same motorcycle would pass by the

6  residence for the next six months, honking its horn every time Santana was at Mellow's

7  residence. Santana stated that on one occasion, Mellow's 21-year old daughter was outside the

8  residence when the motorcycle arrived, and Santana observed the rider wave at Mellow's

9  daughter and Mellow's daughter wave back as if they knew one another.

10  17.   During the interview, Santana stated that in August 2014, at approximately 10 a.m.,

11  he was at Mellow's residence, when a Sheriff's Deputy arrived and wanted to speak to her.

12  Santana heard the deputy ask Mellow whether she knew Nathan Santana and inquire whether

13  Mellow was ok. Mellow told the deputy that she was ok. While the deputy was at the residence,

14  the black Harley Davidson motorcycle passed by the residence approximately four times.

15  Santana heard the deputy ask Mellow if she knew who the person on the motorcycle was and

16  Mellow responded that she did not know who it was. Santana stated that he did not observe

17  Mellow calling the Sheriff's office to request service on the day that the deputy visited. With

18  respect to the domestic violence incident that occurred on August 31, 2014, Santana stated that he

19  had arrived at Mellow's residence on the evening of August 30, 2014, spent the night, and had

20  sex during the morning of August 31, 2014. Later that day, Santana walked to his car that was

21  parked in front of Mellow's residence and discovered a greeting card in an envelope under the left

22  side windshield wiper of his car.

23  18.   During the September 23, 2014 interview with Santana, Santana produced the

24  greeting card and envelope that he claimed to have found on his car on August 31, 2014. I took

25  photographs of the greeting card and envelope and returned them to Santana. True and correct

26  copies of the photographs that I took of the greeting card that Santana produced during his

27  September 23, 2014 interview are attached to this declaration as Defendants' Exhibit 32. The

28  envelope of the greeting card contained in Defendants' Exhibit 32 was addressed to "Tawnya

9

1    Rachelle" in handwriting. The greeting card contained the following writing, (hand writing

2    denoted via italic font):

3        Since I met you *(December 6, 2013)* all I can think about is making you <u>happy</u>
         *[underlined three times]*. I want to see your smile and hear your laughter. I want to
4.       kiss away old hurts and hold you *SO TIGHT* until you know without a doubt that this
         is for real . . . *AND YOU KNOW IT IS !!*
5

6        *Aug. 31, 2014*
         *DEAREST TAWNYA, SINCE OUR FIRST DATE (12/6/13), I HAVE NOT BEEN THE*
7        *SAME... AND OUR WALK ACROSS THE BRIDGE AND KISS ON THE CHEEK*
         *SHORTLY AFTER YOUR INNOCENT TEXT "MARRY ME" HAS ME WANTING TO*
         *ASK YOU THE SAME THING. YOU MEAN THE WORLD TO ME AND THOUGH*
8        *WE DO NOT SPEND ENOUGH TIME TOGETHER THE TIMES ARE SPECIAL TO*
         *ME. I LOVE EVERYTHING ABOUT YOU, YOUR GIRLS, PARENTS, GMA, YOUR*
9        *LAUGH, SMILE, VOICE, AND JUST LOVE YOU SO VERY MUCH !!!! PLEASE*
         *KNOW I WANT TO SPEND FOREVER WITH YOU AS US !!!*
10

11       I want to memorize the sound of your voice and the dreams of your heart. More than
         anything else, I want to make you happier than you've ever been before, *JUST LIKE*
12       *YOU WERE IN TAHOE* and give you all the things that <u>you</u> *[underlined three times]*
         truly <u>deserve</u> *[underlined three times]*. *WHICH IS <u>THE WORLD</u> [underlined three*
         *times] !!! I LOVE YOU FOR WHO YOU ARE TAWNYA RACHELLE AND WANT*
13       *NOTHING MORE THAN TO UNITE AS ONE!! LOVE ME!!*

14       19.    During the September 23, 2013 interview, Santana explained that after he discovered

15   the card, he returned to Mellow's house and confronted Mellow about it. Santana denied

16   physically assaulting Mellow. Santana claimed that he asked Mellow who wrote the card and

17   when Mellow would not tell him, he threatened to break up with her. Mellow then told Santana

18   that Officer Larios had left the greeting card. Santana stated that he immediately recognized

19   Officer Larios's name from his pending marijuana criminal charges. During our interview of

20   Santana, Santana produced a copy of the search warrant related to his marijuana cases, which was

21   purportedly authored and signed by Officer Larios. Santana then compared the writing in the

22   affidavit to the writing in the greeting card and stated that he believed the writing looked similar.

23   Santana stated that he told Mellow that he could not believe she was having sex with Officer

24   Larios, the main investigator in his case. Santana stated that he asked Mellow about the

25   motorcycle rider that had been driving past her residence and Mellow told him that the rider was

26   Officer Larios. Santana stated that Mellow denied having gone to Lake Tahoe with Officer

27   Larios and denied having sex with him. She stated that Officer Larios was weird, often followed

28   her, and had left flowers on her car when she was at the gym. Mellow told Santana that she did

                                                    10

1    not want anything to do with Officer Larios and denied having had a relationship with him.

2    Santana stated that he told Mellow that the greeting card left by Officer Larios was going to get

3    him out of his case. Santana claimed that Mellow attempted to take the greeting card from him

4    and a struggle over the card ensued. Santana kept the card and threatened to leave Mellow and

5    Mellow threatened to call the police. Santana told Mellow that he was going to see his attorney

6    and then left Mellow's residence with the greeting card.

7        20.   On September 25, 2014, SINTF Commander James provided me with a SINTF Daily

8    Intelligence Memorandum (DIM) Number 13-22, dated September 18, 2013. A true and correct

9    copy of the DIM Number 13-22 is attached to this declaration as Defendants' Exhibit 19. From

10   speaking to Commander James, I learned that SINTF used DIMs to collect tips regarding

11   narcotics activities in the Shasta County region. In this DIM, a reporting party named "Rachelle,"

12   whose phone number was (530) 945-4986. According to the DIM, the reporting party stated that

13   she had information regarding large scale marijuana sales by Nate Santana at his residence.

14   Commander James further explained that the reporting party named "Rachelle" was Tawnya

15   Mellow and that "Rachelle" was Tawnya Mellow's middle name.

16       21.   I delivered Officer Larios's SINTF phone that I received from Lieutenant Kyle Foster

17   to CHP's Computer Crimes Investigation Unit (CCIU) Investigator Peter Phurchpean on or about

18   September 25 or 26, 2014, to extract all data from Officer Larios's SINTF Phone. Before

19   handing Officer Larios's SINTF phone over to Investigator Phurchpean, I performed a cursory

20   review of the text messages stored on it at the time I received it by opening the text message

21   application and reviewing its contents. In my preliminary review of the text message application

22   on Officer Larios's SINTF-assigned cell phone, I did not see any text messages sent to or

23   received from Tawnya Mellow's phone number (530) 945-4986.

24       22.   On September 30, 2014, I reviewed departmental policy contained in CHP's Highway

25   Patrol Manual (HPM), section 81.1, *Vehicle Theft Control*, Chapter 7, *Informant Management*

26   *and Confidential Funds,* entitled "Relationship of Officers with Informants." This policy was

27   current CHP policy between the operative dates of the administrative investigation into Larios,

28   September 1, 2013 through November 6, 2014, and beyond. This policy states in pertinent part:

11

1    Relationships between officers and informants shall be completely ethical and
     professional in nature. Officers shall not fraternize with an informant in any way
2    other than in an official capacity. When contacting informants, officers shall have
     another officer or member of an allied agency present. Officers shall not accept any
3    gift or gratuities from an informant or engage in any business or financial dealings
     with an informant.

4

5    A true and correct copy of the CHP HPM, section 81.1 that I reviewed during the CHP's

6    administrative investigation of Officer Larios is attached to this declaration as Defendants'

7    Exhibit 40.

8          23.   On October 1, 2014, On October 1, 2014, Investigator Hutsell and I interviewed

9    SINTF Commander Les James at the SINTF office in Redding. The interview of James was

10   digitally recorded. During the interview, Commander James stated that SINTF was multi-agency

11   narcotics task force and that he was the Commander of SINTF. Officer Larios was assigned to

12   SINTF as an agent and Commander James was his immediate supervisor in SINTF. Officer

13   Larios was removed from SINTF and reassigned to the CHP because of allegations of

14   misconduct. Commander James explained the process for SINTF agents establishing the

15   reliability of confidential informants. He explained that citizen informants, i.e., informants who

16   provide information without expectation of remuneration or other inducement apart from

17   confidentiality, are deemed reliable but the information they provide must be verified. By

18   contrast a criminal informant, is a person who provides information in exchange for payment or a

19   reduction in charges in their own criminal case. To establish the reliability of a citizen informant,

20   SINTF agents need to identify the informant to the extent necessary to contact them in the future.

21   A search warrant could not be prepared based on the information provided by a citizen informant

22   who was not willing to verify their identification. SINTF agents ordinarily verified the identity of

23   an informant by searching the California Law Enforcement Telecommunication System (CLETS)

24   database or the PUBSAFE AS400 system, which is a Shasta County-wide database for law

25   enforcement. SINTF did not retain information about citizen informants, however, agents are

26   expected to be able to identify citizen informants if requested by the court.

27         24.   Commander James confirmed that SINTF adopted a written policy governing

28   confidential informant management and explained that under SINTF's informant policy, agents

                                           12

1   are prohibited from meeting an informant in person without another agent present.  According to

2   Commander James, the SINTF informant policy also prohibited agents from having a relationship

3   with an informant that is not professional in nature.  Commander James informed me that the

4   reason for prohibiting SINTF agents from having personal relationships with informants is that

5   such a relationship could affect the impartiality of the agent toward the informant.  Commander

6   James indicated that he interpreted this SINTF policy to prohibit romantic or intimate

7   relationships between an Agent and informant, particularly if the related criminal matter was

8   ongoing and not adjudicated.  Commander James added that an agent having a romantic

9   relationship with an informant after the conclusion of a criminal case would be concerning as

10  well.

11       25.    Commander James stated that he became aware of the possibility that Officer Larios

12  had a non-professional relationship with one of his citizen informants when he received a call

13  from Captain Anthony Bertain of Shasta County Sheriff's Office on September 2 or 3, 2014.

14  James stated that he met with Captain Bertain and Deputy Nick Thompson on the same day he

15  received Captain Bertain's call.  During the meeting, Deputy Thompson told James that he

16  responded to a domestic violence call on August 31, 2014, at Tawnya Mellow's residence and

17  that the victim was Tawnya Mellow and the suspect was Mellow's boyfriend Nathan Santana.

18  Commander James stated that according to Deputy Thompson, the domestic violence incident

19  occurred after Santana found a greeting card that was allegedly left by Officer Larios, and which

20  described a romantic relationship between Officer Larios and Mellow, including a trip Officer

21  Larios took with Mellow to Tahoe.  According to Commander James, Deputy Thompson also

22  stated that while he was responding to the August 31, 2014 domestic violence call, a person on a

23  black Harley Davidson motorcycle with a face mask rode by the residence multiple times.

24  Deputy Thompson stated that he suspected that the rider of the motorcycle may have been Officer

25  Larios.  Deputy Thompson stated that he had responded to a welfare check at Mellow's residence

26  a few weeks before August 31, 2014, that Officer Larios had requested.  During the welfare

27  check, Nathan Santana told Deputy Thompson that he had observed a black Harley Davidson

28  motorcycle traveling in front of Mellow's residence while honking the horn.

13

26.   Commander James stated that he also met with CHP Sergeant Greg Ziegler to brief him about the Officer Larios's alleged involvement in the August 31, 2014 domestic violence incident at Mellow's residence after his meeting with Captain Bertain and Deputy Nick Thompson.

27.   Commander James stated that after his meeting with CHP Sergeant Ziegler, he met with Officer Larios at the SINTF officer to discuss his involvement in the August 31, 2014 domestic violence incident at Mellow's residence.  Commander James stated that during their discussion, Officer Larios admitted that he left a Hallmark-type greeting card with the intent that Santana would find it.  Officer Larios stated that he knew that the relationship between Santana and Mellow had a history of violence.  According to Commander James, Officer Larios stated that he thought that once Santana read the card that he would believe that Mellow was in a relationship with someone else and leave her alone.  Officer Larios claimed that the contents of the card, which expressed romantic love toward Mellow, was not true, and that it was a ruse.  Officer Larios admitted that he went to Lake Tahoe with Mellow and that she was the confidential informant for the case involving Nathan Santana.  But Officer Larios denied that he had had an intimate relationship with Mellow.  According to James, Officer Larios also admitted that he was the rider on the black motorcycle described by Deputy Thompson.  Officer Larios further admitted that he had requested the welfare check on Mellow.  According to Commander James, Officer Larios explained that he requested the welfare check on Mellow because he had received a call from Mellow's daughter regarding an altercation between Santana and Mellow, and that he requested a welfare check to make sure that Santana had not followed Mellow home after their altercation.

28.   Commander James also confirmed that he had observed Officer Larios with a black Harley Davidson motorcycle and wearing a face mask and a skull cap style helmet.

29.   According to Commander James, Officer Larios claimed that he had known Mellow for a year or more before she became his confidential informant.  Officer Larios also admitted that he and Mellow texted each other but claimed that the texts were not intimate.  Officer Larios claimed that when he first contacted Mellow that he did not recognize her voice or the name that

14

1    she provided. Officer Larios claimed that sometime after Santana's arrest, in December 2013 or

2    January 2014, Mellow and Officer Larios saw each other in public and rekindled their past

3    friendship. Officer Larios stated that he realized that Mellow was his confidential informant on

4    the Santana case shortly after they resumed their friendship.

5         30.    During his October 1, 2014 interview, Commander James also discussed the impacts

6    that the misconduct allegations against Officer Larios had on SINTF's investigations and

7    prosecutions arising from SINTF investigations. Specifically, Commander James stated that after

8    the misconduct allegations against Officer Larios surfaced, the prosecution of Nathan Santana

9    was dismissed by the Shasta County District Attorney's Office. Commander James also stated

10    that Officer Larios was the main investigator in a joint state and federal investigation, and that

11    Officer Larios had been involved in making undercover drug buys. As part of the investigation,

12    the Assistant United States Attorney (AUSA) had prepared a request for a federal wiretap

13    warrant. But once the allegations against Officer Larios was removal from SINTF and the

14    suspicions that Officer Larios had an inappropriate relationship with a confidential informant

15    surfaced, the AUSA advised Commander James that he planned to insert a footnote describing the

16    allegations against Officer Larios into the affidavit supporting the federal wiretap application.

17    Commander James told me that because he was not comfortable in agreeing to the AUSA's plan

18    to add a footnote describing the allegations against Officer Larios in the affidavit, they stopped

19    the application. Commander James further stated that the Shasta County District Attorney's

20    Office declined to sign a search warrant made in connection with this investigation because of the

21    allegations pending against Officer Larios.

22         31.    Commander James confirmed that Officer Larios was assigned a SINTF cell phone.

23    When asked about the cell phone used by Officer Larios for SINTF investigations, James stated

24    that Officer Larios should have used his assigned SINTF cell phone to communicate with Tawnya

25    Mellow and that SINTF did not provide other phones to its agents for conducting business with

26    confidential informants. Commander James added that Officer Larios also had access to a phone

27    that was strictly for him to use for conducting undercover communications with a suspect in a

28    joint state and federal investigation.

1    32.    Commander James stated that pursuant to SINTF confidential informant management

2    policy, Officer Larios should have notified him immediately upon realizing that Mellow was his

3    confidential informant in the Santana case, yet Officer Larios failed to do so.

4    33.    During my October 1, 2014 interview of SINTF Commander James he described his

5    knowledge of Tawnya Mellow's confidential informant status. Specifically, James stated that:

6    (1) Mellow initially provided info to SINTF as a tip; (2) Mellow's tip was documented on a form

7    called a daily intelligence memorandum (DIM), which are ordinarily randomly assigned to

8    Agents—SINTF Agents do not have any control over who is assigned to follow up on a particular

9    DIM assignments to follow up on a DIM; (3) it is standard protocol for SINTF Agents to identify

10   themselves to the citizen informant when responding to a tip; (4) Officer Larios briefed him about

11   using Mellow as a confidential informant after making contact with her; (5) Larios told him that

12   Mellow was a victim of domestic violence and that her desire to leave her boyfriend had

13   motivated her to provide report Santana's criminal activities to SINTF; (6) Officer Larios told

14   Commander James that he verified the domestic violence history between the informant and

15   Santana on the AS400 system to establish her reliability as an informant; (7) James authorized

16   Officer Larios to use Mellow as a confidential informant; (8) at the time James authorized Officer

17   Larios to use Mellow as a confidential informant, he was not told that her name was Tawnya

18   Mellow.

19   34.    Commander James told me that Officer Larios told him that he (Larios) did not

20   realize that he was already friends with Mellow before making her a confidential informant in the

21   Santana investigation because the DIM only supplied Mellow's name as "Rachelle," not Tawnya,

22   the name by which Officer Larios knew Mellow.

23   35.    Commander James stated that Officer Larios's claim—that he did not recognize

24   Mellow until after Santana's arrest—did not make sense to him because: (1) Officer Larios relied

25   on information provided by Mellow as a confidential informant to obtain a warrant to search

26   Nathan Santana's residence; (2) Officer Larios would have had to identify Mellow beyond her

27   first name and telephone number in order to rely on Mellow as a source in support of an

28   application for a search warrant, and Larios would not have been able to do that based on his

16

1  claim that he only knew the informant as "Rachelle," not Tawnya; (3) Officer Larios would have

2  had to have fully verified Mellow's identity because a judge could have required him to disclose

3  the identity of his informant, and Larios would not have been able to verify Mellow's identity

4  based on Officer Larios's claim that he only knew the informant as "Rachelle," not Tawnya; and

5  (4) contrary to Officer Larios's claim that he did not know who Mellow was, Officer Larios told

6  James that he verified Mellow's information and history with Santana in the AS400 system,

7  which he could not have done without knowing or discovering her last name.

8      36.    Commander James instructed me on the use of the Shasta County law enforcement

9  database, PUBSAFE AS400.  Commander James demonstrated searches for incidents involving

10  Tawnya Rachelle Mellow, searches performed via variations on Mellow's name and her known

11  cell phone number.  Each of the searches resulted in a list of multiple incidents corresponding

12  with the name Tawnya Mellow.  During this demonstration, I also learned that all inquiries into

13  the PUBSAFE AS400 database are logged and maintained on the database and the inquiries can

14  be audited by entering the user's name.

15      37.    Commander James's demonstration of the PUBSAFE AS400 system showed that

16  between September 30, 2013, and October 16, 2013, Officer Larios made fifteen separate

17  inquiries from the PUBSAFE AS400 database regarding Tawnya Mellow, using Mellow's name

18  and aliases, including Tawnya, Scheidecker, Tawnya Rachelle Mellow, and Mellow's driver's

19  license number, which appeared to contradict Officer Larios's statement to James that he did not

20  recognize Mellow until after Santana was arrested because Mellow had used the name

21  "Rachelle."

22      38.    Commander James stated that SINTF agents often communicated with confidential

23  informants and shared information such as pictures of people or locations via text messaging.

24      39.    Commander James denied ever meeting Tawnya Mellow in person.

25      40.    On October 2, 2014, Investigator Hutsell and I interviewed Shasta County Sheriff's

26  Deputy Meghan Bliss, ID 205.  During the interview, Deputy Bliss informed me that she had

27  responded to a domestic violence call with Deputy Nick Thompson on August 31, 2014.

28

17

1       41.   On October 2, 2014, I met with Supervising Public Safety Dispatcher Sherry Bartolo,

2 of Shasta Area Safety Communications Agency (SHASCOM). Bartolo showed me a history of

3 phone calls for service to Mellow's residence address. Bartolo also provided closed incident

4 reports and audio recordings of Officer Larios calling SHASCOM to report incidents occurring at

5 the address.

6       42.   On October 3, 2014, CCIU Investigator Phurchpean provided me with an (1)

7 extraction report; and (2) the data extracted from Officer Larios's SINTF cell phone in an HTML

8 report format on a CD. A true and correct copy of the report explaining how Investigator

9 Phurchpean completed the data extraction of Officer Larios's SINTF phone that Investigator

10 Phurchpean delivered to me is attached to this declaration as Defendants' Exhibit 38.

11       43.   On October 7, 2014, I met with CHP Officer Whitney Geraurd, of the CHP Field

12 Support Section. Officer Geraurd served as the CHP Statewide CalPhoto Coordinator. Through

13 my training and experience as a CHP Officer, I have become familiar with the CalPhoto database

14 and its use by CHP officers. CalPhoto is a database of driver's license photographs and personal

15 identifying information of California drivers and residents that is maintained by the California

16 Department of Motor Vehicles. CHP officers have had direct access to CalPhoto for use in

17 investigations. The database also records and stores records of all database inquiries made by

18 account users, including CHP officers. Officer Geraurd provided me with a CalPhoto audit report

19 showing all of Officer Larios's CalPhoto inquiries regarding Tawnya Mellow made from

20 September 20, through November 11, 2013. A true and correct copy of this audit report is

21 attached to this declaration as Defendants' Exhibit 41.

22       44.   Defendants' Exhibit 41 indicated that Officer Larios pulled CalPhoto reports on

23 Tawnya Mellow on three separate occasions—twice on September 30, 2013, and once on October

24 9, 2013—all of which occurred before Nathan Santana's November 12, 2013 arrest. And because

25 Officer Larios's CalPhoto inquiries regarding Mellow would have revealed Tawnya Mellow's full

26 name and physical identifying information, including her driver's license portrait, and height,

27 weight, and other physically identifying features to Officer Larios at the time they were accessed,

28 Officer Larios's statement to SINTF Commander James—that he had been friends with Mellow

18

1   before she became an informant yet did not realize who Mellow was until after Santana's arrest in

2   November 2013—appeared to be false.

3       45.   On October 8, 2014, Mell Hutsell and I interviewed Redding Police Department

4   Investigator and SINTF Agent Kip Kinneavy. Agent Kinneavy stated that he worked in SINTF

5   with Officer Larios for 2 ½ years and knew Officer Larios outside of work for ten years.

6   Kinneavy confirmed that he was involved in the Santana investigation but had minimal

7   involvement in it. Kinneavy denied knowing Tawnya Mellow and denied recognizing her when I

8   showed him a picture of Mellow. Agent Kinneavy confirmed that SINTF had a policy that

9   required SINTF agents to bring another SINTF agent along when meeting a confidential

10  informant in person, and stated that he had accompanied Officer Larios during such meetings

11  before. Kinneavy confirmed that he had observed Officer Larios confirming the identities of

12  suspects with confidential informants by either meeting with them in person or texting them a

13  photo to verify. Kinneavy denied knowing about a domestic violence incident. Kinneavy could

14  not recall Officer Larios taking a trip to Lake Tahoe apart from training trips to the area.

15      46.   On October 8, 2014, Investigator Hutsell and I interviewed Shasta County Sheriff's

16  Deputy and SINTF Agent Tom Moon. Moon stated that he had been assigned to SINTF for two

17  years, but had known Officer Larios for four years. Moon could not recall any details from the

18  Santana investigation apart from discovering gun safes full of marijuana. Moon denied having

19  met Tawnya Mellow or knowing who she was. Moon confirmed that SINTF had a policy that

20  required SINTF agents to bring another SINTF agent along when meeting a confidential

21  informant in person. Moon could not recall ever meeting Mellow. Moon stated that he had seen

22  Officer Larios text photographs to confidential informants to identify suspects in the past. After I

23  showed Moon a picture of Mellow, Moon denied knowing Mellow or ever having met her.

24      47.   On October 9, 2014, I met with Candie Sullivan, Systems Analyst of the City of

25  Redding. Ms. Sullivan confirmed that the PUBSAFE AS400 System was confidential and could

26  only be accessed by officials who had credentials to access it.

27      48.   On October 15, 2014, I reviewed and analyzed the data that had been extracted from

28  Officer Larios's SINTF phone and provided to me on CD in the form of an HTML report by

19

1  Officer Phurchpean. I accessed the report by placing the CD in a computer drive, opening the file

2  folder entitled "C771 GzOne Commando" and then opening the file called "Report.html." After

3  clicking on the "Report.html" file, it opened in a web browser to a Dashboard Page. The

4  Dashboard Page of the Report contains the emblem of the CHP CCIU and several fields including

5  a Summary Field. By reviewing this Summary Field, I was able to determine that the extraction

6  was performed on October 1, 2014, that the make and model of the phone was a C771 Casio G'z

7  One Commando, the examiner was Peter Phurchpean and that the extraction was performed by

8  CCIU in Sacramento, California. Under the "Contents" field of the report dashboard, there was

9  an option of reviewing the Call Log, Contacts, MMS Messages, SMS Messages, a Timeline, User

10  Dictionary, Data Files, Activity Analytics, and Analytics Phones. By opening the Timeline field

11  of the data extraction Report from the Dashboard Page, I was able to review the data extracted

12  from Officer Larios's SINTF phone depicted chronologically. The Timeline filed, once opened

13  displayed the latest date of phone activity as September 26, 2014, and the earliest date of activity

14  as January 21, 2013. From this information, I deduced that the data extracted from Officer

15  Larios's SINTF phone contained activity from the Officer Larios's SINTF phone from January

16  21, 2013, to September 26, 2014. Attached to this declaration as Defendants' Exhibit 42 is a true

17  and accurate depiction of excerpts of the data extraction HTML report of Officer Larios's SINTF

18  phone that I received from Investigator Phurchpean and reviewed as part of the IAS's

19  administrative investigation of Officer Larios. The portion of Exhibit 42 that accurately

20  demonstrates what I observed from the Dashboard Page of the HTML report containing the data

21  extraction of Officer Larios's SINTF phone is located on pages 1-3 of Defendants' Exhibit 42.

22  The portion of Exhibit 42 that accurately demonstrates the dates of the first and last entries of

23  Timeline page of the HTML report containing the data extraction of Officer Larios's SINTF

24  phone is located on pages 4-5 of Defendants' Exhibit 42. All identifying information has been

25  redacted from these entries to protect the identities of the informants. However, a disc containing

26  the full HTML extraction, without redactions, is being lodged with the Court.

27       49.   By reviewing the Call Log field in the Dashboard Page of the data extraction of

28  Officer Larios's SINTF phone, page 2 of Defendants' Exhibit 42, I observed that there were 500

20

1  phone calls logged on the SINTF phone. By reviewing the MMS Message and SMS Message

2  fields in the Dashboard Page of the data extraction of Officer Larios's SINTF phone, page 3 of

3  Defendants' Exhibit 42, I observed that there were 8,681 text messages stored on the SINTF

4  phone. During my examination of the data extraction via the HTML report, I reviewed some of

5  the text messages contained on the phone and, based on my experience and training as a CHP

6  officer they appeared to be related to a criminal investigation.

7      50.   During my review of the data extraction of Officer Larios's SINTF phone, I

8  performed a search for calls and text messages between Officer Larios's SINTF phone and

9  Tawnya Mellow's known phone number obtained from the DIM in Defendants' Exhibit 19. In

10  order to determine whether there were any phone calls and text messages between Officer

11  Larios's SINTF phone and Tawnya Mellow's phone number, I first opened the Analytics Phones

12  Field by clicking on it. Once the Analytics Phones page opened, I pressed "control F" to open a

13  search field on the web browser. In the search field, I entered Tawnya Mellow's phone number

14  without dashes, "5309454986." Once I entered, Mellow's phone number in the search field, the

15  browser indicated one match. The match displayed a field of information corresponding with

16  Tawnya Mellow's phone number 5309454986," including calls logged, and MMS and SMS

17  messages sent and received. My examination of the field corresponding with Tawnya Mellow's

18  phone number indicated only one outgoing call that lasted 31 seconds. There was no record of

19  any MMS messages or SMS messages being exchanged between Officer Larios's SINTF phone

20  and Tawnya Mellow's phone number. The portion of Exhibit 42 that accurately demonstrates the

21  search results I observed when searching the Analytics Phones page of the Data Extraction of

22  Officer Larios's SINTF phone for phone activity between Officer Larios's SINTF phone and

23  Tawnya Mellow's phone number is located on page 6 of Defendants' Exhibit 42.

24      51.    To verify the accuracy of my search, I also performed searches of Mellow's number

25  in the MMS Messages Field and SMS Message Field pages using the "control F" browser search

26  method described in the preceding paragraph. Those searches also revealed no record of any text

27  messages sent to or received from Tawnya Mellow's phone number. I also performed a search in

28  the Call Log page. My search of the Call Log page revealed one outgoing call from Officer

21

1    Larios's SINTF phone to Tawnya Mellow's phone number that took place on August 14, 2014,

2    and lasted 31 seconds.

3        52.   During my review of the data extraction of Officer Larios's SINTF phone, I also

4    performed a search for calls and text messages between Officer Larios's SINTF phone and

5    Officer Larios's personal cell phone number that I had obtained through the Redding Area office

6    to determine whether Officer Larios used his personal cell phone to conduct or store SINTF work.

7    In order to determine whether there were any phone calls and text messages between Officer

8    Larios's SINTF phone and Officer Larios's personal cell phone number, I first opened the

9    Analytics Phones Field by clicking on it. In the search field, I entered Officer Larios's personal

10   cell phone number without dashes, "53092276063." Once I entered Officer Larios's personal cell

11   phone number in the search field, the browser indicated one match. The match displayed a field

12   of information corresponding with Officer Larios's personal phone number "53092276063,"

13   including calls logged, and MMS and SMS messages sent and received. My examination of the

14   field corresponding with Officer Larios's personal phone number indicated only three outgoing

15   calls, lasting a total of one minute and 9 seconds; 109 sent and received SMS messages, and 1

16   sent MMS message. The portion of Exhibit 42 that accurately demonstrates the search results I

17   observed when searching the Analytics Phones page of the Data Extraction of Officer Larios's

18   SINTF phone for phone activity between Officer Larios's SINTF phone and Officer Larios's

19   personal cell phone number is located on page 7 of Defendants' Exhibit 42.

20       53.   After confirming that Officer Larios's SINTF phone both sent and received text

21   messages to and from Officer Larios's personal cell phone number, I opened the SMS Messages

22   Field page by clicking on it. After the SMS Messages page opened in the browser, I pressed

23   "control F" to open a search field on the web browser. In the search field, I entered Officer

24   Larios's personal cell phone number without dashes, "53092276063." Once I entered Officer

25   Larios's personal cell phone number in the search field, the browser indicated more than one

26   hundred matches. I reviewed each of the fields corresponding with Officer Larios's personal cell

27   phone number. My review of these fields indicates that Officer Larios's SINTF cell phone

28   received multiple text messages from Officer Larios's personal cell phone number. The contents

22

1  of these messages varied but mostly consisted of texts containing what appeared to be addresses,

2  phone numbers, names, and license plate numbers; information that, based on my experience and

3  training as a CHP officer they appeared to be related to a criminal investigation. Based on my

4  review of these messages I suspected that Officer Larios was using his personal cell phone to

5  conduct work.

6      54.    The absence of text messages between Officer Larios's SINTF phone and Tawnya

7  Mellow's phone number combined with the presence of multiple text messages between Officer

8  Larios's SINTF phone and Officer Larios's personal cell phone indicated to me that Officer

9  Larios used his personal cell phone to conduct work, and likely used it to exchange text messages

10  with confidential informant Tawnya Mellow given that (1) Tawnya Mellow and Nathan Santana

11  stated in their witness interviews that Mellow texted Officer Larios multiple times; (2) multiple

12  witnesses stated that Officer Larios communicated with his informants by text; (3) the greeting

13  card that Officer Larios left at Mellow's residence referenced receiving a text from Mellow; and

14  (4) Officer Larios's Statement of Probable Cause indicated that he had conversed with Mellow

15  and showed her a picture of Santana and a Google earth image of Santana's residence, yet based

16  on my interviews with multiple witnesses, including Mellow, and SINTF agents Kinneavy and

17  Moon, and review of SINTF confidential informant management policy, Larios likely never met

18  Mellow in person until after the search warrant was served and Santana was arrested on

19  November 12, 2013.

20      55.    On October 21, 2014, Investigator Hutsell and I met with Assistant United States

21  Attorney (AUSA) Michael McCoy at his office in Sacramento. AUSA McCoy stated that

22  between May and September of 2014, Officer Larios participated in a joint federal state

23  investigation of a drug trafficking organization. AUSA McCoy stated that Officer Larios's role in

24  the investigation included making undercover drug buys, conducting recorded conversations and

25  communicating by text messages with targets of the investigation. AUSA McCoy stated that

26  Officer Larios's removal from SINTF as a result of the CHP's internal investigation negatively

27  impacted the joint state and federal DTO investigation because they would have to identify

28  another undercover agent to keep the investigation going. AUSA McCoy further stated that he

23

1  had been processing a Federal T-III Wire Application for the DTO investigation when he was

2  notified of the alleged misconduct involving Officer Larios, and that although the alleged

3  misconduct was not related to the federal investigation, he cancelled the application for a federal

4  wiretap warrant instead of disclosing the allegations of misconduct pending against Officer Larios

5  in the supporting affidavit. AUSA McCoy's interview corroborated the information I viewed in

6  the emails I reviewed in the beginning of the investigation contained in Defendants' Exhibit 35

7  and the interview responses that SINTF Commander Les James provided when I inquired about

8  the effect that the allegations of Officer Larios's misconduct had on SINTF investigations.

9       56.   On October 22, 2014, SINTF Commander James provided voice call records from

10  Verizon for Officer Larios's SINTF phone from July 2013 to September 2014. Based on my

11  review of these records, they appeared to register phone calls between Officer Larios's SINTF

12  phone and Tawnya Mellow's phone between September 2013 and August 2014, despite the fact

13  that Santana was arrested in December 2013. The voice call records did not include information

14  about the text messages sent or received from Officer Larios's SINTF phone. A true and correct

15  copy of these records are attached to this declaration as Defendants' Exhibit 36.

16       57.   On October 22, 2014, I called Tawnya Mellow to arrange a follow-up interview.

17  Mellow stated that she was not comfortable speaking with me and hung up.

18       58.   On October 28, 2014, I received transcripts from a September 17, 2014 court hearing

19  from the Shasta County Superior Court. This transcript transcribed court proceedings that

20  occurred on September 17, 2014, in the Shasta County Superior Court, in *The People of the State*

21  *of California v. Robin Carl Rudolph and Nathan John Santana*, Case Number 13F7922. The

22  transcript corroborated Shasta County Deputy D.A. Laura Smith's statement to me that on or

23  about September 17, 2014, the Shasta County D.A.'s Office dismissed the felony case against

24  Nathan Santana and Robin Rudolph that was brought after Officer Larios executed a search

25  warrant on Santana's residence. A true and correct copy of the reporter's transcript that I

26  received from the Shasta County Superior Court is attached to this declaration as Defendants'

27  Exhibit 43.

28

59.     Based on the investigation conducted between September 10, 2014 and October 30, 2014, and my review of applicable CHP and SINTF polices and professional standards, I suspected that Officer Larios fostered an inappropriate, personal relationship with his confidential informant Tawnya Mellow in violation of CHP policy and professional standards.

60.     First, the witness statements from SINTF Commander Les James, Mellow, and Nathan Santana, and documents, including Commander James's email correspondence, the August 31, 2014 Shasta County Sheriff's Office investigation report, and the greeting card that Nathan Santana produced, indicated that on or about August 31, 2014, Officer Larios placed a greeting card addressed to Mellow on the windshield of a car parked at Mellow's residence.  In the greeting card, Officer Larios handwrote multiple messages expressing romantic interest in Mellow, including:  (1) "I love everything about you…;" (2) "Just love you so much!!!;" (3) "Please know I want to spend forever with you as us !!!;" (4) "I want to make you happier than you've ever been before, just like you were in Tahoe…"; (5) "I love you for who you are Tawnya Rachelle and want nothing more than to unite as one!!;" (6) "Love Me!!;" and (7) discussing "our walk across the bridge and kiss on the cheek shortly after your innocent text "Marry Me' …;" and described having a first date with Mellow on December 6, 2013, having kissed, exchanged a text proposing marriage, and taking a trip to Lake Tahoe together.  The same sources, further indicated that Mellow's boyfriend, Nathan Santana, discovered the greeting card that Larios left at the residence and allegedly assaulted Mellow until she revealed that Officer Larios authored the card.  These facts alone indicated that there Officer Larios had an intimate, physical relationship with Mellow between December 2013 and August 2014.

61.     Second, the witness statements of Santana, Mellow and Commander James, and documents, including Commander James's email correspondence, the SINTF Investigative Report and Statement of Probable Cause from the Santana investigation, and the September 18, 2013 SINTF Daily Intelligence Memorandum (DIM), indicated that Tawnya Mellow served as Officer Larios's confidential informant in an investigation into Nathan Santana, that Mellow provided Officer Larios with information that enabled Officer Larios a search warrant to search Santana's residence, recover approximately 158 pounds of marijuana and ultimately arrest

25

1   Santana for possession of marijuana for sale and conspiracy. In addition, Shasta County Deputy

2   D.A. Laura Smith indicated that the criminal prosecution of Nathan Santana, which arose from

3   Larios's SINTF investigation of Santana, was still pending until September 17, 2014, when the

4   D.A.'s office stipulated to dismiss the case for lack of evidence and because Larios and Mellow

5   were compromised as a witnesses.

6        62.   Third, the witness statements of Santana and Mellow indicated that Officer Larios

7   had expressed romantic interest in Mellow between December 2013 and August 2014. In fact,

8   the witness statements of Santana, Commander James, and the August 31, 2014 Shasta County

9   Sheriff's Office crime report, taken together, indicated that Officer Larios attempted to disrupt

10   Santana and Mellow's relationship by continuously riding his motorcycle outside of her residence

11   and honking his horn repeatedly on occasions when Santana was present at Mellow's residence,

12   thus possibly indicating to me that Officer Larios was jealous of Santana. Specifically, Santana

13   stated that on multiple occasions while visiting Mellow, a black Harley Davidson whose rider

14   wore a skullcap helmet and a facemask drove by Mellow's residence multiple times honking its

15   horn. Commander James also confirmed that Officer Larios drove by Mellow's residence on his

16   motorcycle after he had requested that local law enforcement perform a welfare check at Mellow'

17   residence, and that he had observed Officer Larios riding a black Harley Davidson motorcycle

18   with a skullcap helmet. Moreover, that Officer Larios was observed driving and honking his horn

19   in front of Mellow's residence was corroborated by Sheriff's Deputy Nick Thompson's narrative

20   contained in the August 31, 2014 Shasta County Sheriff's Office crime report and in Thompson's

21   statements during a meeting with Commander James about the August 31, 2014 domestic

22   violence incident in which he stated that he observed a black Harley Davidson driven back and

23   forth at Mellow's residence while honking the horn during a welfare check he conducted in

24   August 2014.

25        63.   Fourth, the witness statements of Mellow and Commander James further bolstered the

26   suspicion that Officer Larios had a romantic and possibly physically intimate relationship with

27   Tawnya Mellow while the criminal case she assisted with was still pending in court. Specifically,

28   their statements established that Officer Larios and Mellow took an overnight trip to South Lake

26

1    Tahoe together in spring or summer of 2014, and shared the same hotel room and bed during that

2    trip.

3         64.    Fifth, Commander James's email correspondence, witness statement, and my review

4    of Officer Larios's searches made on the PUBSAFE AS400 database and the DMV's CalPhoto

5    database indicated that Officer Larios falsely told Commander James that he had been friends

6    with Mellow years before she served as his confidential informant, yet did not realize who she

7    was until December 2013, following Santana's arrest because Mellow had used the name

8    "Rachelle" when initially reporting Nathan Santana to SINTF because Officer Larios's

9    PUBSAFE AS400 and CalPhoto searches showed that he between September 20, 2013 and

10   November 11, 2013, he had accessed information that not only revealed Tawnya Mellow's full

11   name, including the name Rachelle, but also provided information about her physical appearance

12   and her portrait photo more than one month before Santana was arrested.

13        65.    I further suspected that Officer Larios communicated with confidential informant

14   Tawnya Mellow via text message, and that he likely used his personal cell phone to not only

15   conduct work but to exchange text messages with Mellow, and therefore likely contained

16   evidence of the nature of Officer Larios's and Tawnya Mellow's relationship.

17        66.    First, the witness statements of Tawnya Mellow, Nathan Santana, and Les James,

18   informed me that Officer Larios communicated with informants via text message, Officer Larios

19   and Tawnya Mellow exchanged text messages regarding the Santana investigation and continued

20   exchanging text messages after Santana was arrested, and that SINTF issued Officer Larios a cell

21   phone for the express purpose of conducting SINTF business such as communicating with

22   confidential informants. But, my review of Officer Larios's SINTF phone revealed no text

23   messages to or from Tawnya Mellow's phone number, and my review of the data extracted from

24   Officer Larios's SINTF phone indicated that Officer Larios's SINTF phone contained no text

25   messages between Tawnya Mellow's phone number and Larios's SINTF phone and only one

26   outgoing phone call lasting approximately 31 seconds for the time period between January 21,

27   2013, and September 26, 2014. These facts combined indicated to me that Officer Larios likely

28   used his personal cell phone to communicate with Mellow.

                                           27

67.   Second, the data extracted from Officer Larios's SINTF phone, which (1) displayed that more than 100 text messages were exchanged between Officer Larios's SINTF phone and Officer Larios's personal cell phone number; and (2) consisted messages relaying license plate numbers, names, and addresses, indicated to me that Officer Larios was using his personal cell phone to conduct and store SINTF work and to transmit it to his SINTF phone.

68.   Third, the greeting card that Santana produced during his September 23, 2014 interview and Officer Larios's admission to Commander James that he placed it on a car outside Tawnya Mellow's residence on August 31, 2014, indicated to me that Tawnya Mellow sent Officer Larios a text that stated "Marry Me," yet no such corresponding text was discovered on Officer Larios's SINTF phone.

69.   Fourth, the Statement of Probable Cause from SINTF's investigative file from the Nathan Santana investigation, indicated that Officer Larios attested that he conversed with Tawnya Mellow and confirmed Nathan Santana's identity and residence address by showing Mellow a mug shot of Nate Santana and a Google earth image of Santana's residence. Yet the witness statements of Commander James, Mellow, and SINTF Agents Tom Moon and Kip Kinneavy, indicated that Officer Larios and Mellow never met in person before Santana's November 12, 2013 arrest, and therefore, Officer Larios likely texted Mellow Santana's mugshot and the Google earth image of Santana's residence in order to have submitted a truthful affidavit of probable cause.

70.   In addition, on November 6, 2014, Officer Larios's told me that he had SINTF work product on his personal cell phone.

71.   As the administrative investigation of Officer Larios progressed from September 8 through October 30, 2014, I developed a suspicion that Officer Larios may attempt to destroy any evidence of his relationship with Tawnya Mellow, including evidence on his personal cell phone for multiple reasons. First, CAHP district representative Mike Cantrall appeared at Tawnya Mellow's September 23, 2014 interview despite the fact that he had not been invited to the interview by me or Investigator Hutsell. Because Tawnya Mellow was the only other person aware of this interview to my knowledge, I suspected that Officer Larios arranged to have Mike

28

1    Cantrall appear with Mellow to obtain information about the administrative investigation.

2    Second, when I attempted to schedule a follow-up interview with Tawnya Mellow, she declined

3    to speak with me and ended the conversation.  Third, my interviews with Les James and

4    examination of Officer Larios's use of the PUBSAFE AS400 database to look up Tawnya

5    Mellow using various different names indicated to me that Officer Larios falsely told SINTF

6    Commander Les James that he did not know who Tawnya Mellow was because she used a

7    different name "Rachelle" to report Nathan Santana's involvement in marijuana sales to SINTF.

8    These facts combined indicated to me that Officer Larios was willing to commit dishonest acts in

9    order to obscure the nature of his relationship with Tawnya Mellow and obstruct the

10   administrative investigation.  For these reasons, I believed, and my supervisors Helena Williams

11   and Robert Jones agreed that it was imperative to obtain and preserve Officer Larios's text

12   messages with informant Tawnya Mellow as expeditiously as possible.

13        72.    On October 31, 2014, the CHP directed me to obtain and examine Officer Larios's

14   personal cellular telephone pursuant to CHP General Order 100.95, *On-Duty Use of Cellular*

15   *Telephones and Personal Electronic/Entertainment Devices*, based on the suspicion that:  (1)

16   Officer Larios had engaged in an intimate relationship with confidential informant Tawnya

17   Mellow; and (2) evidence of text communications between Officer Larios and Mellow, which

18   would substantiate the suspected illicit relationship between Officer Larios and Mellow, were

19   located on Officer Larios's personal cell phone.

20        73.    In order to avoid examining data that was irrelevant to the subject of the investigation

21   and mitigate the likelihood of examining personal data, IAS directed the CHP Computer Crimes

22   Investigation Unit, whose investigators were assigned to perform the data extraction of Officer

23   Larios's personal cell phone, to provide only call logs and text messages (MMS and SMS), sent

24   and received, from September 1, 2013, to November 5, 2014, from the data extraction for the

25   following phone numbers:  (1) (530) 945-4986, informant Tawnya Mellow's phone number; (2)

26   (530) 510-1356, Commander Les James's SINTF phone; (3) (530) 510-7635,  Agent Kinneavy's

27   SINTF cell phone; (4) (530) 510-7634, Agent Tom Moon's SINTF cell phone; and (5) (530) 510-

28   7642, Officer Larios's SINTF phone.  I learned Commander James's cell phone number, and the

29

1   SINTF phone numbers assigned to Agents Kinneavy, Moon, and Officer Larios from Commander

2   James. I learned Tawnya Mellow's phone number from the DIM that was completed on or

3   around September 18, 2013. I provided this information to my supervisor, Lieutenant Helena

4   Williams. A true and correct copy of the memorandum instructing CCIU on the scope of the

5   Personal Cell Phone search which was prepared by then-Lieutenant Helena Williams is attached

6   to this declaration as Defendants' Exhibit 25.

7       74.   On November 6, 2014, Investigator Kevin Domby and I met Officer Larios at the

8   Redding CHP office and instructed him to provide his personal cell phone corresponding with

9   phone number (530) 227-6063 for examination of departmental work product. Also present at the

10  meeting were CHP Lieutenant Kyle Foster and California Association of Highway Patrolmen

11  Representative Jeff Tempest. During the meeting, I handed Officer Larios a memorandum

12  directing Officer Larios to provide his telephone and passcodes associated with telephone number

13  (530) 227-6063 pursuant to CHP General Order 100.95, *On-Duty Use of Cellular Telephones and*

14  *Personal Electronic/Entertainment Devices*. A true and correct copy of the Memorandum that I

15  gave to Officer Larios on November 6, 2014, is attached to this declaration as Exhibit 22.

16      75.   After receiving Officer Larios's cell phone from him on November 6, 2014, I

17  delivered it to CCIU Investigator Curtis Duray and we proceeded to a secure location in Redding,

18  California, to conduct the data extraction. Between when I received Officer Larios's personal cell

19  phone from Officer Larios and when I gave it to Officer Duray, I did not open it or examine its

20  contents. A true and correct copy of a Property Receipt Report documenting the chain of custody

21  with respect to Officer Larios's cell phone is attached as Defendants' Exhibit 24.

22      76.   During the inspection of Officer Larios's cell phone, Investigator Duray's equipment

23  failed to perform the extraction as planned. Accordingly, I assisted Investigator Duray in

24  examining the text messages contained in a text message thread between Officer Larios's

25  personal phone and Tawnya Mellow's phone number. Tawnya Mellow's contact had already

26  been opened, so Investigator Domby and I scrolled through the text messages and took digital

27  photos and video of the process. During this manual inspection, we did not access any other part

28  of Officer Larios's personal cell phone.

30

1    77.    Because of the significant volume of text messages between Officer Larios's personal

2    phone and Mellow's phone number, Officer Duray used another method to image Officer

3    Larios's personal phone so that he could perform the data extraction prescribed by the IAS memo

4    in Defendants' Exhibit 25 at a later time.  After Investigator Duray performed this procedure, he

5    returned Officer Larios's phone to me.  Once I received Officer Larios's phone back from

6    Investigator Duray, I transported it back to the Redding Area Office at approximately 6:00 p.m.

7    During the period of time in which I received Officer Larios's phone back from Investigator

8    Duray, and the time I returned Officer Larios's cell phone to him, I did not access any data on

9    Officer Larios's cell phone.

10    78.    At the time of the November 6, 2014 meeting in which Officer Larios was directed to

11    produce his personal cell phone for inspection, he was suspected only of committing

12    administrative violations of CHP policy and professional standards, which, if proven, could have

13    resulted in disciplinary action.  Based on my experience as an IAS Investigator and Analyst and

14    my familiarity with the disciplinary process in the CHP at the time, the most extreme sanction

15    Officer Larios faced was dismissal.  I did not suspect him of committing a crime, nor was the

16    administrative investigation that I performed through November 6, 2014, aimed at determining

17    whether Officer Larios committed a crime.

18    79.    On or about November 13, 2014, after CCIU Investigator Duray completed his data

19    extraction of Officer Larios's cell phone, he delivered a DVD containing the data extracted from

20    Officer Larios's personal cell phone in the form of an HTML report that could be accessed

21    through a web browser.

22    80.    On or about November 13, 2014, I commenced reviewing and analyzing the data

23    extracted from Officer Larios's personal cell phone by opening the HTML report that Investigator

24    Duray provided me.  My review of the text messages between Officer Larios's cell phone and

25    Tawnya Mellow's phone number appeared to confirm that, as suspected, Officer Larios:  (1)

26    pursued and engaged in an inappropriate, romantic relationship with CI Tawnya Mellow while

27    the prosecution against Nathan Santana, the target of Mellow's assistance, was still pending in

28

1   court; and (2) lied about his relationship with Mellow to his superiors, including SINTF

2   Commander Les James.

3       81.   My review of the text messages between Officer Larios's cell phone and Tawnya

4   Mellow's phone number also appeared to indicate that: (1) on three occasions Officer Larios

5   made false reports to SHASCOM between July 18, 2014 and August 10, 2014; (2) on three

6   occasions Officer Larios text messaged images of SHASCOM closed incident reports to Tawnya

7   Mellow's phone number; and (3) that Officer Larios texted Tawnya Mellow images of him in

8   uniform, and undercover, and other information that revealed operational details of ongoing

9   undercover operations such as the approximate dates and times that he was placing GPS trackers

10   on vehicles in support of an investigation, and travel plans to Chicago related to his work on a

11   joint state and federal investigation of a drug trafficking organization called Operation RPM or

12   Martinez. Based on these discoveries, I had reason to suspect that Officer Larios may have

13   violated California Penal Code sections 502, 11142, and 13303. I did not suspect that Officer

14   Larios had committed such violations before reviewing the text messages between Officer

15   Larios's personal cell phone and Tawnya Mellow's phone number.

16       82.   On February 3 and 10, 2015, Investigator Hutsell and I conducted an administrative

17   interrogation of Officer Larios in the course of our administrative investigation into Officer

18   Larios's relationship with his Confidential Informant Tawnya Mellow. This administrative

19   interrogation was digitally recorded. Officer Larios appeared at his administrative interrogation

20   with a legal representative, Tony Santana on both dates. At the beginning of the interrogation on

21   both dates, I verbally gave Officer Larios a Lybarger admonition, in which I informed Officer

22   Larios of the following

23       You are being questioned as part of an official internal investigation. You are hereby
directed to answer all questions honestly and completely. Your refusal to answer or

24       any type of evasion, deception, dishonesty or lack of cooperation on your part could
constitute insubordination and/or inexcusable neglect of duty and result in

25       disciplinary action up to and including dismissal.

26       ***Neither your statement nor any information or evidence which is gained by reason
of such statement can be used against you in any criminal proceedings.*** No

27       promise of reward will be made as an inducement for the answer to any question.

28

32

1   (Emphasis mine.).  A true and correct copy of excerpts of the transcript of Officer Larios's

2   Administrative Interrogation showing that I administered this Lybarger admonition on both days

3   of the administrative interrogation is attached as Defendants' Exhibit 30.

4         83.   During the administrative interrogation of Officer Larios, I confronted Officer Larios

5   with evidence that I believed indicated that he may have violated California Penal Code

6   provisions 500, 11142, and 13303 based on records showing his calls to SHASCOM, and text

7   messages between Officer Larios's personal cell phone and Tawnya Mellow's cell phone,

8   indicating that Officer Larios may have (1) made false reports of a crime to SHASCOM; and (2)

9   disclosed confidential law enforcement information without authorization by sending images of

10   SHASCOM closed incident reports to Tawnya Mellow's phone number.  I did not address these

11   possible penal code provisions during the administrative interrogation as part of a criminal

12   inquiry or in order to build a criminal case against Officer Larios.  Rather, I addressed these

13   possible violations of the penal code to emphasize the seriousness and severity of the misconduct

14   that Officer Larios was suspected of committing.  Moreover, based on my experience

15   investigating and analyzing other CHP administrative misconduct cases, I was aware at the time

16   that the California State Personnel Board (SPB), a Board which reviews and decides appeals of

17   disciplinary action taken against California state employees, would consider Officer Larios's

18   violation of criminal provisions when assessing whether any disciplinary penalty imposed was

19   proper.  Specifically, I was aware that the SPB had issued a precedential decision that determined

20   that a CHP officer's off-duty conduct that violates criminal provisions was relevant to

21   determining whether the officer brought discredit to the agency under Government Code section

22   19572, subsection (t), and relevant in assessing the propriety of the imposed discipline.  A true

23   and correct copy of the SPB precedential decision that I relied on, *In the matter of the Appeal by*

24   *G. O.* (1992) SPB Dec. No. 92-11, is attached to this Declaration as Defendants' Exhibit 46.  The

25   applicable discussion is contained in pages 2 through 8 of the decision.  My questions about

26   Officer Larios's understanding of these criminal provisions were intended to secure admissions

27   by Officer Larios that he knowingly violated California Penal Code provisions in order to support

28   any disciplinary penalty imposed on Officer Larios by the CHP.

33

84.   I did not participate in any criminal interrogation of Officer Larios, nor have I ever informed him of his Constitutional rights under *Miranda*, or witnessed Officer Larios being informed of his Constitutional rights under *Miranda*.

85.   Based in part on my review of the data extracted from Officer Larios's personal cell phone and provided to me by CCIU Investigator Duray in an HTML report, I prepared an investigative report that included my analysis of the text messages that I observed between Officer Larios's personal cell phone and informant Tawnya Mellow's phone number. A true and correct copy of my Investigative Report is attached to this declaration as Defendants' Exhibit 44.

86.   Based on my review of the data extraction of Officer Larios's cell phone associated with number (530) 227-6063, I observed text messages between Officer Larios's cell phone and Tawnya Mellow's phone number (530) 945-4986, indicating that Mellow provided Officer Larios with information related to his investigation of Nathan Santana using Officer Larios's personal cell phone number. True and correct copies of these messages that I observed from the data extraction of Officer Larios's cell phone are included on pages 7-8 of my Investigative Report attached as Defendants' Exhibit 44.

87.   Based on my review of the data extraction of Officer Larios's cell phone associated with number (530) 227-6063, I observed text messages between Officer Larios's cell phone and Tawnya Mellow's phone number (530) 945-4986, indicating that Officer Larios pursued and engaged in a romantic, physical relationship with his confidential informant, Tawnya Mellow. True and correct copies of these messages that I observed from the data extraction of Officer Larios's are included on pages 12-14 of my Investigative Report attached to this declaration as Defendants' Exhibit 44.

88.   Based on my review of the data extraction of Officer Larios's cell phone associated with number (530) 227-6063, I observed text messages between Officer Larios's cell phone and Tawnya Mellow's phone number (530) 945-4986, indicating that Officer Larios falsely reported to law enforcement that a possibly crime was occurring at Tawnya Mellow's residence on three occasions. True and correct copies of these messages that I observed from the data extraction of

34

1   Officer Larios's are included on pages 19-20, 22-23, and 25-26 of my Investigative Report

2   attached to this declaration as Defendants' Exhibit 44.

3        89.   Based on my review of the data extraction of Officer Larios's cell phone associated

4   with number (530) 227-6063, I observed text messages between Officer Larios's cell phone and

5   Tawnya Mellow's phone number (530) 945-4986, indicating that Officer Larios provided

6   confidential automated information from the Shasta Area Public Safety System (PUBSAFE)

7   AS400 to Tawnya Mellow on three occasions.  True and correct copies of these messages that I

8   observed from the data extraction of Officer Larios's are included on pages 27-29 of my

9   Investigative Report attached to this declaration as Defendants' Exhibit 44.

10       90.   Based on my review of the data extraction of Officer Larios's cell phone associated

11  with number (530) 227-6063, I observed text messages between Officer Larios's cell phone and

12  Tawnya Mellow's phone number (530) 945-4986, indicating that from February 19 to August 27,

13  2014, Officer Larios disclosed sensitive operational information from a joint state and federal

14  investigation of a drug trafficking organization (DTO) to Tawnya Mellow.  True and correct

15  copies of these messages that I observed from the data extraction of Officer Larios's are included

16  on pages 31-34 of my Investigative Report attached to this declaration as Defendants' Exhibit 44.

17       91.   Based on my review of the data extraction of Officer Larios's cell phone associated

18  with number (530) 227-6063, I observed text messages between Officer Larios's cell phone and

19  Tawnya Mellow's phone number (530) 945-4986, indicating that Officer Larios intentionally

20  provided false information to SINTF Commander Les James concerning his relationship with

21  Tawnya Mellow, and conspired with Mellow regarding how to cover up their relationship.  True

22  and correct copies of these messages that I observed from the data extraction of Officer Larios's

23  are included on pages 36-40 of my Investigative Report attached to this declaration as

24  Defendants' Exhibit 44.

25       92.   Based on my review of the data extraction of Officer Larios's cell phone associated

26  with number (530) 227-6063, I observed text messages between Officer Larios's cell phone and

27  Tawnya Mellow's phone number (530) 945-4986, indicating that Officer Larios knew that his

28  conduct with respect to Tawnya Mellow jeopardized her safety and placed her at substantial risk

· 35 ·

1   of being exposed as his informant.  True and correct copies of these messages that I observed

2   from the data extraction of Officer Larios's are included on pages 41-43 of my Investigative

3   Report attached to this declaration as Defendants' Exhibit 44.

4        I declare under penalty of perjury under the laws of the State of California that the

5   foregoing is true and correct.

6   Executed this 7TH day of October 2019, in Sacramento, California.

7

8                                    SCOTT LUNARDI

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28