XAVIER BECERRA, State Bar No. 118517
Attorney General of California
KRISTIN M. DAILY, State Bar No. 186103
Supervising Deputy Attorney General
WILLIAM H. DOWNER, State Bar No. 257644
Deputy Attorney General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone: (916) 210-6120
 Fax: (916) 324-5567
 E-mail: William.Downer@doj.ca.gov
*Attorneys for Defendants Scott Lunardi, Kyle Foster, and Robert J. Jones*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| TIMOTHY LARIOS, | 2:15-cv-02451-MCE-CMK |
|---|---|
| Plaintiff, | **DECLARATION OF ROBERT J. JONES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE MOTION FOR SUMMARY ADJUDICATION** |
| v. | |
| SCOTT LUNARDI, ET AL., | |
| Defendants. | |

I, Robert J. Jones, declare:

1. All of the facts set forth below are of my personal knowledge and, if called upon to testify, I could and would competently testify to the following.

2. I was employed by the California Highway Patrol (CHP). I started as a cadet in the CHP Academy March 1986 and retired in March 2018, after approximately 32 years of service. By December 2009, I had attained the rank of Captain and served as the interim Commander of the CHP's Internal Affairs Section (IAS) until June 2010. I served as the CHP's Deputy Inspector General from July 2010 until August 2011. In or around September 2011, I was promoted to the rank of Assistant Chief and served as the Executive Assistant to the Assistant Commissioner, Field until February 2013. From March 2013 to July 2015, I served as the

1

1  Commander of the CHP's Internal Affairs Section. During that time my, direct supervisor was
2  Professional Standards and Ethics Division Commander, Chief Andy Sechrist. In or around July
3  2015, I was promoted to Chief and served as the Division Commander for the Administrative
4  Services Division until my retirement in March 2018.

5      3. On or about September 8, 2014, the CHP's Internal Affairs Section (IAS) commenced
6  an administrative investigation to determine whether CHP Officer Timothy Larios (Officer
7  Larios) fostered an inappropriate relationship with his Confidential Informant Tawnya Mellow in
8  violation of CHP policies and professional standards, and Government Code section 19572, and
9  whether, and to what extent, Officer Larios's actions compromised or jeopardized the integrity of
10 his investigations, SINTF operations, or the safety of CI Mellow or allied law enforcement
11 personnel, and brought discredit to the CHP.

12     4. I learned about the misconduct allegations against Officer Larios from briefings I
13 received from IAS Lieutenant Helena Williams. During these briefings from Lieutenant
14 Williams, I learned that Officer Larios was assigned to the Shasta Interagency Narcotics Task
15 Force (SINTF), a multi-agency drug task force that investigated narcotics activity in Shasta
16 County, California and enforced California's laws regarding illegal narcotics. I learned that
17 Officer Larios's confidential informant, Tawnya Mellow, provided him with information about
18 her boyfriend, Nathan Santana's, involvement in selling significant quantities of marijuana, that
19 Mellow's information aided Officer Larios in obtaining a search warrant to search Santana's
20 residence, and that service of the search warrant resulted in the discovery of significant amounts
21 of marijuana, the arrest of Nathan Santana, and the Shasta County District Attorney's Office
22 pursuing criminal charges against Santana. I further learned that Officer Larios was suspected of
23 fostering an inappropriate relationship with his confidential informant Tawnya Mellow, and that
24 this suspicion arose after Officer Larios left a greeting card expressing romantic sentiments
25 toward Mellow on a vehicle outside Mellow's residence, Nathan Santana discovered it, and
26 allegedly assaulted Mellow until she told him that Officer Larios had left the card. I was further
27 informed that Officer Larios admitted to his SINTF Commander Les James that he left the
28

2

Declaration of Robert J. Jones in Support of Defendants' Motion for Summary Judgment or in the Alternative
Motion for Summary Adjudication (2:15-cv-02451-MCE-CMK)

greeting card at Mellow's residence, and that he left it there with the intent that her boyfriend, and narcotics investigation target, Nathan Santana would find it.

5.  Based on briefings that I received from Lieutenant Williams, I also understood that as an agent with SINTF, Officer Larios assumed an undercover identity for some of his investigations and participated in multiple joint state and federal investigations of drug trafficking organization which involved sensitive operations including obtaining GPS tracking warrants and placing tracking devices on vehicles. I was further informed that in one of the joint state and federal investigations that Officer Larios was assigned to, the United States Attorney's Office was in the process of applying for a wiretap warrant, but the warrant application was withdrawn after the allegations of fostering an inappropriate relationship with an informant surfaced against Officer Larios.

6.  As a CHP officer with decades of experience in law enforcement, and particularly experience investigating officer misconduct, I am familiar with the CHP's policies governing confidential informant management and the CHP's rationale for adopting such policies. Under CHP policy, relationships between officers and informants shall be completely ethical and professional in nature and officers are prohibited from fraternizing with an informant in any way other than in an official capacity. A true and correct copy of this CHP policy, which is contained in Highway Patrol Manual section 81.1(h), is attached to this declaration as Defendants' Exhibit 40. The rationale for adopting this policy is to formalize the professional and personal barriers between officers and informants who are engaged in a law enforcement operation in order to protect the safety and credibility of the informant and the officer and ensure the integrity of law enforcement personnel and operations. Here, the central allegation of work-related misconduct against Officer Larios—that Officer Larios fostered an inappropriate relationship with his confidential informant—was serious because, if proved true, Officer Larios's conduct blurred the very professional and personal barriers that CHP policy imposed to protect officers and informants, thereby jeopardizing the safety of the informant and compromising Officer Larios's credibility.

3

7.       In addition, Officer Larios's alleged misconduct demonstrated a severe lapse of judgment and ethics, and therefore had the potential to, and in this case, did adversely affect investigations that Officer Larios conducted and assisted in. I was informed via briefings from Lieutenant Williams and the IAS Investigators assigned to the Larios administrative investigation, that the U.S. Attorney's Office withdrew a federal wiretap warrant application in a joint state and federal drug trafficking investigation that Officer Larios was involved in after learning about the allegations of misconduct against Officer Larios. Further, based on my understanding of the administrative investigation, just the allegations of misconduct against Officer Larios, alone, played a part in the Shasta County District Attorney's Office's decision to dismiss criminal narcotics charges against Nathan Santana that resulted from Officer Larios's investigation. Finally, the allegations against Officer Larios were inherently damaging to the reputation of the CHP and brought discredit to the Department of the California Highway Patrol. I was informed that after the allegations against Officer Larios came to light, the Shasta County District Attorney's office refused to submit any additional GPS vehicle tracker warrant application on a case that Officer Larios had worked on.

8.       Moreover, the allegations of misconduct against Officer Larios were especially egregious because of the manner in which they came to light—i.e., the domestic violence incident between Officer Larios's informant Mellow and her boyfriend, Nathan Santana, that Officer Larios triggered by leaving a romantically-worded greeting card at Mellow's residence. Officer Larios's conduct jeopardized his confidential informant's safety because it allegedly resulted in Mellow being physically assaulted. More importantly Officer Larios's conduct was dangerous because it linked Mellow to Officer Larios, the officer who investigated and arrested Nathan Santana on drug charges, and therefore potentially exposed Mellow's role as informant to Nathan Santana—the suspect and defendant she had provided information against. Such disregard demonstrated a spectacular lack of judgment and ethics on Officer Larios's part.

9.       As a professional law enforcement department that is charged with ensuring the safety of California's roadways, state facilities, and the Governor of the State of California, and providing assistance to allied agencies, the CHP is held to a high standard by courts and people of

4

California. Accordingly, in investigating alleged misconduct of a CHP Officer, it was incumbent upon the CHP and IAS to swiftly and thoroughly investigate the allegations against Officer Larios in order to (1) ensure that both Officer Larios and the people of California were well served by an investigation that was thorough and prompt, (2) mitigate the potential risks to Officer Larios's informant's safety, (3) preserve all relevant evidence of work-related misconduct before it could be lost or destroyed, (4) objectively and impartially examine and weigh the evidence of misconduct against Larios, and (5) discover the extent to which Officer Larios's misconduct—if proven true—damaged his investigations and brought discredit upon SINTF and the CHP.

10. In addition, the one-year statute of limitations for bringing disciplinary action against a peace office for misconduct imposed under the Peace Officer Bill of Rights (POBR), California Government Code §§ 3300, et seq., amplified the urgency of completing the investigation of Officer Larios's alleged misconduct with sufficient time to analyze the evidence and assess an appropriate penalty if the misconduct suspected was proven to be true. Under POBR, the CHP was mandated to complete this investigation and serve any notice of punitive disciplinary action against Officer Larios within one year of the date it became aware of Officer Larios's potential misconduct. California Government Code § 3304(d).

11. On or around October 30, 2014, I was briefed about the status of the Larios investigation by Investigators Lunardi and Hutsell. During the briefing, the Investigators stated that based on the multiple witness interviews they conducted, review of pertinent documents, and reviewing of the data on Officer Larios's SINTF-issued cell phone, they had reason to suspect that Officer Larios had fostered an inappropriate relationship with his informant Tawnya Mellow, that he used his personal cell phone to conduct work, and that he likely used his personal cell phone to communicate with Mellow via text message, and that based on these facts, they suspected that evidence of the nature of Officer Larios's relationship with informant Mellow would be located in text message communications stored on Officer Larios's personal cell phone.

12. After being briefed by the investigators, Lieutenant Williams and I decided to request authorization from our chain of command to direct Officer Larios to produce his phone so that work product could be extracted under CHP General Order 100.95.

5

Declaration of Robert J. Jones in Support of Defendants' Motion for Summary Judgment or in the Alternative Motion for Summary Adjudication (2:15-cv-02451-MCE-CMK)

13. During the pendency of the IAS's administrative investigation into Officer Larios, CHP policy under General Order 100.95, which was entitled "On-Duty Use of Cellular Telephones and Personal Electronic/Entertainment Devices," permitted CHP officers to use personal cell phones, but informed them that "work stored on any type of electronic device is the property of the state and must be relinquished on demand." A true and correct copy of this policy is attached to this declaration as Defendants' Exhibit 16.

14. On or about October 30, 2014, Professional Standards and Ethics Division Commander, Chief Andy Sechrist relayed approval from the CHP Executive chain of command to direct Officer Larios to produce his phone so that work product could be extracted under CHP General Order 100.95.

15. On or about November 5, 2014, I reviewed and signed a memorandum which directed Officer Larios to provide his cell phone to the CHP, and informed him that (1) the CHP would conduct a data extraction to retrieve all work product; and (2) failure to adhere to the memorandum's direction "may result in additional charges/disciplinary action." A true and correct copy of this memorandum is attached to this declaration as Defendants' Exhibit 22.

16. After November 12, 2014, I was briefed about the status of the administrative investigation of Officer Larios and through that briefing I was informed that, based on the Internal Affairs Investigators' examination of the text messages between Officer Larios and Confidential Informant Tawnya Mellow, Officer Larios may have violated California criminal laws by falsely telling a Shasta County emergency services dispatcher that Tawny Mellow was being held against her will, and texting images of a confidential law enforcement database to Tawnya Mellow without authorization.

17. The Internal Affairs Section did not conduct a criminal investigation of Officer Larios. However, the IAS considered investigating Officer Larios criminally after the investigators assigned to conduct the administrative investigation reviewed the text messages between Officer Larios and his confidential informant that were extracted from Officer Larios's personal cell phone and found evidence indicating that Officer Larios may have violated

California criminal laws. Ultimately, the CHP declined to authorize IAS to conduct a criminal investigation of Officer Larios.

18. Internal Affairs conducted criminal interrogation of Officer Larios solely in order to inform Larios of his Miranda rights in order to comply with the California Peace Officer Bill of Rights, Government Code Section 3303(h). IAS Investigators Viktor Scrivner and Cliff Morrison were assigned to perform the criminal interrogation of Officer Larios. Investigators Scrivner and Morrison were not assigned any other roles in the investigation of Officer Larios. They were not assigned to participate in any investigation of Officer Larios from September 8, 2014 through November 6, 2014. Nor were they assigned to conduct any investigative activities involving Officer Larios beyond conducting the February 3, 2015 interrogation.

19. As a result of the administrative investigation into Officer Larios's relationship with his confidential informant, Officer Larios was served with a Notice of Adverse Action charging him with violating Government Code section 19572, subsections (d) inexcusable neglect of duty; (e) insubordination; (f) dishonesty; (o) willful disobedience; (p) misuse of state property; (r) violations of Government Code section 19990; and (t) other failure of good behavior causing discredit to the appointing authority or employment, and recommending the penalty of dismissal. A true and correct copy of the Notice of Adverse Action recommending dismissal against Officer Larios is attached to this declaration as Defendants' Exhibit 4.

20. Officer Larios was, however, permitted to retire in lieu of being dismissed.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 4TH day of OCTOBER 2019, in Sacramento, California.

_____
ROBERT J. JONES

SA2015303210
14092660.docx

7

Declaration of Robert J. Jones in Support of Defendants' Motion for Summary Judgment or in the Alternative Motion for Summary Adjudication (2:15-cv-02451-MCE-CMK)